No. 22-1770

# In the United States Court of Appeals for the First Circuit

———————————————

JOHN CONTI,
*Plaintiff-Appellant,*

v.

CITIZENS BANK, N.A.,
*Defendant-Appellee.*

———————————————

On Appeal from the United States District Court
for the District of Rhode Island, Providence
Case No. 1:21-cv-00296-MSM (The Hon. Mary S. McElroy)

## BRIEF OF PLAINTIFF-APPELLANT

JANINE L. POLLACK
MICHAEL LISKOW
GEORGE FELDMAN MCDONALD, PLLC
745 Fifth Avenue, Suite 500
New York, NY 10151
(917) 983-2707

LORI G. FELDMAN
GEORGE FELDMAN MCDONALD, PLLC
102 Half Moon Bay Drive
Croton-on-Hudson, NY 10520
(917) 983-9321

PATRICK DOWLING, JR.
D'AMICO BURCHFIELD, LLP
536 Atwells Ave.
Providence, RI 02909
(401) 454-1212

DEEPAK GUPTA
JONATHAN E. TAYLOR
GUPTA WESSLER LLP
2001 K Street, NW, Suite 850 North
Washington, DC 20006
(202) 888-1741
jon@guptawessler.com

DAVID J. GEORGE
BRITTANY L. BROWN
GEORGE FELDMAN MCDONALD, PLLC
9897 Lake Worth Road, Suite 302
Lake Worth, FL 33467
(561) 232-6002

August 29, 2024                    *Counsel for Plaintiff-Appellant*

# TABLE OF CONTENTS

Table of authorities ...................................................................iii

Introduction.............................................................................1

Jurisdictional statement .............................................................4

Statement of the issues...............................................................4

Statement of the case ................................................................4

    I.     Statutory and regulatory background....................................4

        A.    National Bank Act preemption.....................................4

        B.    Mortgage-escrow accounts ........................................18

    II.    Factual and procedural background..................................... 23

Summary of argument ............................................................ 25

Standard of review.................................................................. 26

Argument...............................................................................27

    I.     Because Citizens Bank has not shown that Rhode Island's law
        imposes a significant practical impediment to a national
        banking power, it is not entitled to prevail on its preemption
        defense. .........................................................................27

        A.    Because this case is unlike any case in which the Supreme
            Court has found significant interference, there is no basis
            for declaring Rhode Island's law preempted at this stage. ....... 29

        B.    Comparing this case to cases where the Supreme Court
            has found no significant interference only confirms that
            there is no basis for declaring Rhode Island's law
            preempted.................................................................. 35

        C.    The text, structure, and history of Dodd-Frank further
            confirm that Rhode Island's law is not preempted................... 39

i

D.    If Citizens Bank believes it can substantiate its claim of significant interference, it is free to try to build a record and make that showing as the case proceeds to discovery........ 42

II.    Alternatively, at the very least, this Court should vacate and remand because the district court applied the same preemption test that the Supreme Court squarely rejected in *Cantero*....................44

Conclusion............................................................................................45

# TABLE OF AUTHORITIES

## Cases

*Anderson National Bank v. Luckett,*
321 U.S. 233 (1944) ...................................................................... *passim*

*Atherton v. F.D.I.C.,*
519 U.S. 213 (1997) ........................................................................ 4, 8, 10

*Barnett Bank of Marion County, N.A. v. Nelson,*
517 U.S. 25 (1996) ........................................................................ *passim*

*Biestek v. Berryhill,*
587 U.S. 97 (2019) ........................................................................ 43

*Bowler v. Hawke,*
320 F.3d 59 (1st Cir. 2003) ........................................................ 26, 42

*Cantero v. Bank of America, N.A.,*
144 S. Ct. 1290 (2024) .................................................................. *passim*

*Cantero v. Bank of America, N.A.,*
408 F. Supp. 3d 171 (E.D.N.Y. 2019) ........................................ *passim*

*Cantero v. Bank of America, N.A.,*
49 F.4th 121 (2d Cir. 2022) .................................................. 1, 24, 39, 43

*Chamber of Commerce v. Whiting,*
563 U.S. 582 (2011) ...................................................................... 32

*Clarke v. Bank of America, N.A.,*
2020 WL 902457 (D. Md. Feb. 24, 2020) ................................... 3

*Cuomo v. Clearing House Association,*
557 U.S. 519 (2009) ...................................................................... *passim*

*DeBoer v. Mellon Mortgage Company,*
64 F.3d 1171 (8th Cir. 1995) ...................................................... 19

*Federal National Mortgage Association v. Lefkowitz,*
390 F. Supp. 1364 (S.D.N.Y. 1975) ....................................... 3, 21, 28, 37

*Fidelity Federal Savings & Loan Association v. de la Cuesta,*
   458 U.S. 141 (1982) ...................................................................... 29, 33

*First Agricultral National Bank v. State Tax Commission,*
   392 U.S. 339 (1968) ............................................................................. 9

*First National Bank of San Jose v. California,*
   262 U.S. 366 (1923) ................................................................. 11, 29, 34

*First National Bank v. Missouri,*
   263 U.S. 640 (1924) ......................................................................... 10

*Fitzgerald v. Harris,*
   549 F.3d 46 (1st Cir. 2008) ............................................................. 26

*Flagg v. Yonkers Savings & Loan Association,*
   396 F.3d 178 (2d Cir. 2005) ............................................................. 13

*Franklin National Bank of Franklin Square v. New York,*
   347 U.S. 373 (1954) ........................................................ 29, 30, 31, 35

*Kansas v. Garcia,*
   589 U.S. 191 (2020) .......................................................................... 32

*Kivett v. Flagstar Bank, FSB,*
   2024 WL 3901188 (9th Cir. Aug. 22, 2024) .................................... 3, 42

*Lawrence General Hospital v. Continental Casualty Company,*
   90 F.4th 593 (1st Cir. 2024) ........................................................... 26

*McClellan v. Chipman,*
   164 U.S. 347 (1896)............................................................... 36, 38, 39

*McCulloch v. Maryland,*
   17 U.S. (4 Wheat.) 316 (1819) ........................................................ 36

*National Bank v. Commonwealth,*
   76 U.S. (9 Wall.) 353 (1870) ................................................... 7, 36, 38

*People v. Franklin National Bank of Franklin Square,*
   105 N.Y.S.2d 81 (N.Y. Sup. Ct. 1951) ........................................... 31

*Skidmore v. Swift & Company*,
    323 U.S. 134 (1944) ...................................................................... 17

*Tiffany v. National Bank*,
    85 U.S. 409 (1873) ......................................................................... 6

*Watters v. Wachovia Bank, N.A.*,
    550 U.S. 1 (2007) .................................................................... 6, 7, 9

*Wyeth v. Levine*,
    555 U.S. 555 (2009) ...................................................................... 44

## Statutory materials

12 U.S.C. § 24 .............................................................................. *passim*

12 U.S.C. § 25b ............................................................................ *passim*

12 U.S.C. § 2609 ............................................................................... 20

12 U.S.C. § 36 .................................................................................. 41

12 U.S.C. § 371 ............................................................................. 9, 29

12 U.S.C. § 5553 ............................................................................... 42

15 U.S.C. § 1602 ............................................................................... 41

15 U.S.C. § 1639d ................................................................... 22, 35, 41

Cal. Civ. Code § 2954.8 ...................................................................... 20

Conn. Gen. Stat. § 49-2a .................................................................... 20

Federal Reserve Act, 38 Stat. 251 ......................................................... 9

H.R. Rep. No. 111-517 (2010) .............................................................. 16

H.R. Rep. No. 111-94 (2009) ............................................................... 22

N.Y. G.O.L. § 5-601 .......................................................................... 20

Or. Rev. Stat. § 86.245 ...................................................................... 21

R.I. Gen. Laws § 19-9-2 .................................................................. 1, 20

S. Rep. No. 111-176 (2010) ..................................................................... *passim*

Vt. Stat. Ann. tit. 8, § 10404 ....................................................................... 21

## Regulatory materials

*Bank Activities and Operations; Real Estate Lending and Appraisals,*
    69 Fed. Reg. 1904 (Jan. 13, 2004) ................................................. *passim*

*Office of Thrift Supervision Integration;*
    *Dodd-Frank Act Implementation,*
    76 Fed. Reg. 30,557 (May 26, 2011) ..................................................... 17

*Office of Thrift Supervision Integration;*
    *Dodd-Frank Act Implementation,*
    76 Fed. Reg. 43,459 (July 21, 2011) ......................................... 17, 18, 22

## Other authorities

Antonin Scalia & Bryan A. Garner,
    *Reading Law: The Interpretation of Legal Texts* (2012) ................................. 41

Arthur E. Wilmarth,
    *The Dodd-Frank Act's Expansion of State Authority to*
    *Protect Consumers of Financial Services,*
    36 J. Corp. L. 893 (2011) ........................................................... 6, 13, 14

Arthur E. Wilmarth,
    *The OCC's Preemption Rules Exceed the Agency's Authority*
    *and Present a Serious Threat to the Dual Banking System and*
    *Consumer Protection,*
    23 Ann. Rev. Banking & Fin. L. 225 (2004) ..................................... 8, 9

Bruce E. Foote,
    Cong. Rsch. Serv., 98-979E, *Mortgage Escrow Accounts:*
    *An Analysis of the Issues* (1998) ......................................................... 19, 20

Catherine M. Sharkey,
    *Inside Agency Preemption,*
    110 Mich. L. Rev. 521 (2012) ..................................................................... 21

Daniel J. Elazar,
   *Banking and Federalism in the Early American Republic*,
   28 Huntington Library Q. 301 (1965) ............................................... 5, 8

Edward L. Symons, Jr.,
   *The 'Business of Banking' in Historical Perspective*,
   51 Geo. Wash. L. Rev. 676 (1983) ...................................................... 5

Financial Crisis Inquiry Commission,
   *The Financial Crisis Inquiry Report* (2011) .................................... 14

GAO,
   *Study of the Feasibility of Escrow Accounts on Residential
   Mortgages Becoming Interest Bearing* (1973) ................................ 21

George E. Barnett,
   *State Banking in the United States Since the Passage of the
   National Bank Act* (1902) .................................................................. 7

Henry N. Butler & Jonathan R. Macey,
   *The Myth of Competition in the Dual Banking System*,
   73 Cornell L. Rev. 677 (1988) ........................................................... 6

James E. Carberry,
   *Rebellious Homeowners: Mortgagors Challenge Demand That
   Taxes Be Paid Into No-Interest Escrow Accounts*,
   Wall St. J., Oct. 26, 1971 ................................................................ 19

Kenneth E. Scott,
   *The Dual Banking System: A Model of Competition in
   Regulation*, 30 Stan. L. Rev. 1 (1977) ................................... 5, 6, 7, 8

Letter from George W. Madison, General Counsel,
   Department of the Treasury, to John Walsh, Acting
   Comptroller of the Currency (June 27, 2011) ................................. 18

Lev Menand & Morgan Ricks,
   *Federal Corporate Law and the Business of Banking*,
   88 U. Chi. L. Rev 1361 (2021) ........................................................... 5

Milton Friedman & Anna J. Schwartz,
   *A Monetary History of the United States,
   1867–1960* (1963) .............................................................................. 9

Patricia A. McCoy, Andrey D. Pavlov & Susan M. Wachter,
    *Systemic Risk Through Securitization: The Result of Deregulation
    and Regulatory Failure*,
    41 Conn. L. Rev. 1327 (2009) ..............................................................14

Roderick M. Hills, Jr.,
    *Exorcising McCulloch: The Conflict-Ridden History of
    American Banking Nationalism and Dodd-Frank Preemption*,
    161 U. Pa. L. Rev. 1235 (2013)..................................................... *passim*

## INTRODUCTION

For decades, Rhode Island law has required mortgage lenders to pay a modest interest rate on the money advanced to them by borrowers for paying taxes and insurance premiums on mortgaged properties. To comply with this law, lenders need only pay interest at the prevailing market rate for regular savings accounts. R.I. Gen. Laws § 19-9-2(a). Thirteen other states have enacted similar interest-on-escrow laws.

The district court below held that Rhode Island's law is preempted as applied to federally chartered banks like Citizens Bank because the law "places limits on" their asserted power "to establish escrow accounts," Add. 8—even if the law has no significant real-world effect on the exercise of that asserted power. As support for this categorical rule, the court cited the Second Circuit's decision in *Cantero v. Bank of America, N.A.*, 49 F.4th 121 (2d Cir. 2022), *vacated*, 144 S. Ct. 1290 (2024). That decision similarly held that New York's interest-on-escrow law was preempted as applied to national banks because it sought to "control" the exercise of their powers. *Id.* at 134.

After the district court's decision, however, the U.S. Supreme Court granted certiorari in *Cantero*. The United States and a broad coalition of states (from Rhode Island to Texas) filed briefs criticizing the Second Circuit's analysis, and the Supreme Court then unanimously overturned the Second Circuit's decision.

In an opinion by Justice Kavanaugh, the Supreme Court held that the Second Circuit's "control" test is not the correct standard for preemption in this context.

*Cantero v. Bank of Am., N.A.*, 144 S. Ct. 1290, 1301 (2024). The correct standard, rather, is the one articulated in *Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25 (1996), and codified in the Dodd-Frank Act of 2010: A state law is preempted "only if," as relevant here, it "prevents or significantly interferes with the exercise by the national bank of its powers." *Cantero*, 144 S. Ct. at 1301 (quoting 12 U.S.C. § 25b(b)(1)(B)).

"A court applying that *Barnett Bank* standard," the Supreme Court made clear, "must make a practical assessment of the nature and degree of the interference caused by a state law." *Id.* at 1300. It must focus on the particular "text and structure of the [relevant] laws" and ask whether the degree of interference with the asserted banking power is "more akin" to the interference in the cases where the Supreme Court found significant interference or to the interference in the cases where the Supreme Court found no significant interference. *Id.* at 1300–01 & n.3. Because the Second Circuit "did not conduct that kind of nuanced comparative analysis," but instead applied "a categorical test that would preempt virtually all state laws that regulate national banks," the Supreme Court vacated and remanded. *Id.* at 1301.

The district court's decision in this case reflects the same mistake. The district court did not "consider the interference caused by the state laws in *Barnett Bank*" and the "precedents on which *Barnett Bank* relied." *Id.* at 1300. Nor did it try to compare the level of interference caused by Rhode Island's law to the level of interference caused by the state laws in the precedents cited by *Barnett Bank* and discussed again

in *Cantero*. *Id.* Indeed, the district court did not make *any* "practical assessment of the nature and degree of the interference caused by [Rhode Island's] law" because the court incorrectly believed that it did not *have* to look to the law's practical effects. *Id.*

That was error. Had the district court applied the correct test, it would have concluded that Rhode Island's law does not significantly interfere with the ability of national banks to establish escrow accounts (or at least that no such showing has yet been made). Eight federal judges have reached the same conclusion. The district court in *Cantero*, for example, surveyed the cases where the Supreme Court found significant interference and held that, as compared to them, any interference caused by interest-on-escrow laws is "minimal." *Cantero v. Bank of Am., N.A.*, 408 F. Supp. 3d 171, 195 (E.D.N.Y. 2019). A three-judge court held similarly in upholding New York's law in 1975, engaging in a comparative analysis with Supreme Court precedent and finding that any interference is "insignificant." *Fed. Nat'l Mortg. Ass'n v. Lefkowitz*, 390 F. Supp. 1364, 1369 (S.D.N.Y. 1975). And just last week, the Ninth Circuit did the same for California's law. *Kivett v. Flagstar Bank, FSB*, 2024 WL 3901188, *2 (9th Cir. Aug. 22, 2024); *see also Clarke v. Bank of Am., N.A.*, 2020 WL 902457, **7–8 (D. Md. Feb. 24, 2020).

This Court should join the consensus and reverse. Alternatively, and at a very minimum, this Court should vacate and remand, as the Supreme Court did in *Cantero*, because the district court "did not apply [the preemption] standard in a manner consistent with Dodd-Frank and *Barnett Bank*." *Cantero*, 144 S. Ct. at 1294.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1332(d). This Court has jurisdiction under 28 U.S.C. § 1291 because this appeal is from the district court's final judgment entered on September 28, 2022. Add. 1–10. On October 7, 2022, the plaintiff timely filed a notice of appeal under 28 U.S.C. § 2107(a). App. 38.

## STATEMENT OF THE ISSUES

**I.**     Has Citizens Bank shown that Rhode Island's interest-on-escrow law prevents or significantly interferes with the exercise of a national banking power?

**II.**     Was the district court correct to follow the reasoning of the Second Circuit's now-vacated opinion in *Cantero* and hold that Rhode Island's interest-on-escrow law is preempted as applied to national banks?

## STATEMENT OF THE CASE

## I.     Statutory and regulatory background

### A.     National Bank Act preemption

During "most of the first century of our Nation's history, … state-chartered banks were the norm and federally chartered banks an exception." *Atherton v. F.D.I.C.*, 519 U.S. 213, 221 (1997).[1] In the early republic, most "American banks were either state-owned joint-stock companies in which the state was a major shareholder or were controlled by the state through special charter provisions." Elazar, *Banking*

---

[1] Unless otherwise noted, all internal quotation marks, citations, alterations, brackets, and ellipses have been omitted from quotations throughout this brief.

4

*and Federalism in the Early American Republic*, 28 Huntington Library Q. 301, 303–04 (1965). These banks were considered "quasi-governmental entities[] because their most important function was the issuance of notes, which served as money." Symons, *The 'Business of Banking' in Historical Perspective*, 51 Geo. Wash. L. Rev. 676, 686 (1983).

### 1. Congress creates the First and Second Banks of the United States.

Congress created the First Bank of the United States in 1791 and, a quarter century later, it created the Second Bank of the United States. *See* Elazar, *Banking and Federalism in the Early American Republic*, 28 Huntington Libr. Q. at 311, 313. "Although the Second Bank of the United States was not a central bank in the modern sense, there was a major public element in its operations." Scott, *The Dual Banking System: A Model of Competition in Regulation*, 30 Stan. L. Rev. 1, 15 (1977). The Bank secured the government's money, collected tax revenues, loaned money to the government, and paid its debts. *See* Hills, *Exorcising McCulloch: The Conflict-Ridden History of American Banking Nationalism and Dodd-Frank Preemption*, 161 U. Pa. L. Rev. 1235, 1249 (2013).

### 2. The National Bank Act establishes the dual system of private banks subject to federal and state law.

"The demise of the Second Bank of the United States in 1836 at the hands of President Andrew Jackson left the country with a heterogeneous, unequal, and unsafe money supply." Menand & Ricks, *Federal Corporate Law and the Business of Banking*, 88 U. Chi. L. Rev 1361, 1384 (2021). In 1864, Congress responded with the

National Bank Act (or NBA), thereby "establishing the system of national banking still in place today." *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 10 (2007).

The NBA created a new federal agency called the Currency Bureau—later, the Office of the Comptroller of the Currency (or OCC)—with authority to charter and supervise a new system of "national banks." Scott, *The Dual Banking System*, 30 Stan. L. Rev. at 3. Congress hoped that these banks would "provide the nation with a stable system of currency to replace the existing system of notes issued by state banks," and, by requiring national banks to back the notes with federal bonds, "a ready market for the new bonds the federal government was issuing to finance the Civil War." Butler & Macey, *The Myth of Competition in the Dual Banking System*, 73 Cornell L. Rev. 677, 681 (1988); *see also Tiffany v. Nat'l Bank*, 85 U.S. 409, 413 (1873).

The NBA gave the new national banks the exclusive power—and in some cases, the duty—"to issue a national currency in the form of national bank notes." Wilmarth, *The Dodd-Frank Act's Expansion of State Authority to Protect Consumers of Financial Services*, 36 J. Corp. L. 893, 945 (2011). It also granted national banks a list of other enumerated powers, including the power to make contracts, to accept deposits, and to make non-real-estate loans, plus "such incidental powers as shall be necessary to carry on the business of banking." 12 U.S.C. § 24; "To maintain a meaningful role for state legislation and for state corporations," however, Congress "expressly prohibited" national banks "from making mortgage loans." *Watters*, 550 U.S. at 23

6

(Stevens, J., dissenting). Thus, for decades, the "characteristic difference" between state and national banks was that "state banks [could] loan on real estate security, while national banks [were] prohibited from doing so." Barnett, *State Banking in the United States Since the Passage of the National Bank Act* 50 (1902).

"Originally, it was anticipated that existing banks would surrender their state charters and re-incorporate under the terms of the new law." *Watters*, 550 U.S. at 23 (Stevens, J., dissenting). "Instead, after an initial post-[NBA] decline, state-chartered institutions thrived." *Id.* The result was the "competitive mix of state and national banks" now "known as the dual banking system." *Id.*

In the dual-banking system, banks may choose whether to charter as a state bank or a national one. *See* Scott, *The Dual Banking System*, 30 Stan. L. Rev. at 8. Those that choose to become national banks are subject to primary regulation by the OCC and the powers and limitations of the NBA. *See id.* The NBA says "nothing explicit, however, about most operations of national banks, thus leaving regulation of those activities largely to other bodies of law." *Id.* at 16. So, even for national banks, state law generally applies: They "are governed in their daily course of business far more by the laws of the State than of the nation." *Nat'l Bank v. Commonwealth*, 76 U.S. (9 Wall.) 353, 362 (1870). In other words, they are subject to a "mixed state/federal regime[], in which the Federal Government exercises general oversight while leaving state substantive law in place." *Cuomo v. Clearing House Ass'n*, 557 U.S. 519, 530 (2009).

Despite being chartered by the federal government, national banks were not "public institutions comparable to the Second Bank of the United States." Wilmarth, *The OCC's Preemption Rules Exceed the Agency's Authority and Present a Serious Threat to the Dual Banking System and Consumer Protection*, 23 Ann. Rev. Banking & Fin. L. 225, 242 (2004). Rather, the NBA "contemplated and achieved a system of thousands of privately owned banks." Scott, *The Dual Banking System*, 30 Stan. L. Rev. at 15. These banks were competitive and profit-seeking, not "agents of government." Elazar, *Banking and Federalism in the Early American Republic*, 28 Huntington Library Q. at 318.

### 3. The Federal Reserve Act ends the public function of national banks.

By the early 1900s, it "had become completely indefensible" to compare these newly created private companies to the First and Second Banks of the United States. Hills, *Exorcising McCulloch*, 161 U. Pa. L. Rev. at 1262. The idea that federally chartered banks required the protection of federal law "might have seemed a strong one during most of the first century of our Nation's history, for then … federal banks often encountered hostility and deleterious state laws." *Atherton*, 519 U.S. at 221. But by the twentieth century, the concern that states were hostile to federally chartered banks "was obsolete." Hills, *Exorcising McCulloch*, 161 U. Pa. L. Rev. at 1274.

At the same time, repeated economic crises and bank failures had "exposed the fragility of a financial system essentially rooted in the self-governance of decentralized bankers." *Id.* at 1263. The Panic of 1907 and the Great Depression

prompted Congress to overhaul the nation's banking system. *See id.* "Most significantly, in 1913 Congress established the Federal Reserve System to oversee federal monetary policy through its influence over the availability of credit." *Watters*, 550 U.S. at 26 (Stevens, J., dissenting); *see* Federal Reserve Act (FRA) §§ 2, 9, 38 Stat. 251, 259. Under the FRA, the Federal Reserve System (or Fed) "perform[s] all central banking functions for the nation"—functions once assigned to the Bank of the United States. Wilmarth, *The OCC's Preemption Rules*, 23 Ann. Rev. Banking & Fin. L. at 241.

Another core "objective of the FRA was to provide the [Fed] with sole control over the nation's money supply." *Id.* The Act phased out national bank notes and authorized the creation of Federal Reserve notes. *See id.* In doing so, the Act "terminat[ed] the roles that national banks had previously played in funding government operations and issuing a national currency under the original National Bank Act." *Id.* Accordingly, national banks now "perform[] no significant federal governmental function that is not performed equally by state-chartered banks." *First Agric. Nat'l Bank v. State Tax Comm'n*, 392 U.S. 339, 354 (1968) (Marshall, J., dissenting).

The FRA also gave national banks, for the first time, the authority to make real-estate loans. 12 U.S.C. § 371(a). Thus, in addition to terminating their only public duty, the Act ended their most significant remaining limitation, "greatly reduc[ing] the importance of the distinction between national and nonnational banks." Friedman & Schwartz, *A Monetary History of the United States, 1867-1960*, at 196 (1963).

9

### 4. In a series of cases culminating in *Barnett Bank*, the Supreme Court holds that NBA preemption is governed by ordinary preemption principles.

In light of Congress's banking reforms, the Supreme Court began altering its approach to NBA preemption. Before, the Court had adopted what was in essence a field-preemption regime, under which state banking laws were broadly preempted as applied to national banks, on the theory that national banks operated as federal instrumentalities akin to the First and Second Banks of the United States. *See* Hills, *Exorcising McCulloch*, 161 U. Pa. L. Rev. at 1258. Beginning in 1924, however, the Court "subsequently found numerous state laws applicable to federally chartered banks" when those laws did not discriminate against national banks or conflict with the NBA's express terms. *Atherton*, 519 U.S. at 223. The Supreme Court in these cases engaged in detailed, fact-intensive inquiries over the practical effect of the law on national banks. *See, e.g.*, *First Nat'l Bank v. Missouri*, 263 U.S. 640 (1924) (upholding application of a Missouri law barring banks from opening branch offices in the state). By 2009, the Court was able to write that states had "enforced their banking-related laws against national banks for at least 85 years." *Cuomo*, 557 U.S. at 534.

The Court in *Anderson National Bank v. Luckett*, for example, upheld application of a Kentucky law requiring national banks to transfer dormant accounts to the state. 321 U.S. 233 (1944). Although the law directly targeted bank deposits, it did "not discriminate against national banks" or conflict with "any word in the national

banking laws." *Id.* at 247. The "mere fact that the depositor's account is in a national bank," the Court explained, "does not render it immune to attachment by the creditors of the depositor, as authorized by state law." *Id.* at 248. The Court distinguished *First National Bank of San Jose v. California*, 262 U.S. 366 (1923), which held a similar law preempted, on the ground that the law in that case was "so unusual and so harsh in its application to depositors as to deter them from placing or keeping their funds in national banks." *Anderson*, 321 U.S. at 250. Unlike that law, Kentucky's law did not "impose an undue burden on the performance of the banks' functions" because it would not "deter [depositors] from placing their funds in national banks." *Id.* at 248, 252. Stated another way, the law neither prevented nor significantly impaired national banks from exercising their powers. So it was not preempted.

*Barnett Bank* later applied this principle. There, the Court held that an NBA provision expressly permitting national banks to sell insurance in small towns preempted a Florida law prohibiting the practice. *See* 517 U.S. at 27–28. In doing so, the Court reiterated *Anderson*'s holding that states may "regulate national banks"— even as to a "bank's exercise of its powers"—unless they "prevent or significantly interfere with" those powers. *Id.* at 33. The Florida law rose to this level of interference, the Court explained, because "the Federal Statute authorizes national banks to engage in activities that the State Statute expressly forbids." *Id.* at 31.

### 5. The OCC resurrects field preemption.

Over time, as "the devastating results of predatory mortgage lending" grew evident, thirty states and the District of Columbia adopted laws to prohibit banks from inducing borrowers to borrow more than they could repay. S. Rep. No. 111-176, at 16–17 (2010). But "rather than supporting these antipredatory lending laws, federal regulators preempted them." *Id.* In 2004, the OCC enacted sweeping preemption rules purporting to bar state efforts against subprime lending. *See Bank Activities and Operations; Real Estate Lending and Appraisals*, 69 Fed. Reg. 1904 (Jan. 13, 2004).

The OCC's rules summarily declared that fourteen broad categories of state law did "not apply to national banks' lending and deposit taking activities." *Id.* In reaching that result, the OCC declined to follow *Barnett Bank*'s "prevent or significantly interfere with" standard, contending that no "one phrase constitutes the exclusive standard for preemption." *Id.* at 1910. Instead, the OCC broadly declared preempted any "state laws that obstruct, impair, or condition a national bank's ability to fully exercise its Federally authorized real estate lending powers"—a standard that the agency characterized as a "distillation of the various preemption constructs articulated by the Supreme Court." *Id.* at 1910–11.

Although the OCC denied having adopted field preemption, it acknowledged that its rules were "substantially identical" to 1996 field-preemption rules adopted under the Home Owners' Loan Act (or HOLA). *Id.* at 1911 n.56 (citing 12 C.F.R.

§ 560.2(b) (2004)). But it did not acknowledge a key difference: HOLA governs the charters of federal savings associations—not the NBA. And in 2004, HOLA was thought to preempt its field, while the NBA was not. *Compare, e.g.*, *Flagg v. Yonkers Sav. & Loan Ass'n*, 396 F.3d 178, 182 (2d Cir. 2005) (field preemption under HOLA), *with Cuomo*, 557 U.S. at 534 (no field preemption under the NBA since at least 1924).

Commentators have thus recognized that, "despite the OCC's disclaimers," the "rationale for its 2004 rules … institutes a regime of field preemption." Hills, *Exorcising McCulloch*, 161 U. Pa. L. Rev. at 1278. Even the agency admitted that it was "largely immaterial" whether it had erected "field" or "conflict" preemption because its rules would preempt whole categories of state law either way. 69 Fed. Reg. at 1911. The OCC thus created "a regime of field preemption in everything but name." Wilmarth, *The Dodd-Frank Act's Expansion of State Authority*, 36 J. Corp. L. at 937.

Under the OCC's framework, the NBA would preempt state attempts to regulate the manner or content of national banks' real-estate lending. The agency's rules allowed only "general" state laws to apply, and only to the extent that such laws have a mere "incidental" effect on the real-estate lending activities of national banks. 69 Fed. Reg. at 1912. The OCC explained that state laws will be deemed to have an "incidental" effect only if those laws "form the legal infrastructure that makes it practicable to exercise a permissible Federal power." *Id.* But as the Supreme Court later held in *Cuomo*, the OCC's "legal infrastructure" rule "can be found nowhere

within the text of the statute" and "attempt[ed] to do what Congress declined to do: exempt national banks from all state banking laws." 557 U.S. at 532–33.

### 6.    The 2008 financial crisis ensues.

Within just a few years of the OCC's deregulatory efforts, the housing market collapsed, and the country plunged into "the most calamitous worldwide recession since the Great Depression." S. Rep. No. 111-176, at 2. Taking advantage of the OCC's efforts to nullify huge swaths of state law by bureaucratic fiat, large national banks had "expanded aggressively into subprime" loans. Wilmarth, *The Dodd-Frank Act's Expansion of State Authority*, 36 J. Corp. L. at 917. The consequences to the nation were severe: "defaults and foreclosures on millions of nonprime loans" and federal "bailouts of several of the largest national banks." *Id.* at 898; *see* McCoy, Pavlov & Wachter, *Systemic Risk Through Securitization: The Result of Deregulation and Regulatory Failure*, 41 Conn. L. Rev. 1327, 1353 (2009).

After the crisis, Congress found that the OCC's categorical preemption of state consumer-finance laws "helped bring the financial system down." S. Rep. No. 111-176, at 166. The Financial Crisis Inquiry Commission, which Congress created to investigate the crisis, found that the OCC's preemption efforts "prevent[ed] adequate protection for borrowers and weaken[ed] constraints on this segment of the mortgage market." Fin. Crisis Inquiry Comm'n, *The Financial Crisis Inquiry Report* 126 (2011). By "exempt[ing] all national banks from State lending laws, including the

anti-predatory lending laws," the OCC "actively created an environment where abusive mortgage lending could flourish without State controls," planting the seeds "for long-term trouble in the national banking system." S. Rep. No. 111-176, at 16–17.

### 7.    In 2010, Congress enacts several provisions to repudiate the OCC.

Congress rebuked the OCC in the Dodd-Frank Act of 2010. After much debate, Congress settled on an unusual, carefully reticulated set of interlocking provisions designed to "clarify the preemption standard relating to State consumer financial laws as applied to national banks." S. Rep. No. 111-176, at 175. Those provisions, set forth in section 25b, made clear that the NBA "does not occupy the field in any area of State law." 12 U.S.C. § 25b(b)(4). Congress thus expressly "repudiate[d] the sort of categorical field preemption" that, under the OCC's 2004 rule, had sought to "preclude[] states from enforcing banking-specific rules against nationally chartered banks." Hills, *Exorcising McCulloch*, 161 U. Pa. L. Rev. at 1287.

Congress then clarified the proper standard for preempting "State consumer financial laws." A "State consumer financial law" is necessarily banking-specific: Congress defined it as a law that does not discriminate against national banks and that "directly and specifically regulates the manner, content, or terms and conditions of any financial transaction." 12 U.S.C. § 25b(a)(2). With this definition, Congress overruled the OCC's previous classification of laws as "incidental"—and therefore not preempted—if they "do *not* attempt to regulate the manner or content of national

banks' real estate lending, but … instead form the legal infrastructure that makes it practicable to exercise a permissible Federal power." 69 Fed. Reg. at 1912 (emphasis added). Instead, section 25b provides that the NBA preempts "State consumer financial laws" in two key circumstances, both of which focus on the laws' effects. First, such a law is preempted if its application "would have a discriminatory effect on national banks." *See* 12 U.S.C. § 25b(b)(1)(A). Second, such a law is preempted if, "in accordance with … *Barnett Bank*," the law "prevents or significantly interferes with the exercise by the national bank of its powers." *Id.* § 25b(b)(1)(B).

As the statute's text and historical context show, these provisions were meant to "undo[] broader standards adopted by … the OCC in 2004." S. Rep. No. 111-176, at 175. Congress expected that the "standard for preempting State consumer financial laws" would "return to what it had been for decades, that recognized by the Supreme Court in *Barnett Bank*." *Id.*; *see* H.R. Rep. No. 111-517, at 875 (2010) (Dodd-Frank "revises the standard the OCC will use to preempt state consumer protection laws").

Finally, Congress granted the OCC tightly limited authority to make a "preemption determination." 12 U.S.C. § 25b(b)(3). Section 25b provides that the agency may apply *Barnett Bank* to preempt state laws only on a "case-by-case basis," after assessing "the impact of a particular State consumer financial law on any national bank." *Id.* § 25b(b)(1)(B). The agency must back up its determination with "substantial evidence, made on the record of the proceeding," that "supports the

16

specific finding regarding the preemption of such [state law] in accordance with" *Barnett Bank*. *Id.* § 25b(c). Even then, a reviewing court will give the OCC's determination only *Skidmore* deference, based on the "thoroughness evident" in its "reasoning," and whether it is "persuasive" to the court. *Id.* § 25b(b)(5)(A); *see Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). In addition, the agency must consult with the Consumer Financial Protection Bureau before expanding its determination to "substantially equivalent" laws in other states, and publish and periodically review any preemption determinations. 12 U.S.C. § 25b(b)(3), (d).

### 8. Ignoring Dodd-Frank, the OCC resurrects field preemption.

Rather than comply with the new statute, the OCC acted as if nothing had happened. It quickly proposed new preemption rules that largely left intact its 2004 rules. The OCC did propose removing the phrase "obstruct, impair, or condition" from the preemption rules, explaining that this "terminology had resulted in misunderstanding and confusion." *Office of Thrift Supervision Integration; Dodd-Frank Act Implementation*, 76 Fed. Reg. 43,459, 43,552 (July 21, 2011). Nevertheless, the OCC claimed that its test was "an amalgam of prior precedents" consistent with *Barnett Bank*. *Office of Thrift Supervision Integration; Dodd-Frank Act Implementation*, 76 Fed. Reg. 30,557, 30,563 (May 26, 2011). The agency concluded that "eliminating this language [would] not impact the continued applicability of precedents based on those rules." 76 Fed. Reg. at 43,553. Its 2004 preemption rules would thus stay in effect. *See id.*

The General Counsel of the Treasury Department, of which OCC is a part, took the unusual step of commenting on the proposed rule, questioning its lawfulness. He criticized the OCC for proposing "a preemption standard that is broader than the language of … Dodd-Frank" and "take[s] the position that the Dodd-Frank standard has no effect." Letter from George W. Madison, Gen. Couns., Dep't of the Treasury, to John Walsh, Acting Comptroller of the Currency 1–2 (June 27, 2011).

Nevertheless, the OCC adopted the proposed rule. It made no effort to comply with Dodd-Frank's limits on its authority to make preemption determinations. The OCC did not review state laws on a "case-by-case" basis. *See* 76 Fed. Reg. at 43,557. It did not consult with the CFPB before adopting categorical preemptions of multiple state laws. *Id.* And it did not identify evidence supporting its determinations, instead relying on its general "conclusion that the listed types and terms of state laws would be preempted by application of the conflict preemption standard of the *Barnett* decision." *Id.* at 43,556. The OCC argued that these "procedural requirements" did not apply "retroactively" to its new rules—which it adopted one day before Dodd-Frank's effective date. *Id.* at 43,553.

### B.  Mortgage-escrow accounts

#### 1.  Mortgage-escrow accounts rise in popularity, leading to abuse.

Escrow accounts emerged in the 1930s, on the eve of the postwar housing boom. Mortgage lenders began requiring that borrowers deposit funds into these

accounts on a monthly basis so that lenders could access the funds to cover insurance payments and annual property taxes. *See* Foote, Cong. Rsch. Serv., 98-979E, *Mortgage Escrow Accounts: An Analysis of the Issues* 1 (1998). In time, most mortgages required such accounts, in part because the Federal Housing Administration mandated their use under its home loan insurance program. *See id.* at 2. The rising popularity of escrow accounts made sense: A tax lien or, without insurance, a natural disaster could prevent a lender from recovering a mortgage's full value in the event of a default.

But as the escrow device grew more common, it also became subject to abuse. Many banks required borrowers to make payments well in advance and often in excess of future tax and insurance charges. *Id.* at 3. When banks refused to pay interest on these deposits, they profited. Because the banks could "invest the money accumulated in impound accounts in profitable, short-term investments," the "loss of interest income to the consuming public on tax prepayments alone could," by 1971, "be as high as $100 million annually." Carberry, *Rebellious Homeowners: Mortgagors Challenge Demand That Taxes Be Paid Into No-Interest Escrow Accounts*, Wall St. J., Oct. 26, 1971, at 40. In other words, payments once intended to avert foreclosure effectively became a large "interest-free loan from the customer" to the customer's own bank. *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1173 (8th Cir. 1995).

## 2. Congress and numerous states enact laws regulating mortgage-escrow accounts.

In the 1970s, Congress and state legislatures introduced guardrails on escrow accounts to curb these abuses. In the Real Estate Settlement Procedures Act of 1974, Congress limited the maximum balance that national banks can hold in escrow and the circumstances under which they can require it. *See* 12 U.S.C. § 2609. Around the same time, several states adopted laws requiring lenders to pay a minimum amount of interest on escrow-account balances. *See* Foote, *Mortgage Escrow Accounts*, at 3–4. In total, fourteen states have enacted such laws. Among them are New York and California, which require banks to pay at least 2% interest on escrow accounts, *see* N.Y. G.O.L. § 5-601; Cal. Civ. Code § 2954.8(a), and Rhode Island, which requires banks to pay at least "the prevailing market rate of interest for regular savings accounts offered by local financial institutions" (or "the rate paid to the mortgagee on its regular savings account, if offered," R.I. Gen. Laws § 19-9-2(a)).[2]

These state laws are nondiscriminatory—they apply equally to state and national banks. *See, e.g.*, Conn. Gen. Stat. § 49-2a (applicable to any "state bank" and "national banking association"). They implement modest interest rates that reflect, for example—as with Rhode Island's law—the "prevailing market rate of interest for regular savings accounts offered by local financial institutions." Vt. Stat. Ann. tit. 8,

---

[2] The other states are Connecticut, Iowa, Maine, Maryland, Massachusetts, Minnesota, New Hampshire, Oregon, Utah, Vermont, and Wisconsin.

§ 10404(b); *see also* GAO, *Study of the Feasibility of Escrow Accounts on Residential Mortgages Becoming Interest Bearing* 21 (1973) (explaining that the California legislature enacted its escrow-interest law only after "study[ing] the amount of money held by lending institutions for the payment of taxes, the amount of interest paid on such funds, and the cost of administering such funds"). And they are designed to balance the interests of borrowers and lenders: In exchange for receiving the "security protection provision" of an escrow account, a lender must pay interest. Or. Rev. Stat. § 86.245(2).

### 3.    The OCC attempts to preempt interest-on-escrow laws and is rebuffed by Congress.

For decades, federal and state interest-on-escrow laws operated side by side. *See, e.g.*, *Lefkowitz*, 390 F. Supp. at 1368 (upholding New York's interest-on-escrow law against a preemption challenge in 1975). But in 2004, despite having never regulated mortgage-escrow accounts before, the OCC added state laws "concerning … escrow accounts" to the broad categories of state law that it deemed preempted. 69 Fed. Reg. at 1917. The OCC provided no rationale for including escrow-account laws and made "no factual findings … explaining why preemption was necessary in th[is] specific case or what conflicts between state authorities and federal banks justified preemption." Sharkey, *Inside Agency Preemption*, 110 Mich. L. Rev. 521, 581 (2012). Outside the text of the rule itself, the OCC made no mention of escrow accounts in its thirteen-page statement accompanying the rule. *See* 69 Fed. Reg. 1904. The OCC wrote only that the list of areas covered (which included escrow accounts) "reflects

our experience with types of state laws that can materially affect and confine—and thus are inconsistent with—the exercise of national banks' real estate lending powers." *Id.* at 1911. It neglected to describe what that "experience" was.

Following the housing market's collapse, Congress in Dodd-Frank mandated compliance with state interest-on-escrow laws for certain subprime mortgage transactions. In an effort to curtail "a number of abusive and deceptive practices related to escrow accounts, mortgage servicing, and appraisal practices," H.R. Rep. No. 111-94, at 49 (2009), Dodd-Frank amended the Truth in Lending Act by enacting a new provision on mortgage-escrow accounts. *See* 15 U.S.C. § 1639d. Subsection 1639d(g)(3) requires all "creditor[s]" (including state and national banks) to pay interest on balances in covered escrow accounts if required by any "applicable State or Federal law," and to do so "in the manner as prescribed by that applicable … law." Covered escrow accounts arise in two circumstances—where required by state or federal law, and in connection with certain home mortgages, including those insured by state or federal agencies and some higher-priced mortgages. *Id.* § 1639d(b).

Notwithstanding Dodd-Frank's massive overhaul, the OCC's 2011 rules again sought to preempt all state laws "concerning … [e]scrow accounts." 76 Fed. Reg. at 43,557. The OCC did not explain why, other than to note that it had "re-reviewed those rules … to confirm that the specific types of laws cited in the rules are consistent with [*Barnett Bank*'s] standard for conflict preemption." *Id.*

## II.    Factual and procedural background

Plaintiff John Conti is a Rhode Island resident who financed the purchase of his home with a mortgage loan from Citizens Bank, a bank established under the NBA. Add. 1. His loan agreement required him to deposit funds in an escrow account held by the bank to cover property taxes and insurance payments. App. 11; *see* App. 22–37. Although his agreement provided that interest would be paid on account funds where "Applicable law requires interest to be paid on the Funds," Citizens Bank refused to comply with Rhode Island's interest-on-escrow law. App. 9, 16, 26.

Mr. Conti brought a putative class action against Citizens Bank, asserting claims for breach of contract and unjust enrichment. App. 6–19. Citizens Bank moved to dismiss the claims on the ground that the NBA preempts application of Rhode Island's law. ECF No. 15. Citizens Bank argued that "state interest-on-escrow laws place limitations on, and therefore significantly interfere with, national banks' incidental powers to utilize mortgage escrow accounts." ECF No. 17, at 13.

The district court agreed and granted the motion. Add. 1. It held that Rhode Island's law is preempted because it "places limits on" national banks' asserted power "to establish escrow accounts." Add. 8. Although the court cited *Barnett Bank*, it did not engage in any comparative analysis with the degree of interference caused by the state laws in that case or in any other Supreme Court case. Instead, the district court regarded the degree of interference as irrelevant to the preemption question.

23

As support for its categorical rule, the district court cited the Second Circuit's decision in *Cantero*. *See id.* There, the Second Circuit similarly held that New York's interest-on-escrow law was preempted under *Barnett Bank* and Dodd-Frank because the law "'would exert control over banks' exercise of [a national banking] power,'" *id.* (quoting *Cantero*, 49 F.4th at 134), regardless of "how much [the] state law impacts" the exercise of that power or "the magnitude of its effects," *Cantero*, 49 F.4th at 131.

Mr. Conti appealed. While his appeal was pending (with the briefing schedule stayed), the Supreme Court granted certiorari in *Cantero* and unanimously vacated the Second Circuit's decision. The Supreme Court held that there is no "bright line" "categorical test" for deciding whether a state interest-on-escrow law is preempted under *Barnett Bank* and Dodd-Frank. *Cantero*, 144 S. Ct. at 1301. Instead, a court "must make a practical assessment of the nature and degree of the interference caused by [the] state law." *Id.* at 1300. It must analyze "the text and structure of the laws" at issue and compare the degree of interference caused by the state law with "the interference caused by the state law in *Barnett Bank*" and in the "precedents on which *Barnett Bank* relied." *Id.* at 1300, 1301 & n.3. Because the Second Circuit "did not conduct that kid of nuanced comparative analysis, the Supreme Court held that it "did not analyze the preemption question in a manner consistent with Dodd-Frank and *Barnett Bank*." *Id.* at 1301. The Supreme Court vacated the Second Circuit's judgment and remanded for application of the correct test in the first instance. *Id.*

## SUMMARY OF ARGUMENT

**I.** This Court should reverse because Citizens Bank has not shown that Rhode Island's law significantly interferes with the exercise of a national banking power.

**A.** This case is nothing like the cases where the Supreme Court found significant interference. Rhode Island's law does not prohibit national banks from exercising an express power or doing anything specifically identified by Congress. Nor does it impose any significant barrier to exercising an express power, or operate in such a harsh and unusual way as to deter customers from using national banks.

**B.** This case instead resembles the cases where the Supreme Court did not find significant interference. Chief among them is *Anderson*, which involved a law that required banks to hand over certain balances, depriving banks of the ability to earn interest on them. Rhode Island's law is not meaningfully different. Nor does it impact national banks any more than generally applicable laws that are not preempted.

**C.** Dodd-Frank's text, structure, and history confirm that this law is not preempted. Section 25b provides that state consumer financial laws generally are not preempted. And far from suggesting that interest-on-escrow laws significantly impair necessary banking powers, Congress instead required banks to *comply* with them.

**D.** Were there any doubt as to the degree of interference, this Court should still reverse the decision below and allow for further factual development.

**II.** At a very minimum, the Court should vacate and remand, as in *Cantero*.

## STANDARD OF REVIEW

This Court gives fresh review to a district court's decision to grant a motion to dismiss for failure to state a claim, applying the law with no deference to the district court and accepting as true the complaint's well-pleaded allegations. *Lawrence Gen. Hosp. v. Continental Cas. Co.*, 90 F.4th 593, 598 (1st Cir. 2024). Because preemption is ultimately a legal question for a court, it is "amenable to resolution by a motion to dismiss" where answering it does not depend on any facts. *Fitzgerald v. Harris*, 549 F.3d 46, 52 (1st Cir. 2008). The Supreme Court in *Cantero*, for example, noted that in previous Supreme Court cases involving NBA preemption, "the Court reached its conclusions about the nature and degree of the state laws' alleged interference with the national banks' exercise of their powers based on the text and structure of the laws, comparison to other precedents, and common sense." 144 S. Ct. at 1301 n.3.

But the Supreme Court in *Cantero* did not hold that facts are always irrelevant to the question of significant interference. In many cases, as this Court has previously observed, this question is "unlikely to be purely legal." *Bowler v. Hawke*, 320 F.3d 59, 64 (1st Cir. 2003). Courts will sometimes "have to make judgment calls about the extent to which [state] laws hinder the ability of [national banks] to engage in [certain authorized] activities, as a factual matter," which "will often be better made on an evidentiary record." *Id.* When that is so, and the proponent of preemption is unable to show significant interference as a matter of law, dismissal is improper.

**ARGUMENT**

I.     **Because Citizens Bank has not shown that Rhode Island's law imposes a significant practical impediment to a national banking power, it is not entitled to prevail on its preemption defense.**

The Supreme Court's decision in *Cantero* confirms that preemption turns on "a practical assessment of the nature and degree of the interference caused by [the] state law." 144 S. Ct. at 1300. "Under Dodd-Frank, as relevant here, courts may find a state law preempted 'only if,' 'in accordance with the legal standard' from *Barnett Bank*, the law 'prevents or significantly interferes with the exercise by the national bank of its powers.'" *Id.* at 1301 (quoting 12 U.S.C. § 25b(b)(1)(B)). If the "law prevents or significantly interferes with the national bank's exercise of its powers, the law is preempted." *Id.* at 1300. But if not, "the law is not preempted." *Id.*

The Supreme Court also confirmed that there is no "bright line" rule to assess when "the nature and degree of [] interference" is "significant." *Id.* Instead, a court must conduct a "nuanced comparative analysis." *Id.* The court should "consider the interference caused by the state laws in *Barnett Bank*" and in the "precedents on which *Barnett Bank* relied," some of which found significant interference and some of which did not. *Id.* The court should find the law to be preempted only if the proponent of preemption has shown that the law interferes with the exercise of a banking power in a way that is "more akin" to the level of interference in cases where the Supreme Court held that the state law at issue was preempted. *Id.* Further, a court may answer

this question, if it is able, "based on the text and structure of the laws, comparison to [Supreme Court] precedents, and common sense." *Id.* at 1301 n.3. If a court is satisfied that there is significant interference using these analytical tools, it should hold that the state law is preempted. But if that showing has not been made (or not yet been made because factual development is necessary), the court should decline to do so.

Applying these principles here yields a clear answer: Nothing in any statute or Supreme Court case authorizes displacing Rhode Island's law, nor does common sense. As the district court in *Cantero* correctly held, any interference caused by such laws is "minimal" when "[c]ompared to the state laws in *Barnett Bank*" and the other cases in which the Supreme Court has found significant interference. 408 F. Supp. 3d at 195. In those cases, the state laws imposed a significant practical impediment to the exercise of an express power. Not here. As another district court observed when it upheld a similar law against a preemption challenge nearly half a century ago: "The case presenting the closest analogy," *Lefkowitz*, 390 F. Supp. at 1368, is the very case that *Barnett Bank* later cited "as the primary example of a case where state law was not preempted," *Cantero*, 144 S. Ct. at 1299 (discussing *Anderson*, 321 U.S. 233).

That observation remains true today. Now, as then, close examination of the relevant statutes, Supreme Court cases, and common sense shows that any burden is "insignificant." *Lefkowitz*, 390 F. Supp. at 1369. If Citizens Bank believes it can show otherwise, it may try to make that showing with evidence as the case proceeds.

28

**A.    Because this case is unlike any case in which the Supreme Court has found significant interference, there is no basis for declaring Rhode Island's law preempted at this stage.**

The comparative inquiry starts with the cases where the Supreme Court has found significant interference. These include not only *Barnett Bank*, but three cases cited in that opinion: (1) *Franklin National Bank of Franklin Square v. New York*, 347 U.S. 373 (1954); (2) *Fidelity Federal Savings & Loan Association v. de la Cuesta*, 458 U.S. 141 (1982); and (3) *First National Bank of San Jose*, 262 U.S. 366. We discuss each in turn.

**Barnett Bank.** The degree of interference in *Barnett Bank* was significant by any measure. The question before the Supreme Court was "whether a federal statute that permits national banks to sell insurance in small towns pre-empts a state statute that forbids them to do so." 517 U.S. at 27. By its terms, the federal statute expressly provided that "national banks 'may' sell insurance in small towns," so the relevant national banking power was the power to sell insurance in small towns. *Id.* at 28. The Court held that the state statute significantly interfered with the exercise of that power because it prohibited national banks from exercising the power altogether.

This case couldn't be more different. Here, no "Federal Statute authorizes national banks to engage in activities that the State Statute expressly forbids." *Contra id.* at 31. Citizens Bank has identified only two federal statutes as being relevant: One grants national banks the power to make real-estate loans, 12 U.S.C. § 371; the other grants national banks any "incidental powers as shall be necessary to carry on the

business of banking," *id.* § 24 Seventh. According to Citizens Bank, the power to use mortgage-escrow accounts when not required by law is necessary to the business of banking and is thus an incidental power. But even assuming that were true, there is no serious argument that Rhode Island's law "forbids" the exercise of that asserted incidental power. *Contra Barnett Bank*, 517 U.S. at 31. As the district court in *Cantero* explained, all that a law like this does is require mortgage lenders "to pay interest on the comparatively small sums deposited in mortgage escrow accounts." 408 F. Supp. 3d at 195. "It does not bar the creation of mortgage escrow accounts, or subject them to state visitorial control, or otherwise limit the terms of their use." *Id.* "Compared to the state law[] in *Barnett Bank*," then, the "degree of interference is minimal." *Id.*

**Franklin.** The same goes for *Franklin*. The federal statute invoked in that case expressly authorized national banks "to receive savings deposits." 347 U.S. at 374. A state law, however, barred national banks—but not certain state banks—from using "the word 'savings,' or its variants," anywhere "in their advertising or business." *Id.* at 374–75. The Supreme Court held that the state law was preempted.

As it did in *Barnett Bank*, the Court focused its preemption analysis on the text of the federal statute. *See Cantero*, 144 S. Ct. at 1301 n.3 (citing *Franklin* as an example of a case where preemption was "based on the text and structure of the laws"). Because "Congress has given a particular label to this type of account," the Court concluded that national banks must be able not only to accept savings deposits, but

"to let the public know about it … by using the commonly understood description which Congress has specifically selected." *Franklin*, 347 U.S. at 378; *see Cantero*, 144 S. Ct. at 1298 (discussing *Franklin* and similarly emphasizing this textual reasoning). The state law in *Franklin* significantly interfered with the exercise of that statutory power by completely prohibiting national banks from using the very word that Congress had itself used in the statutory text (and the very word that was most closely linked to the product in the minds of consumers). *See Cantero*, 144 S. Ct. at 1301 n.3 (describing *Franklin*'s key reasoning as being that state "law interfered with [the bank's] ability to use a 'particular label' that federal law 'specifically selected'"). For that reason, as the Supreme Court later explained in *Barnett Bank*, the degree of interference in *Franklin* was "quite similar" to the degree of interference in *Barnett Bank*, 517 U.S. at 33.

The Court in *Franklin* also had the benefit of a "large record" documenting the state law's real-world "consequences upon banks." *Franklin*, 347 U.S. at 376. This record confirmed the correctness of the Supreme Court's basic conclusion: Congress had used the word "savings" for a reason, and the state law, by outlawing that word, had "restrict[ed] national banks tremendously in obtaining savings deposits." *People v. Franklin Nat'l Bank of Franklin Square*, 105 N.Y.S.2d 81, 94 (N.Y. Sup. Ct. 1951). The record detailed the law's "crippling obstruction" of this express statutory power—in testimony, economic data from before and after the law's passage, and consumer surveys. *Id.*; *see id.* 87–95 (recounting the evidence). This evidence established that the

law put "national banks at a disadvantage in the competition for savings deposits" by forcing them to use words that were "not well understood and [did] not attract depositors in anything like the numbers that the word 'savings' does." *Id.* at 87–88.

Now compare all that with this case. Unlike in *Franklin*, where the preemption analysis hinged on the text of a federal statute, Citizens Bank points to no statutory text that is even remotely comparable—a fatal shortcoming given that preemption is a matter of "congressional intent." *Barnett Bank*, 517 U.S. at 30; *see Kansas v. Garcia*, 589 U.S. 191, 208 (2020) ("All preemption arguments must be grounded in the text and structure of the statute at issue." (cleaned up)); *Chamber of Com. v. Whiting*, 563 U.S. 582, 607 (2011) ("[I]t is Congress … that pre-empts state law."). And unlike in *Franklin*, where abundant record evidence substantiated the text's importance and showed that the state law posed a significant practical impediment to the exercise of an express power, Citizens Bank has offered no such proof here. It has identified no evidence that Rhode Island's law has had *any* effect on the ability of national banks to create and fund mortgage-escrow accounts, let alone a significant effect.

And "common sense" strongly suggests that no such evidence exists. *Cantero*, 144 S. Ct. at 1301 n.3. State interest-on-escrow laws have been in effect for over half a century, and "state banks have been complying with [them]," as counsel from the Solicitor General's Office told the Supreme Court, "without material impairment." *Cantero* Tr. 56. National banks, too, have complied with these laws in the past, and

many do so today (like Wells Fargo). Thirteen states have similar laws, and Rhode Island's law requires only "the prevailing market rate of interest for regular savings accounts offered by local financial institutions." R.I. Gen. Laws § 19-9-2(a). Given all this, it is hard to imagine that this law could significantly interfere with powers that are "necessary" to banking. 12 U.S.C. § 24 Seventh. But if the law somehow does so, Citizens Bank will be able to attempt to make that showing as the case unfolds.

*Fidelity.* Nor is this case anything like *Fidelity*. There, a federal law expressly granted a federal savings and loan association the power to include what is known as a "due on sale" clause in its contracts with borrowers and to enforce the clause "at its option." 458 U.S. at 146–47. A state law, by contrast, had "forbidden a federal savings and loan to enforce a due-on-sale clause solely 'at its option.'" *Id.* at 155. The state law thus presented the same degree of interference with the federal law as in *Barnett Bank*: It entirely prohibited the exercise of a power that had been expressly granted to national banks. Again, Rhode Island's law does nothing of the sort.

The power in *Fidelity*, to be sure, was expressly granted by a regulation (rather than a statute, as in *Barnett Bank* and *Franklin*). The Court held that the agency in that case had properly exercised its "plenary" "authority to pre-empt state law" under HOLA. *Id.* at 160–62. This case, by contrast, does not involve an express grant of power by a regulation. And although the OCC has purported to directly preempt state interest-on-escrow laws, it has no delegated authority to do so beyond its sharply

limited authority to make a preemption determination via the procedures specifically set forth in Dodd-Frank. *See* 12 U.S.C. §§ 25b(b), (c). As the United States explained in its brief to the Supreme Court in *Cantero*, the OCC did not exercise its authority to make a preemption determination under Dodd-Frank, and its "broad[] view" of preemption contravenes "the text, structure, and history of the statute." U.S. *Cantero* Br. 6–7 nn.3–4. The OCC's regulation is therefore irrelevant to this case. The only powers that matter here are the powers that have been granted by Congress.

**First National Bank of San Jose.** Last up is *First National Bank of San Jose*. That case involved a California law that allowed the state to seize deposits in bank accounts that had been inactive for a specified period of time without requiring proof of abandonment. 262 U.S. at 366–67. The Court held that the law was preempted as applied to national banks because it operated in "an unusual way"—to the detriment of depositors—and so was "incompatible with" Congress's decision to "specifically empower[]" national banks "freely to accept deposits from customers irrespective of domicile with the commonly consequent duties and liabilities." *Id.* at 370.

Central to the Court's holding was its observation about the law's predicted effects—that potential customers would "hesitate to subject their funds to possible confiscation" if such laws were enforced. *Id.* As the Court would later put it in *Anderson*, the outcome in *First National Bank of San Jose* "turned … on the effect of the state statute in altering the contracts of deposit in a manner considered so unusual

and so harsh … as to deter [depositors] from placing or keeping their funds in national banks." *Anderson*, 321 U.S. at 250 (distinguishing *First National Bank of San Jose*).

Rhode Island's law is different in every respect. It is not "unusual." *Id.* Interest-on-escrow laws have existed in many states for decades—and indeed, are now part of *federal law* for many mortgage loans. *See* 15 U.S.C. § 1639d (a), (b), (g)(3). Nor is the law "harsh." *Anderson*, 321 U.S. at 250. To the contrary, the law *benefits* consumers. So it "could produce no such deterrent effect." *Cantero*, 144 S. Ct. at 1300.

*    *    *

To sum up, this case lacks any of the indicia of significant interference. Rhode Island's law does not prohibit the exercise of a power that has been expressly granted to national banks (as in *Barnett Bank* and *Fidelity*). It does not prevent them from doing anything "specifically selected" by Congress or impose any significant practical barrier to the exercise of an express power (as in *Franklin*, 347 U.S. at 348). And it is not so harsh and unusual as to deter customers from using national banks (or national banks from using escrow accounts). It thus cannot be preempted as a matter of law.

**B.    Comparing this case to cases where the Supreme Court has found no significant interference only confirms that there is no basis for declaring Rhode Island's law preempted.**

Now switch to the cases where the Supreme Court has found that a state law did *not* significantly interfere with the exercise of a national banking power. The Court in *Barnett Bank* and *Cantero* identified three cases as particularly relevant on this

point: (1) *Anderson*; (2) *National Bank v. Commonwealth*, 76 U.S. (9 Wall.) 353; and (3) *McClellan v. Chipman*, 164 U.S. 347 (1896). As before, we take the cases one by one.

**Anderson.** The *Barnett Bank* Court cited *Anderson* "as the primary example of a case where state law was not preempted." *Cantero*, 144 S. Ct. at 1299. The state law in *Anderson* was "seemingly similar" to the law in *First National Bank of San Jose. Id.* Like that earlier law, the law in *Anderson* required banks to "turn over to the state[] deposits which have remained inactive and unclaimed for specified periods." 321 U.S. at 236. Unlike that earlier law, however, the law in *Anderson* required proof of abandonment.

The Court began its analysis by asking whether the law discriminated against national banks (as the law had in *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819)), and whether "any word in the national banking laws [] expressly or by implication conflicts with the [state law]." *Anderson*, 321 U.S. at 247–48. Finding that both answers were no, the Court then examined the law's practical effect, inquiring into whether it was "so burdensome as to be inapplicable to the accounts of depositors in national banks." *Id.* at 248. The Court determined that "[i]t cannot be said that [the law] would have that effect." *Id.* at 252. Because the state law in *Anderson* required proof of abandonment, it did not mandate what was "in effect 'confiscation' of depositors' accounts," as the law in *First National Bank of San Jose* had done. *Anderson*, 321 U.S. at 251–52. Nor did it bring about an "unusual alteration of depositors' accounts." *Id.* at 251. The Court therefore concluded that the law was unlikely to "deter [depositors]

36

from placing their funds in national banks"—at least not any "more than would the tax laws, the attachment laws," or any number of non-preempted state laws to which national banks are subject. *Id.* at 252. Accordingly, the law in *Anderson* did not "impose an undue burden on the performance of the banks' functions." *Id.* at 248.

This case is similar. As multiple courts have recognized, *Anderson* "present[s] the closest analogy." *Lefkowitz*, 390 F. Supp. at 1368; *see Cantero*, 408 F. Supp. 3d at 195. The interference there wasn't meaningfully different than the interference here. In *Anderson*, the state law required national banks to hand over money to the state even though they would have preferred to hold and earn interest on it indefinitely. Which is why a national bank sued to enjoin the law: It wanted to have "full use of the funds until—if ever—they were claimed." *Lefkowitz*, 390 F. Supp. at 1368. In this case, national banks may hold the money deposited in escrow accounts and are generally free to earn interest on those "comparatively small sums" for themselves if they so choose. *Cantero*, 408 F. Supp. 3d at 195. They just have to pay interest to the consumer at the prevailing local market rate of interest for regular savings accounts.

Will that cost banks money? Of course. But as *Anderson* makes plain, that isn't the question. The law in *Anderson* also cost banks money, as do all sorts of state laws that everyone agrees are not preempted—from fair-lending and foreclosure laws to "the tax laws, the attachment laws," and innumerable other laws that "a state may maintain and apply to … national banks." *Anderson*, 321 U.S. at 252. So the question

isn't whether the state law will cause national banks to be less profitable, but whether the law will significantly interfere with the exercise of a banking "power specifically authorized by Congress." *Cantero*, 408 F. Supp. 3d at 195–96.

**National Bank v. Commonwealth.** The next case illustrates the same point. It involved a state law "tax[ing] the shareholders of all banks (including national banks) on their shares of bank stock." *Cantero*, 144 S. Ct. at 1300 (discussing *National Bank v. Commonwealth*). In holding that this law was not preempted, the Court emphasized that national banks generally "are subject to the laws of the State, and are governed in their daily course of business far more by the laws of the State than of the nation." *National Bank v. Commonwealth*, 76 U.S. (9 Wall.) at 362. The Court then gave some examples: "All their contracts are governed and construed by State laws," and state law also governs "[t]heir acquisition and transfer of property, their right to collect their debts, and their liability to be sued for debts." *Id.* Because the tax at issue produced "no greater interference with functions of the bank" than any of these other laws, there was no significant interference and no preemption. *Id.* at 362–63.

**McClellan.** The Court reaffirmed these principles in *McClellan*, the last case discussed in *Barnett Bank* and *Cantero*. There, a state statute "forbid the taking of real estate … for an antecedent debt" in certain scenarios, and the question was whether that statute was preempted by a federal statute that expressly granted national banks the power "to take real estate for given purposes." *McClellan*, 164 U.S. at 357–59.

The Court held that it was not. Although the state statute restricted national banks' power to engage in real-estate transactions, that was not itself enough to preempt the law. If it were, states would not be able to apply their general contract law to national banks, because "any limitation by a state on the making of contracts is a restraint upon the power of a national bank within the state to make such contracts." *Id.* at 359; *see* 12 U.S.C. § 24 Third (express power "[t]o make contracts"); *see also Cuomo*, 557 U.S. at 532–33 (making same point). The question is instead a matter of degree. *See McClellan*, 164 U.S. at 359 (explaining that, although states may limit the exercise of a national banking power in some cases, they may not "forbid [its exercise] in all cases"). The Court concluded that there was no "undue state interference" there because the state law did not "frustrate the purpose for which the national banks were created[] or impair their efficiency to discharge the duties imposed upon them by the law of the United States." *Id.* at 357.

This case calls for the same conclusion. Requiring mortgage lenders to pay a minimum interest rate on escrow account balances does not unduly interfere with national banks' "power to create and fund escrow accounts." *Cantero*, 49 F.4th at 134.

### C.  The text, structure, and history of Dodd-Frank further confirm that Rhode Island's law is not preempted.

Because any interference here is "more akin" to the interference in *Anderson*, *National Bank v. Commonwealth*, and *McClellan*, Rhode Island's law "is not preempted."

39

*Cantero*, 144 S. Ct. at 1300–01. That is clear from "the text and structure of the laws, comparison to [Supreme Court] precedents, and common sense." *See id.* at 1301 n.3.

It is also confirmed by Dodd-Frank. Section 25b, which codifies the significant-interference standard, sets forth a carefully reticulated set of interlocking preemption provisions, 12 U.S.C. § 25b—provisions that Congress enacted into law to "undo[] broader standards adopted by … the OCC in 2004," S. Rep. No. 111-176, at 175.

In its text, structure, and purpose, this section is as much an anti-preemption clause as it is a preemption clause. It says that "State consumer financial laws" are preempted "only if" one of three conditions is met. 12 U.S.C. § 25b(b)(1). The word "only" is important. It is tantamount to saying: "State consumer financial laws are *not* preempted *unless*" an exception applies. The statute's definition of "State consumer financial law" then reinforces this anti-preemption framing. It defines the term to include only state laws that "directly and specifically regulate[]" activity that national banks are "authorized … to engage in," *id.* § 25b(a)(2)—a clear repudiation of the OCC's 2004 preemption rule, which had found *all* such laws to be preempted. *See* 69 Fed. Reg. at 1912. The definition also excludes the state laws most likely to be preempted—those that "directly or indirectly discriminate against national banks"— a puzzling exclusion if section 25b were just an ordinary preemption clause. 12 U.S.C. § 25b(a)(2). The statute's strong anti-preemption framing thus provides additional confirmation that Rhode Island's law is not preempted (at least not as a matter of

40

law). *See* Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* 167 (2012) (explaining that "the whole-text canon" requires consideration of "the entire text, in view of its structure and of the physical and logical relation of its many parts").[3]

A separate provision of Dodd-Frank reinforces Congress's view that laws like Rhode Island's do not significantly interfere with any powers that are "necessary to carry on the business of banking." *See* 12 U.S.C. § 24 Seventh. Section 1639d requires the use of escrow accounts for many subprime mortgages and provides that, "if prescribed by applicable State or Federal law, each creditor shall pay interest to the consumer on the amount held in any impound, trust, or escrow account that is subject to this section in the manner as prescribed by that applicable State or Federal law." 15 U.S.C. § 1639d(a), (b), (g)(3). This provision—which mandates compliance with state interest-on-escrow laws as a matter of federal law for covered mortgages— uses the mandatory "shall" and applies to each "creditor," with no exception for national (or state) banks. *Id.* § 1602(g). The provision would make no sense if Congress believed that state interest-on-escrow laws, including Rhode Island's, significantly

---

[3] A second statute, passed in 1994, provides another textual clue that Congress intended for national banks generally to comply with consumer-protection laws like interest-on-escrow laws. This statute requires national bank branches to comply with state "consumer protection" and "fair lending" laws that apply equally to state bank branches, except "when Federal law preempts the application of such State laws to a national bank." 12 U.S.C. § 36(f)(1)(A). This provision would serve little purpose if state consumer-protection and fair-lending laws were generally preempted as applied to national banks. And Citizens Bank has conceded that fair-lending laws (but not consumer-protection laws) are generally applicable to national banks.

interfered with the business of banking or were categorically preempted as applied to national banks. *See Kivett*, 2024 WL 3901188 at *2 ("[N]o legal authority establishe[s] that [interest-on-escrow] laws significantly interfere[] with national bank powers," and "the text of Dodd-Frank also reflect[s] Congress's view that such laws do not.").[4]

### D.    If Citizens Bank believes it can substantiate its claim of significant interference, it is free to try to build a record and make that showing as the case proceeds to discovery.

This Court should hold that Rhode Island's law is not preempted "based on the text and structure of the [relevant] laws, comparison to [Supreme Court] precents, and common sense." *Cantero*, 144 S. Ct. at 1301 n.3. But, even if this Court were unsure as to the nature and degree of interference caused by Rhode Island's law and whether it could rise to the level of being substantial, Citizens Bank still would not be entitled to prevail on its affirmative preemption defense and to have this case dismissed at the pleading stage. As this Court has previously observed, in some cases, "courts are going to have to make judgment calls about the extent to which [state] laws hinder" banking powers "as a factual matter," which "will often be better made on an evidentiary record." *Bowler*, 320 F.3d at 64.

---

[4] Dodd-Frank applies to Mr. Conti's claim. His mortgage was executed on July 11, 2011. App. 22–37. Dodd-Frank provides that section 25b "shall not be construed to alter or affect the applicability" of OCC's preemption rules for "any contract entered into on or before [Dodd-Frank's] date of enactment" (July 21, 2010). 12 U.S.C. § 5553. Because Mr. Conti's mortgage was executed after Dodd-Frank's enactment date (but before its effective date of July 21, 2011), he may rely on Dodd-Frank for the relief that he seeks for Citizens Bank's failure to pay him interest after July 21, 2011.

Congress itself understood that preemption under Dodd-Frank would (or at least could) turn on factual questions concerning the practical effects of the state law. Section 25b's text leaves no doubt on this score. It provides that the OCC, when it makes a "preemption determination," must examine the "impact of a particular State consumer financial law on any national bank that is subject to that law." 12 U.S.C. § 25b (b)(1)(B), (3)(A). A court may then give effect to that OCC preemption determination only if "substantial evidence, made on the record of the proceeding, supports the specific finding [of] preemption ... in accordance with ... *Barnett Bank*." *Id.* § 25b(c). "'[S]ubstantial evidence' is a 'term of art' used throughout administrative law to describe how courts are to review agency factfinding." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019). By requiring OCC factfinding, then, Congress recognized that assessing significant interference will sometimes require factual development. And sensibly so: After all, before a court can decide whether the practical effects of a state law significantly interfere with a national banking power, it will have to know what those effects *are*. In some cases, that will entail some degree of factfinding.

Here, as discussed, all the available evidence strongly indicates that interest-on-escrow laws have no material effect on the ability of national banks to "create and fund escrow accounts" (the relevant power identified by the Second Circuit, *see Cantero*, 49 F.4th at 134). As does "common sense." *Cantero*, 144 S. Ct. at 1301 n.3; *see Cantero* Tr. 56–57 (counsel for the United States explaining that "state banks have

been complying with [New York's law], apparently, without material impairment," and expressing "skeptic[ism]" that there could be significant interference).

But if that is ultimately wrong, and Citizens Bank has evidence that complying with Rhode Island's law would significantly affect national banks' ability to create and fund escrow accounts, it is free to attempt to make that evidentiary showing as the case proceeds. Having not yet done so, the company "has failed to demonstrate," "on the record before" the Court, that it is entitled to prevail on its "demanding defense" of preemption. *See Wyeth v. Levine*, 555 U.S. 555, 573 (2009) (cleaned up).

## II.    Alternatively, at the very least, this Court should vacate and remand because the district court applied the same preemption test that the Supreme Court squarely rejected in *Cantero*.

At a minimum, this Court should vacate and remand. The district court held that Rhode Island's law is preempted under *Barnett Bank* by applying a categorical test that is indistinguishable from the Second Circuit's "control" test. Like the Second Circuit in *Cantero*, upon which it relied, the district court found the law preempted because it "places limits on" national banks' power "to establish escrow accounts," Add. 8—without examining the law's practical effects, the text or structure of the relevant statutes, or the level of interference in prior Supreme Court precedents.

Because the district court "did not apply [the preemption] standard in a manner consistent with Dodd-Frank and *Barnett Bank*," this Court could do as the Supreme Court did in *Cantero* and "vacate and remand." 144 S. Ct. at 1294.

## CONCLUSION

The district court's judgment should be reversed or, in the alternative, vacated and remanded so that the district court can apply the correct test for preemption in the first instance, consistent with the Supreme Court's decision in *Cantero*.

Respectfully submitted,

/s/ Jonathan E. Taylor

DEEPAK GUPTA
JONATHAN E. TAYLOR
GUPTA WESSLER LLP
2001 K Street, NW
Suite 850 North
Washington, DC 20006
(202) 888-1741
jon@guptawessler.com

DAVID J. GEORGE
BRITTANY L. BROWN
GEORGE FELDMAN
MCDONALD, PLLC
9897 Lake Worth Road
Suite 302
Lake Worth, FL 33467
(561) 232-6002

JANINE L. POLLACK
MICHAEL LISKOW
GEORGE FELDMAN
MCDONALD, PLLC
745 Fifth Avenue, Suite 500
New York, NY 10151
(917) 983-2707

LORI G. FELDMAN
GEORGE FELDMAN
MCDONALD, PLLC
102 Half Moon Bay Drive
Croton-on-Hudson, NY 10520
(917) 983-9321

PATRICK DOWLING, JR.
D'AMICO BURCHFIELD, LLP
536 Atwells Ave.
Providence, RI 02909
(401) 454-1212

August 29, 2024                               *Counsel for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 11,715 words excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Baskerville font.

August 29, 2024

*/s/ Jonathan E. Taylor*
Jonathan E. Taylor

## CERTIFICATE OF SERVICE

I hereby certify that on August 29, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the First Circuit by using the CM/ECF system. All participants are registered CM/ECF users and will be served by the CM/ECF system.

/s/ Jonathan E. Taylor
Jonathan E. Taylor

# Addendum

# TABLE OF CONTENTS

| Dkt. No. | Document | Date | Page |
|---|---|---|---|
| 27 | Memorandum and Order | September 28, 2022 | Add. 1 |
| 28 | Judgment | September 28, 2022 | Add. 11 |

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| JOHN CONTI, on behalf of himself and all others similarly situated, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) C.A. No. 1:21-CV-00296-MSM-PAS ) |
| CITIZENS BANK, N.A. and DOES 1 through 10, inclusive, | ) ) ) |
| Defendants. | ) ) |

## MEMORANDUM AND ORDER

Mary S. McElroy, United States District Judge.

This matter raises the question of whether a national bank—here, defendant Citizens Bank, N.A. ("Citizens")—is subject to a state statute that requires a lender's payment of interest on a mortgage escrow account or whether, as to national banks, the state statute is preempted by the National Bank Act ("NBA"). The plaintiff, John Conti, brings this putative class action against Citizens, his mortgage lender, for failure to pay that interest on his escrow account. Citizens moves to dismiss the matter on the grounds of federal preemption.

For the following reasons, the Court GRANTS Citizens' Motion (ECF No. 15).

## I. BACKGROUND

In July 2011, the plaintiff, John Conti, purchased a residential property in Cranston, Rhode Island. (ECF No. 1 ¶ 16.) Mr. Conti financed the purchase with a loan from Citizens, which was secured by a mortgage on the property. *Id.* Mr. Conti

makes no allegation that this mortgage was a jumbo loan or was made, guaranteed, or insured by a state or federal governmental lending or insuring agency.

As a condition of the mortgage loan, Citizens required Mr. Conti to make advance payments of municipal property taxes and homeowner's insurance into an escrow account.[1] The mortgage agreement between Citizens and Mr. Conti provided that, "Unless an agreement is made in writing or Applicable Law requires interest to be paid on the [Escrow] Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds." *Id.* ¶ 31. The mortgage agreement defined "Applicable Law" as "all controlling federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions."[2] (ECF No. 18-1 at 3.)

Rhode Island law, subject to certain exceptions not relevant here, requires banks to pay interest on amounts that customers deposit into mortgage escrow accounts. R.I.G.L. § 19-9-2(a). Having not received interest payments from Citizens on his escrow account, the plaintiff filed this action alleging breach of contract and, in the alternative, unjust enrichment.

Citizens, however, being a national bank chartered under the National Bank

---

[1] An escrow account is "[a]n account of accumulated funds held by a lender for payment of taxes, insurance, or other periodic debts against real property." *Account*, Black's Law Dictionary (11th ed. 2019).

[2] Although the mortgage agreement is not a part of the pleadings, the Court may consider it at this motion to dismiss stage because it is referenced in the Complaint and because it is a public record. *See Wilson v. HSBC Mortg. Servs., Inc.*, 744 F.3d 1, 4 (1st Cir. 2014) (holding that the court may consider on a motion to dismiss "information found in the mortgage itself, public records, documents incorporated into the complaint by reference, and other matters susceptible to judicial notice").

Add.2

Case: 22-1719     Case 1:21-cv-00290-MSM-PAS Document 262     Filed 09/26/22     Date Filed: 09/28/2023     Page 23 of 10     Entry ID: 6664570

216

Act, seeks to dismiss the action, arguing that any state statute requiring it to pay interest on escrow accounts is preempted by the National Bank Act.  Preemption issues "are ones of law, not of fact, and are amenable to resolution by a motion to dismiss the complaint." *Fitzgerald v. Harris*, 549 F.3d 46, 52 (1st Cir. 2008).

## II.  MOTION TO DISMISS STANDARD

Motions to dismiss on preemption grounds are considered under Fed. R. Civ. P. 12(b)(6).  *Fitzgerald*, 549 F.3d at 52.  To survive a motion to dismiss, the complaint must state a claim plausible on its face.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  The Court assesses the sufficiency of the plaintiff's factual allegations in a two-step process.  *See Ocasio-Herandez v. Fortuno-Burset*, 640 F.3d 1, 11-13 (1st Cir. 2011).  "Step one: isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements." *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012).  "Step two: take the complaint's well-pled (*i.e.,* non-conclusory, non-speculative) facts as true, drawing all reasonable inferences in the pleader's favor, and see if they plausibly narrate a claim for relief."  *Id.*  "The relevant question … in assessing plausibility is not whether the complaint makes any particular factual allegations but, rather, whether 'the complaint warrant[s] dismissal because it failed *in toto* to render plaintiffs' entitlement to relief plausible." *Rodriguez-Reyes v. Molina-Rodriguez*, 711 F.3d 49, 55 (1st Cir. 2013) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 569 n.14 (2007)).

Add.3

## III.    DISCUSSION

### A.  The National Bank Act, 12 U.S.C. § 1 *et seq.*

The National Bank Act, passed in 1864, created a national banking system and established the Office of the Comptroller of Currency ("OCC") to charter, regulate, and oversee national banks. *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 6 (2007). The NBA created a "dual banking system," under which banks can be chartered and regulated under federal or state law. *Lacewell v. OCC*, 999 F.3d 130, 135 (2d Cir. 2021). "While state banks are organized under state law, '[n]ational banks are instrumentalities of the Federal government, created for a public purpose, and as such necessarily subject to the paramount authority of the United States.'" *Cantero v. Bank of Am.*, ___ F.4th ___ (2d Cir. 2022), 2022 WL 4241359, at *2 (quoting *Davis v. Elmira Sav. Bank*, 161 U.S. 275, 283 (1896)).

The NBA grants national banks the authority "[t]o exercise … all such incidental powers as shall be necessary to carry on the business of banking; by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt; by receiving deposits; … [and] by loaning money on personal security." 12 U.S.C. § 24. An "incidental power" is one that "is convenient or useful in connection with the performance of one of the bank's established activities pursuant to its express powers under the National Bank Act." *Arnold Tours, Inc. v. Camp*, 472 F.2d 427, 432 (1st Cir. 1972). The NBA expressly authorizes national banks to engage in real estate lending. 12 U.S.C. § 371(a). As such, a national bank's "incidental powers" include the provision of mortgage escrow account services. *See*

4

**Add.4**

*Cantero*, 2022 WL 42413549 at *9; *see also* OCC, Interpretive Letter No. 1041, 2005 WL 3629258, at *2 (Sept. 28, 2005); OCC, Corporate Decision, 1999 WL 74103, at *2 (Jan. 29, 1999); OCC, Conditional Approval No. 276, 1998 WL 363812, at *9 (May 8, 1998).

The NBA includes no requirement that national banks pay interest on mortgage and escrow accounts. Pursuant to OCC regulations, "[a] national bank may make real estate loans … without regard to state law limitations concerning: … Escrow accounts, impound accounts, and similar accounts." 12 C.F.R. § 34.4(a)(6).

### B. Rhode Island General Laws § 19-9-2(a)

Rhode Island law does, however, in most cases, require the payment of interest on mortgage escrow accounts. R.I.G.L. § 19-9-2(a) provides in relevant part that

> Every mortgagee holding funds of a mortgagor in escrow for the payment of taxes and insurance premiums with respect to mortgaged property located in this state shall pay or credit interest on those funds at a rate equal to the rate paid to the mortgagee on its regular savings account, if offered, and otherwise at a rate not less than the prevailing market rate of interest for regular savings accounts offered by local financial institutions….

### C. Preemption

Under the Supremacy Clause of the United States Constitution "the Laws of the United States … shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. State laws can be preempted in three ways: (1) "express preemption," when there is specific preemption language in a federal statute; (2) "field preemption," when it can be discerned from

the statutory scheme that Congress intended to leave no room for state law on the same subject; and (3) "conflict preemption," when compliance with state and federal law is a "physical impossibility, or when compliance with the state statute would frustrate the purposes of the federal scheme." *SPGGC, LLC v. Ayotte*, 488 F.3d 525, 530-31 (1st Cir. 2007) (quoting *Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25, 31 (1996)). This matter concerns conflict preemption.

"The Supreme Court has consistently recognized [the NBA's] grant of incidental powers as a 'grant[] of authority not normally limited by, but rather ordinarily pre-empting, contrary state law." *Id.* at 531. The NBA preempts state laws that "prevent or significantly interfere with the national bank's exercise of its powers." *Barnett Bank*, 517 U.S. at 33; *see also SPGGC*, 488 F.3d at 531 (holding that "a state law may be preempted by the National Bank Act when it frustrates or limits the ability of a national bank to exercise its statutorily granted powers") (citing *Barnett Bank*, 517 U.S. at 33-34).

Through the Dodd-Frank Act, which took effect on July 21, 2011, Congress codified—but did not change—the NBA preemption standard set forth by the Supreme Court in *Barnett Bank*. In relevant part, the Dodd-Frank Act provides:

> State law preemption standards for national banks and subsidiaries clarified:
>
> …
>
> (b) Preemption standard.
>
> > (1) In general. State consumer financial laws are preempted, only if –

6

**Add.6**

(A) Application of a State consumer financial law would have a discriminatory effect on national banks, in comparison with the effect of the law on a bank chartered by that State;

(B) in accordance with the legal standard for preemption in the decision of the Supreme Court of the United States in *Barnett Bank of Marion Country, N.A. v. Nelson, Florida Insurance Commissioner, et al.*, 517 U.S. 25 (1996), the State consumer financial law prevents or significantly interferes with the exercise by the national bank of its powers; and any preemption determination under this subparagraph may be made by a court, or by regulation or order of the Comptroller of the Currency on a case-by-case basis, in accordance with applicable law ….

12 U.S.C. § 25b.

Applying the *Barnett Bank* preemption principles, the First Circuit, in *SPGGC*, considered a New Hampshire law that prohibited the sale of gift cards valued at $100 or less that contain expiration dates or administrative fees. 488 F.3d at 528. In that case, a national bank marketed and sold gift cards that contained expiration dates and were subject to administrative fees. *Id.* at 529. The court determined that under the NBA, banks have the incidental power to sell gift cards. *Id.* at 531-32. The court then considered whether the New Hampshire statute "frustrates or limits the ability of a national bank to exercise its statutorily granted powers." *Id.* at 531. The court concluded that because the New Hampshire law placed conditions on national banks' ability to sell gift cards, the law "significantly interferes" with the national bank's statutory powers and therefore was preempted by the NBA.[3] *Id.* at 533.

---

[3] Another case also is instructive. In *First Federal Savings and Loan Association of Boston v. Greenwald*, 591 F.2d 417, 419 (1st Cir. 1979), the First Circuit concluded that the federal Home Owners' Loan Act ("HOLA"), 12 U.S.C. § 1461, et seq., which

7

**Add.7**

R.I.G.L. § 19-9-2(a), like the New Hampshire law in *SPGGC*, places "limits" on an incidental power; here, the power to establish escrow accounts. These limitations therefore "significantly interfere" with a national banks' incidental powers to utilize mortgage escrow accounts. *See SPGGC*, 488 F.3d at 533; *see also Cantero*, 2022 WL 4241359, at *9 (holding that a state interest-on-escrow statute was preempted because "[b]y requiring a bank to pay its customers in order to exercise a banking power granted by the federal government, the law would exert control over banks' exercise of that power").

But there is an additional wrinkle. The Dodd-Frank Act also included an amendment to the Truth in Lending Act, effective January 21, 2013, that provides as follows:

> If prescribed by applicable State or Federal law, each creditor shall pay interest to the consumer on the amount held in any impound, trust, or escrow account that is subject to this section in the manner as prescribed by that applicable State or Federal law.

15 U.S.C. § 1639d(g)(3)

This provision, however, only governs loans where (1) state or federal law requires the establishment of an escrow account; (2) the loan is "made, guaranteed, or insured by a State or Federal governmental lending or insuring agency"; (3) the

---

governs federal savings and loan associations, preempted the Massachusetts interest-on-escrow statute. Pursuant to the authority granted to it under the HOLA, the Federal Home Loan Bank Board promulgated a regulation setting forth the circumstances under which federal savings and loan associations were required to pay interest on escrow accounts. *Id.* at 425. The First Circuit held that as a result of this regulation, HOLA preempted Massachusetts' interest-on-escrow statute. *Id.* at 425-26.

loan is a "jumbo" mortgage; or (4) regulations require the establishment of an escrow account. 15 U.S.C. § 1639d(b)(1) – (4). The plaintiff's mortgage falls into none of these categories and, indeed, the plaintiff acknowledges that he makes no claim for violation of 15 U.S.C. § 1639d.

But the plaintiff argues that § 1639d evinces a congressional intent for an abrogation of NBA preemption of state interest-on-escrow laws generally. The defendant, for its part, argues that § 1639d, which does not mention preemption, does nothing to eliminate NBA preemption of state interest-on-escrow laws.

The Court finds neither position well-grounded. The plaintiff's position is too broad. The plain language of § 1639d does not express congressional intent to impose an exception to NBA preemption for all mortgage loans; rather, it created an exception for the select group to which it applies. *See Cantero*, 2022 WL 4241359 at *12 ("[I]t is much more harmonious to read the NBA together with Dodd-Frank as a decision by Congress to carve out an exception from its general rule, rather than expressly imposing a burden on some mortgage loans in order to impliedly impose a burden on all of them.") (quotation omitted). The defendant's position, on the other hand, is too broad in the opposite fashion—it ignores the carved-out exceptions entirely.

Because the plaintiff's mortgage loan is not of the types subject to §1639d, that statute is irrelevant to this case, and it serves only as an indicator of congressional intent with respect to the types of loans that it covers. The general rule of NBA preemption instead applies, and here preempts R.I.G.L. § 19-9-2(a).

Finally, Citizens argues that the fact that plaintiff seeks to represent a multi-state class asserting claims under various state interest-on-escrow laws is another ground for finding preemption. *See* ECF No. 17 at 10-11 (citing *Watters*, 550 U.S. at 13-14 (holding that national banks should be independent of "limitations and restrictions as various and as numerous as the States")). But here no class has been certified and the Court considers only the Rhode Island statute upon which the sole plaintiff before it claims a violation. *See Lawson v. FMR LLC*, 554 F. Supp. 3d 186, 192 (D. Mass. 2021) ("It is well within a district court judge's discretion to dispose of a motion to dismiss before acting on class certification.")

## IV. CONCLUSION

The plaintiff has not set forth plausible claims for breach of contract or unjust enrichment for Citizens' alleged violation of R.I.G.L. § 19-9-2(a) because, except for loan types not at issue here, that statute is preempted by the National Bank Act. Accordingly, Citizens' Motion to Dismiss (ECF No. 15) is GRANTED.

IT IS SO ORDERED.

_____
Mary S. McElroy
United States District Judge

September 28, 2022

**Add.10**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

John Conti,

     Plaintiffs,


    v.

                                    C.A. No. 21-296MSM


Citizens Bank, NA,
     Defendants.

## **JUDGMENT**

[   ] Jury Verdict.  This action came before the Court for a trial by jury.  The issues have been tried and the jury has rendered its verdict.

[ **X** ] Decision by the Court.  This action came to trial or hearing before the Court.  The issues have been tried or heard and a decision has been rendered.


IT IS ORDERED AND ADJUDGED:

    Judgment hereby enters pursuant to the Memorandum and Order entered on September 28, 2022.


                         Enter:


                         /s/ C.Potter


                         Deputy Clerk

Dated: 9/28/2022