# United States Court of Appeals
*for the*
# First Circuit

---

Case No. 22-1770

---

JOHN CONTI, on behalf of himself and all others similarly situated,

*Plaintiff-Appellant,*

v.

CITIZENS BANK, N.A.,

*Defendant-Appellee,*

DOES 1 through 10, inclusive,

*Defendant.*

---

ON APPEAL FROM THE DISTRICT COURT OF RHODE ISLAND,
PROVIDENCE, IN CASE NO. 1:21-CV-00296-MSM,
MARY S. MCELROY, U.S. DISTRICT JUDGE

---

## BRIEF OF *AMICI CURIAE* CONFERENCE OF STATE BANK SUPERVISORS AND AMERICAN ASSOCIATION OF RESIDENTIAL MORTGAGE REGULATORS IN SUPPORT OF PLAINTIFF-APPELLANT AND REVERSAL

---

MATTHEW LAMBERT
  *Deputy General Counsel*
CONFERENCE OF STATE BANK
  SUPERVISORS
1300 I Street N.W., Suite 700 East
Washington, DC 20005

ARTHUR E. WILMARTH, JR.
  *Professor Emeritus of Law*
GEORGE WASHINGTON UNIVERSITY
  LAW SCHOOL
2000 H Street, N.W.
Washington, DC 20052

STEFAN L. JOURET
  *Counsel of Record*
JOURET LLC
265 Franklin Street, Suite 1702
Boston, MA 02110
(617) 523-0133
jouret@jouretllc.com

*Counsel for Amici Curiae*

## Corporate Disclosure Statement

Pursuant to Federal Rule of Appellate Procedure 26.1, *amici* Conference of State Bank Supervisors ("CSBS") and American Association of Residential Mortgage Regulators ("AARMR") state that they are nonprofit corporations without any parent corporations and no publicly held corporation owns 10% or more of their stock.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................iv

INTEREST OF *AMICI CURIAE* ............................................................. 1

ARGUMENT ........................................................................................... 3

I.   The Decision Below Should Be Reversed Because the National Bank Act Does Not Preempt R.I.G.L. § 19-9-2(a) ...................................................................................... 3

    A.   The Decision Below Adopted an Erroneous and Overbroad Preemption Test for Determining Whether State Consumer Financial Laws Apply to National Banks ............................................................ 3

    B.   The Decision Below Greatly Weakens the States' Authority to Charter and Regulate Financial Institutions and Protect Consumers ............. 8

    C.   The National Bank Act Does Not Preempt R.I.G.L. § 19-9-2(a) Because Rhode Island's Statute Does Not Prevent or Significantly Interfere with the Exercise of National Bank Powers .......................................................................... 11

        1.   Section 19-9-2(a) Is a Valid State Consumer Protection Law .................................... 11

        2.   Section 19-9-2(a) Has a Minimal Impact on National Banks ................................................ 14

        3.   Section 19-9-2(a) Does Not Prevent or Significantly Interfere with the Exercise of National Bank Powers ..................................... 15

II.  The OCC's Preemption Rule Violates 12 U.S.C. § 25b and Is Not Entitled to Judicial Deference ............................ 22

    A.   The OCC's Regulation Violates 12 U.S.C. § 25b ......... 23

B.    The OCC's Regulation Is Not Entitled to
Judicial Deference ........................................................ 28

CONCLUSION ........................................................................... 34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Anderson Nat'l Bank v. Luckett,*
  321 U.S. 233 (1944) .............................................. 15, 18, 20, 21, 22

*Atherton v. FDIC,*
  519 U.S. 213 (1997) ........................................................................4

*Barnett Bank of Marion County, N.A. v. Nelson,*
  517 U.S. 25 (1996) .............. 4, 6, 7, 15, 16, 19, 22, 23, 24, 25, 30, 31

*Cantero v. Bank of Am., N.A.,*
  144 S. Ct. 1290 (2024) ............ 4, 5, 6, 7, 8, 11, 15, 16, 22, 23, 25, 26

*Cantero v. Bank of Am., N.A.,*
  49 F.4th 121 (2d Cir. 2022) ................................................... 5, 6, 13

*Conti v. Citizens Bank, N.A.,*
  C.A. No. 1:21-CV-00296-MSM-PAS (Sept. 28, 2022),
  2022 WL 4535251.................................................... 2, 5, 6, 7, 11, 23

*Cuomo v. Clearing House Ass'n, LLC,*
  557 U.S. 519 (2009) ................................................................. 4, 31

*Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta,*
  458 U.S. 141 (1982) ................................................................ 15, 19

*First Nat'l Bank of San Jose v. California,*
  262 U.S. 366 (1923) ........................................................... 15, 18, 19

*Franklin Nat'l Bank v. New York,*
  347 U.S. 373 (1954) ................................................... 15, 16, 17, 19

*Greenwood Trust Co. v. Massachusetts,*
  971 F.2d 818 (1st Cir. 1992), *cert. denied,*
  506 U.S. 1052 (1993) .................................................................. 13

*Hymes v. Bank of America, N.A.,*
  408 F. Supp. 3d 171 (E.D.N.Y. 2019), *rev'd sub nom.*
  *Cantero v. Bank of Am., N.A.,* 49 F.4th 121 (2d Cir. 2022),
  *vacated and remanded,* 144 S. Ct. 1290 (2024) ............................. 13

*Lewis v. BT Investment Mgrs., Inc.*,
    447 U.S. 27 (1980) ........................................................... 3

*Loper Bright Enterprises v. Raimondo*,
    144 U.S. 2244 (2024) ................................................ 29, 33

*Louisiana Pub. Serv. Comm'n v. FCC*,
    476 U.S. 355 (1986) ......................................................... 28

*Lusnak v. Bank of America, N.A.*,
    883 F.3d 1185 (9th Cir.), *cert. denied*, 139 S. Ct. 567 (2018) .. 15, 29

*Marx v. Gen. Revenue Corp.*,
    568 U.S. 371 (2013) ......................................................... 27

*McClellan v. Chipman*,
    164 U.S. 347 (1896) ........................................ 15, 20, 21, 22

*Nat'l Bank v. Commonwealth*,
    76 U.S. 353 (1869) ................................... 15, 16, 20, 21, 22

*Northeast Bancorp v. Bd. of Governors*,
    472 U.S. 159 ................................................................... 3

*People v. Franklin Nat'l Bank*,
    200 Misc. 557, 105 N.Y.S.2d 81 (1951), *rev'd*, 281 App. Div.
    757, 118 N.Y.S.2d 210, *aff'd*, 305 N.Y. 453, 113 N.E.2d 796
    (1953), *rev'd*, 347 U.S. 373 (1954) .................................. 17

*Skidmore v. Swift & Co.*,
    323 U.S. 134 (1944) ......................................................... 29

*SPGGC, LLC v. Ayotte*,
    488 F.3d 525 (1st Cir. 2007) ................................... 5, 6, 7, 8

## Statutes & Other Authorities:

5 U.S.C. § 706(2)(A) ............................................................... 33

12 U.S.C. § 25b ......................................................... *passim*

12 U.S.C. § 25b(b)(1) .............................................................. 23

12 U.S.C. § 25b(b)(1)(B) ............................................... *passim*

12 U.S.C. § 25b(b)(3) ........................................................................ 26

12 U.S.C. § 25b(b)(3)(A) ................................................................... 24

12 U.S.C. § 25b(b)(3)(B) ................................................................... 24

12 U.S.C. § 25b(b)(5)(A) ............................................................. 28, 29

12 U.S.C. § 25b(c) ................................................................. 23, 24, 26

12 U.S.C. § 25b(d) .......................................................................... 27, 28

12 U.S.C. § 25b(h)(2) ......................................................................... 8

12 U.S.C. § 92 ................................................................................... 16

12 U.S.C. § 371 ................................................................................... 8

12 U.S.C. §§ 5101-17 ......................................................................... 2

12 U.S.C. § 5553 ............................................................................... 27

15 U.S.C. § 1639d(b) ........................................................................ 14

15 U.S.C. § 1639d(g)(3) .................................................................... 14

12 C.F.R. § 34.4(a) ..................................................................... 9, 22-33

12 C.F.R. § 34.4(a)(6) ....................................................................... 23

12 C.F.R. § 330.7(d) ......................................................................... 12

FRAP 29(a)(2) ..................................................................................... 1

Rhode Island General Laws (R.I.G.L.) § 19-9-2(a) ........................ *passim*

H.R. Rep. No. 111-517 (2010) (Conf. Rep.), 2010 U.S.C.C.A.N.
    722 ............................................................................................. 31

S. Rep. No. 111-176 (2010) ................................... 29, 30, 31, 32, 33

S. Rep. No. 93-866, 1974 U.S.C.C.A.N. 6546 ............................... 13

Chris Clow, *U.S. Supreme Court to hear mortgage escrow case in
    February*, HOUSINGWIRE (Jan. 12, 2024) ................................. 8

Dawn Papandrea, *What is Escrow?*, U.S. News (Dec. 20, 2023) ........... 12

Catherine M. Sharkey, *Preemption by Preamble: Federal Agencies and the Federalization of Tort Law*, 56 DePaul L. Rev. 227 (2007) ........................................................ 28

Arthur E. Wilmarth, Jr., *Policy Brief: On Remand in Cantero, the Second Circuit Should Uphold New York's Interest-on-Escrow Law and Reject Bank of America's Preemption Claim* (Geo. Wash. Leg. Stud. Res. Paper No. 2024-53, July 31, 2024), https://ssrn.com/abstract=4920523 ............ 11, 13, 16, 17, 18, 19, 22

Arthur E. Wilmarth, Jr., *The Dodd-Frank Act's Expansion of State Authority to Protect Consumers of Financial Services*, 36 J. Corp. L. 893 (2011) ...................................................... 8, 29, 30

Bank Activities and Operations; Real Estate Lending and Appraisals, 69 Fed. Reg. 1904 (Jan. 13, 2004) ........... 23, 26, 27, 30, 31, 32, 33

Brief in Behalf of Anderson Nat'l Bank in *Anderson Nat'l Bank v. Reeves*, 1944 WL 42454 (U.S., Jan. 18, 1944) ............................ 20

Conference of State Banking Supervisors, *Reengineering Nonbank Supervision*, "Chapter Three: Overview of Nonbank Mortgage" (Sept. 2019) ...................................................... 9

Financial Crisis Inquiry Comm'n, *The Financial Crisis Inquiry Report* 13, 96-97, 111-13, 126 (2011) ...................................... 30, 32

*Inside Mortgage Finance*, "Top 50 Firms in Owned Mortgage Servicing: 2Q24" .............................................................. 10

Office of Thrift Supervision: Dodd-Frank Implementation, 76 Fed. Reg. 43549 (July 21, 2011) ............ 23, 24, 25, 26, 28, 29, 33

Remarks of Acting Comptroller of the Currency Michael Hsu before the Exchequer Club, "Size, Complexity, and Polarization in Banking," at 15-16 (July 17, 2024) ...................... 25

# Interest of *Amici Curiae*

*Amici* Conference of State Bank Supervisors ("CSBS") and American Association of Residential Mortgage Regulators ("AARMR") are national associations of state officials responsible for regulating state-chartered banks and state-licensed nonbank financial institutions (including mortgage lenders and mortgage servicers) in all 50 States, American Samoa, the District of Columbia, Guam, Puerto Rico, and the U.S. Virgin Islands.[1]

Since 1902, CSBS has played a leading role in defending our nation's dual system for regulating banks and other financial service providers. CSBS represents its members at the federal level, and CSBS also promotes collaboration among its members and federal agencies. AARMR supports effective supervision and regulation of the residential mortgage industry by its members, thereby promoting a safe and sound

---

[1] No counsel for a party or person other than *amici curiae*, their members, and their counsel authored any part of this brief or made any monetary contribution intended to fund the preparation or submission of the brief. This brief was funded solely by the *amici curiae* filing this brief. Under FRAP 29(a)(2), each party to this action, by counsel, has consented to the filing of this brief.

industry that meets the needs of local communities and protects the rights of consumers.

CSBS administers the Nationwide Multistate Licensing System ("NMLS") for nonbank originators of residential mortgages. Congress, through the Secure and Fair Enforcement for Mortgage Licensing Act of 2008, 12 U.S.C. §§ 5101-17, commissioned CSBS and AARMR to establish NMLS to "enhance consumer protection, and reduce fraud . . . [in] the residential mortgage industry." *Id.* § 5101.

CSBS and AARMR have a compelling interest in this case. The decision below – *Conti v. Citizens Bank, N.A.*, C.A. No. 1:21-CV-00296-MSM-PAS (Sept. 28, 2022), 2022 WL 4535251 (*Conti*) – held that the National Bank Act preempted Rhode Island General Laws (R.I.G.L.) § 19-9-2(a). The Rhode Island statute requires national banks and other mortgage lenders to pay a modest and reasonable rate of interest on customer balances held in mortgage escrow accounts. The decision below adopted an erroneous and overbroad preemption test for determining whether state consumer financial laws apply to national banks. Consequently, the decision below threatens to degrade the

States' authority to regulate financial institutions and protect

consumers of financial services.

## Argument

### I.    The Decision Below Should Be Reversed Because the National Bank Act Does Not Preempt R.I.G.L. § 19-9-2(a).

### A. The Decision Below Adopted an Erroneous and Overbroad Preemption Test for Determining Whether State Consumer Financial Laws Apply to National Banks.

The Supreme Court has repeatedly affirmed the States' authority

to charter and regulate banks and other financial institutions and

protect consumers.  In *Lewis v. BT Investment Mgrs., Inc.*, 447 U.S. 27,

38 (1980), the Supreme Court said:

> We readily accept the submission that, both as a matter of history
> and as a matter of present commercial reality, banking and
> related financial activities are of profound local concern. . . .
> [S]ound financial institutions and honest financial practices are
> essential to the health of any State's economy and to the well-
> being of its people. Thus, it is not surprising that ever since the
> early days of our Republic, the States have chartered banks and
> have actively regulated their activities.

*Accord, Northeast Bancorp v. Bd. of Governors*, 472 U.S. 159, 177-78

(1985).

The Supreme Court has also repeatedly upheld the general

applicability of nondiscriminatory state laws to national banks.

3

*Atherton v. FDIC*, 519 U.S. 213, 222 (1997) ("[F]ederally chartered banks are subject to state law."); *Cuomo v. Clearing House Ass'n, LLC*, 557 U.S. 519, 534 (2009) ("States . . . have always enforced their general laws against national banks—and have enforced their banking-related laws against national banks for at least 85 years.").

In *Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25, 33 (1996), the Supreme Court held that States have "the power to regulate national banks, where . . . doing so does not prevent or significantly interfere with the national bank's exercise of its powers." In 2010, Congress codified *Barnett Bank*'s "prevents or significantly interferes" preemption test in 12 U.S.C. § 25b(b)(1)(B), a provision of the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank). In *Cantero v. Bank of Am., N.A.*, 144 S. Ct. 1290 (2024), the Supreme Court held that the "prevents or significantly interferes" test provides the "controlling legal standard" for determining whether nondiscriminatory State consumer financial laws apply to national banks. *Id.* at 1297.

The decision below adopted an erroneous and overbroad interpretation of the "prevents or significantly interferes" test. The

district court held that R.I.G.L. § 19-9-2(a) was preempted because it "places 'limits' on [national banks'] incidental power to . . . establish escrow accounts," and those "limitations therefore 'significantly interfere' with a national banks' [sic] incidental powers to utilize mortgage escrow accounts." *Conti*, at *4. Thus, the district court adopted a blanket preemption rule, which would override all state consumer financial laws that place any "limits" on the exercise of national bank "powers."

The district court relied on two appellate court decisions to support its mistaken blanket preemption rule. First, the district court cited the Second Circuit's decision in *Cantero*,[2] which held that New York's similar interest-on-escrow law was preempted because, "[b]y requiring a [national] bank to pay its customers in order to exercise a banking power granted by the federal government, the law would exert control over banks' exercise of that power."[3] Second, the district court cited *SPGGC, LLC v. Ayotte*, 488 F.3d 525, 533 (1st Cir. 2007), which held that the National Bank Act preempted a New Hampshire law that

---

[2] *Cantero v. Bank of Am., N.A.*, 49 F.4th 121 (2d Cir. 2022), *vacated and remanded*, 144 S. Ct. 1290 (2024).

[3] *Conti*, at *4 (quoting *Cantero*, 49 F.4th at 134).

restricted the ability of national banks to sell gift cards through

nonbank agents.  Based on *Ayotte*'s analysis, the district court said that

R.I.G.L. § 19-9-2(a) was preempted because it imposes "conditions" and

"limits" on the "exercise" of a national bank's "powers."[4]

Following the decision below, the Supreme Court vacated and

remanded the Second Circuit's decision in *Cantero*.  The Supreme Court

held that the Second Circuit's "categorical test" for preemption was

erroneous because it "would preempt virtually all state laws that

regulate national banks, at least other than generally applicable state

laws such as contract or property laws."  *Cantero*, 144 S. Ct. at 1301.

The Supreme Court determined that the Second Circuit "did not apply

[the "prevents or significantly interferes"] standard in a manner

consistent with Dodd-Frank and *Barnett Bank*."  *Id.* at 1294.  The

Supreme Court made clear that *Barnett Bank*'s "prevents or

significantly interferes" preemption standard "did not draw a bright

---

[4] *Conti*, at \*3-\*4 (discussing *Ayotte*); *see also Ayotte*, 488 F.3d at 531-33
(holding that New Hampshire's law was preempted because – by
prohibiting nonbank agents from selling gift cards worth $100 or less
with expiration dates and administrative fees – the law "regulates the
terms and conditions" of the gift cards issued by a national bank and
"limits the bank's ability to exercise [its] power" to sell gift cards
through nonbank agents).

line" between preempted and non-preempted state laws. *Id.* at 1301. "Instead, *Barnett Bank* sought to carefully account for and navigate this Court's prior bank preemption cases." *Id.*

The Supreme Court held in *Cantero* that "[a] court applying [the] *Barnett Bank* standard must make a practical assessment of the nature and degree of the interference caused by a state law. . . . with the national bank's exercise of its powers." *Id.* at 1300. In addition, the court should conduct a "nuanced comparative analysis" of the challenged state law consistent with the Supreme Court's evaluations of state laws that were found to be preempted, or not preempted, in *Barnett Bank* and six other Supreme Court precedents. *Id.* at 1301.

The decision below should be reversed because the district court relied on the Second Circuit's erroneous "categorical test" for preemption, which the Supreme Court rejected in *Cantero*, 144 S. Ct. at 1301. Additionally, the district court mistakenly relied on *Ayotte* to support its overbroad rule preempting all state laws that place "conditions" and "limits" on the exercise of national bank "powers."[5]

---

[5] *Conti*, at \*3-\*4 (discussing *Cantero* and *Ayotte*). Congress overruled *Ayotte*'s core holding when it enacted Dodd-Frank in 2010. *Ayotte* held that state laws may not restrict the activities of nonbank agents of

7

The district court's blanket preemption rule directly conflicts with the Supreme Court's decision in *Cantero*, and the decision below should therefore be reversed.

**B. The Decision Below Greatly Weakens the States' Authority to Charter and Regulate Financial Institutions and Protect Consumers.**

The decision below severely undermines the States' authority to charter and regulate financial institutions and protect consumers. The district court's erroneous blanket preemption rule would give national banks an unwarranted competitive advantage in mortgage servicing by preempting over a dozen state laws requiring mortgage lenders to pay interest on customers' balances in mortgage escrow accounts.[6] In

---

national banks. 488 F.3d at 531-33. Dodd-Frank includes a provision, 12 U.S.C. § 25b(h)(2), which clarifies that the National Bank Act and 12 U.S.C. § 371 (a statute authorizing national banks to make real estate loans) do *not* preempt the application of state laws to nonbank subsidiaries, affiliates, and agents of national banks. Accordingly, *Ayotte* does not have any continuing precedential force. *See* Arthur E. Wilmarth, Jr., *The Dodd-Frank Act's Expansion of State Authority to Protect Consumers of Financial Services*, 36 J. Corp. L. 893, 935 & n.318 (2011) [hereinafter Wilmarth, *Dodd-Frank*], https://ssrn.com/abstract=1891970.

[6] *See* Chris Clow, *U.S. Supreme Court to hear mortgage escrow case in February*, HOUSINGWIRE (Jan. 12, 2024), https://www.housingwire.com/articles/us-supreme-court-to-hear-mortgage-escrow-case-in-february/ ("At least thirteen states" have enacted interest-on-escrow laws).

addition, as discussed below in Part II, appellee Citizens Bank, N.A. (Citizens) has argued that R.I.G.L. § 19-9-2(a) is preempted by a regulation, 12 C.F.R. § 34.4(a), issued by the Office of the Comptroller of the Currency (OCC).  The OCC's unlawful regulation purports to exempt national banks from complying with fourteen broad categories of state consumer financial laws.  The district court's erroneous blanket preemption rule provides unjustified support for the OCC's invalid regulation.

The business of mortgage servicing has evolved from an in-house function performed by banks to a complex business activity conducted by a variety of bank and nonbank market participants.  Participants in the mortgage servicing market include state banks, national banks, state and federal credit unions, and state-licensed nonbank mortgage lenders and servicers.[7]  Among the nation's top 50 mortgage servicers, state-licensed nonbank providers held a significantly larger share of the

---

[7] For information about the mortgage servicing market, *see* Conference of State Banking Supervisors, *Reengineering Nonbank Supervision*, "Chapter Three: Overview of Nonbank Mortgage," at 27 – 35 (Sept. 2019), https://www.csbs.org/sites/default/files/other-files/Chapter%20Three%20-%20Overview%20of%20Nonbank%20Mortgage_updated.pdf.

servicing market in June 2024 than national banks did, as shown below.

**Market Share of 50 Largest Mortgage Servicers**

|                          | Servicing Market Share | Number of Institutions |
|--------------------------|------------------------|------------------------|
| National Banks           | 34.7%                  | 13                     |
| State Licensed Nonbanks  | 57.1%                  | 26                     |
| State Banks              | 6.7%                   | 8                      |
| Federal Credit Unions    | 1.2%                   | 2                      |
| Housing Finance Agencies | 0.3%                   | 1                      |

*Inside Mortgage Finance*, "Top 50 Firms in Owned Mortgage Servicing: 2Q24," https://www.insidemortgagefinance.com/ (2024). Used with permission.

The district court's erroneous blanket preemption rule would give national banks – including the largest banks in the nation – an unjustified competitive edge by allowing them to evade state interest-on-escrow laws while their state-chartered and state-licensed competitors must comply with those laws.  Additionally, the district court's erroneous decision provides unwarranted support for the OCC's invalid preemption regulation, thereby giving further competitive advantages to national banks and severely weakening the States' ability to protect consumers.

10

**C. The National Bank Act Does Not Preempt R.I.G.L. § 19-9-2(a) Because Rhode Island's Statute Does Not Prevent or Significantly Interfere with the Exercise of National Bank Powers.**

**1. Section 19-9-2(a) Is a Valid State Consumer Protection Law.**

Citizens "required [appellant] Conti to make advance payments of municipal property taxes and homeowner's insurance" into his mortgage escrow account as a "condition of [his] mortgage loan." *Conti*, at *1. Mortgage escrow accounts provide significant benefits to Citizens and other mortgage lenders "by ensuring that the borrower's insurance and tax bills are timely paid, thus protecting the loan collateral (the home) against tax foreclosure or uninsured damage." *Cantero*, 144 S. Ct. at 1295. Escrow accounts also enable Citizens and other mortgage lenders to earn "float" profits by investing their customers' funds held in escrow accounts.[8]

Mortgage escrow accounts operate as mandatory savings accounts for borrowers like appellant Conti, who are required to make monthly

---

[8] Arthur E. Wilmarth, Jr., *Policy Brief: On Remand in Cantero, the Second Circuit Should Uphold New York's Interest-on-Escrow Law and Reject Bank of America's Preemption Claim*, at 5 (Geo. Wash. Leg. Stud. Res. Paper No. 2024-53, July 31, 2024), [hereinafter Wilmarth, *Policy Brief*], https://ssrn.com/abstract=4920523.

deposits to prefund their lenders' future payments of real estate taxes and property insurance premiums on their behalf.[9]  Reflecting the functional role of mortgage escrow accounts as mandatory savings accounts, R.I.G.L. § 19-9-2(a) requires mortgage lenders to pay interest on escrow account balances "at a rate equal to the rate paid to the mortgagee on [the servicer's] regular savings account, if offered, and otherwise at a rate not less than the prevailing market rate of interest for regular savings accounts offered by local financial institutions."

The market-based interest rate required by § 19-9-2(a) is modest, reasonable, and consistent with the fact that mortgage escrow accounts operate as mandatory savings accounts for borrowers.  During the entire period since appellant Conti received his mortgage in 2011,

---

[9] *See Understanding escrow accounts*, EECU Mortgage Services, https://eecu.org/personal-banking/mortgage-home-equity/resource-center/general-mortgage/understanding-escrow-accounts (last visited August 28, 2024) (information provided by a federally-insured credit union in Fort Worth, TX) ("Think of an escrow account as a savings account for your property taxes and insurance."); *see also* Dawn Papandrea, *What is Escrow?*, U.S. News (Dec. 20, 2023), https://money.usnews.com/loans/mortgages/articles/what-is-escrow (reporting that a mortgage "escrow account is basically a savings account," according to David Carey, vice president of Tompkins Mahopac Bank in Brewster, NY). Mortgage escrow account balances are protected by federal deposit insurance if they are deposited in an FDIC-insured bank like Citizens.  12 C.F.R. § 330.7(d)

FDIC-insured depository institutions have produced average yields on
earning assets far above the average interest rates paid on savings
accounts.[10]  Accordingly, § 19-9-2(a) is a valid state consumer protection
law[11] that imposes a minimal burden on mortgage lenders and provides
borrowers with a modest and reasonable return on the balances they
must maintain in their mortgage escrow accounts.[12]

---

[10] Wilmarth, *Policy Brief*, *supra* note 8, at 25, 36-37.

[11] *See Greenwood Trust Co. v. Massachusetts*, 971 F.2d 818, 828 (1st Cir.
1992) (confirming that "banking" and "consumer protection" are
"squarely within the ambit of the states' historic powers," and "any
preemption provision [affecting those state powers] must be construed
cautiously and with due regard for state sovereignty"), *cert. denied*, 506
U.S. 1052 (1993).

[12] *Cf. Hymes v. Bank of America, N.A.,* 408 F. Supp. 3d 171, 176
(E.D.N.Y. 2019) ("By the 1970s, some lenders had begun to exploit . . .
mortgage escrow accounts by requiring borrowers to deposit vastly more
money than their tax and insurance liabilities demanded. *See* S. Rep.
No. 93-866, 1974 U.S.C.C.A.N. 6546, 6548. These lenders could then
invest this money for their own benefit, effectively giving themselves an
interest-free loan for however long the mortgage escrow account
remained in place. [¶] In 1974, Congress and the State of New York
responded with consumer protection legislation aimed at curbing
different aspects [of] this practice."), *rev'd sub nom. Cantero v. Bank of
Am., N.A.*, 49 F.4th 121 (2d Cir. 2022), *vacated and remanded*, 144 S.
Ct. 1290 (2024).

## 2. Section 19-9-2(a) Has a Minimal Impact on National Banks.

Except for its modest interest requirement, R.I.G.L. § 19-9-2(a) does not dictate the terms and conditions of mortgage escrow accounts or affect their administration. The statute does not deprive mortgage lenders of control over their borrowers' escrowed funds, and it allows mortgage lenders to retain all profits from investing those funds that exceed the required interest rate. The statute does not discriminate against national banks and does not conflict with any federal statute.

R.I.G.L. § 19-9-2(a) is consistent with the congressional policy expressed in 15 U.S.C. § 1639d(g)(3). Under § 1639d(g)(3), mortgage lenders who provide certain types of mortgages specified in 15 U.S.C. § 1639d(b) must pay interest on mortgage escrow accounts in accordance with "applicable" state laws. Section 1639d(g)(3) does not apply to Conti's mortgage. However, the federal statute's "language" and "legislative history" indicate "Congress's view that [state interest-on-escrow] laws would not necessarily prevent or significantly interfere with a national bank's operations," and "creditors, including large corporate banks like Bank of America, can comply with state escrow interest laws without any significant interference with their banking

powers." *Lusnak v. Bank of America, N.A.*, 883 F.3d 1185, 1194-96 (9th Cir.), *cert. denied*, 139 S. Ct. 567 (2018).

### 3. Section 19-9-2(a) Does Not Prevent or Significantly Interfere with the Exercise of National Bank Powers.

In accordance with the Supreme Court's instructions in *Cantero*, 144 S. Ct. at 1300-01, a "nuanced comparative analysis" of § 19-9-2(a) demonstrates that the Rhode Island statute does not "prevent or significantly interfere" with the "exercise" of national bank "powers." Section 19-9-2(a)'s relatively minor impact on the "powers" of national banks is clearly insignificant when compared to the severe burdens imposed by the state laws that were preempted in *Barnett Bank*, *Franklin Nat'l Bank v. New York,* 347 U.S. 373 (1954) (*Franklin*); *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141 (1982) (*Fidelity*); and *First Nat'l Bank of San Jose v. California*, 262 U.S. 366 (1923) (*San Jose*).

Additionally, § 19-9-2(a)'s impact on the "powers" of national banks is much less substantial than the burdens created by state laws that were upheld against preemption claims in *Anderson Nat'l Bank v. Luckett*, 321 U.S. 233 (1944) (*Anderson*); *McClellan v. Chipman*, 164 U.S. 347 (1896) (*McClellan*); and *Nat'l Bank v. Commonwealth*, 76 U.S.

15

353 (1869) (*Commonwealth*).  Accordingly, § 19-9-2(a) is not preempted

under the "prevents or significantly interferes" preemption standard

established by *Barnett Bank* and codified in 12 U.S.C. § 25b(b)(1)(B).

*Cantero*, 144 S. Ct. at 1297-1301.

     In *Barnett Bank*, the challenged Florida law prohibited national

banks from selling insurance in the state if they were subsidiaries of

bank holding companies.  More than 75% of U.S. banks were

subsidiaries of bank holding companies when the Supreme Court

decided *Barnett Bank*.  The Court held that Florida's statute was

preempted because it prevented most national banks operating in

Florida from exercising their power to sell insurance from small-town

offices under 12 U.S.C. § 92.[13]

     In *Franklin*, the New York trial court determined that the

challenged New York statute – which forbade national banks from

using the terms "saving" or "savings" in advertising for savings deposits

– imposed a "crippling obstruction" on a "necessary part" of the

defendant national bank's "banking business" by "*restrict[ing]* it

---

[13] *Barnett Bank*, 517 U.S. at 28-35; *see also* Wilmarth, *Policy Brief*, *supra* note 8, at 11-12 (discussing *Barnett Bank*).

16

'tremendously' . . . in obtaining 'savings deposits.'"[14]  The Supreme
Court recognized that national banks "depend upon their success in
attracting private deposits," and the Court found that the New York
statute created "a clear conflict" with federal statutes authorizing
national banks to accept savings deposits.[15]

The Supreme Court pointed out in *Franklin* that federal statutes
empowering national banks to accept deposits were part of a broader
federal policy to ensure that national banks were "at no disadvantage in
competition with state-created institutions."  *Franklin*, 347 U.S. at 375.
New York's law undermined that federal policy by impairing the ability
of national banks to compete for savings deposits with New York state-
chartered savings institutions.  The challenged New York statute
hampered national banks and favored state-chartered savings
institutions by allowing only the latter institutions to use the terms
"saving" or "savings" in advertising their savings accounts.  *Id.* at 374,
374-75 n.1.  The Court held that national banks "must be deemed to

---

[14] *People v. Franklin Nat'l Bank*, 200 Misc. 557, 568-71, 105 N.Y.S.2d
81, 92-95 (1951), *rev'd*, 281 App. Div. 757, 118 N.Y.S.2d 210, *aff'd*, 305
N.Y. 453, 113 N.E.2d 796 (1953), *rev'd*, 347 U.S. 373 (1954); *see also*
Wilmarth, *Policy Brief*, *supra* note 8, at 12-14 (discussing *Franklin*).
[15] *Franklin*, 347 U.S. at 375-78 (quotes at 375 and 378).

have the right to advertise [their savings deposits] by using the commonly understood description which Congress has specifically selected." *Id.* at 378.

In *San Jose*, 262 U.S. at 369-70, the Supreme Court determined that the challenged California escheat law "directly impair[ed]" and "interfere[d]" with the "plainly granted powers" of national banks to solicit and accept deposits. The Supreme Court held that California's law created an impermissible "conflict" with the National Bank Act by attempting "to qualify in an unusual way agreements between national banks and their customers." *Id.* California's law required deposits to be escheated to the state upon "mere proof of dormancy" for over twenty years and "without any determination of abandonment in fact."[16] The Supreme Court concluded that California's law "alter[ed] the contracts of deposit in a manner considered so unusual and so harsh in its application to depositors as to deter them from placing or keeping their funds in national banks."[17]

---

[16] *Anderson*, 321 U.S. at 250-51 (discussing *San Jose*).
[17] *Id.* at 250 (same); *see also* Wilmarth, *Policy Brief*, *supra* note 8, at 14-15 (same).

In *Fidelity*, 458 U.S. at 154-59, 159 n.14, the Supreme Court held that a California judicial rule created "an actual conflict" with a valid regulation issued by the Federal Home Loan Bank Board (FHLBB). The FHLBB's regulation gave federal savings associations "unrestricted" authority to enforce due-on-sale clauses in their mortgages. *Id.* at 146-47, 169 n.22. In contrast, California's judicial rule permitted the enforcement of due-on-sale clauses only in "cases where the lender's security is impaired," thereby "limiting the availability of an option the [FHLBB] considers essential to the economic soundness of the thrift industry." *Id.* at 155-56. The Supreme Court held that California's rule was preempted because it undermined the FHLBB's delegated authority "to ensure the financial stability" of federal savings associations.[18]

R.I.G.L. § 19-9-2(a)'s relatively minor impact on the "exercise" of "powers" by national banks is clearly insignificant compared to the severe burdens imposed by the state laws preempted in *Barnett Bank*, *Franklin*, *San Jose*, and *Fidelity*. Additionally, § 19-9-2(a)'s impact on

---

[18] *Fidelity*, 458 U.S. at 154-56, 168-70; *see also* Wilmarth, *Policy Brief*, *supra* note 8, at 15-17 (discussing *Fidelity*).

national bank "powers" is much less substantial than the burdens resulting from state laws that were found *not* to be preempted in *Anderson*, *McClellan*, and *Commonwealth*.

In *Anderson*, 321 U.S. at 236-47, a national bank argued that a Kentucky statute injured national banks by requiring them to transfer custody of long-dormant deposits to state authorities. While Kentucky's statute did not escheat long-dormant deposits to the state without proof of abandonment, the statute removed such deposits from banks, thereby preventing national banks from continuing to invest those deposits and earn additional profits.[19] In contrast, R.I.G.L. § 19-9-2(a) allows mortgage lenders to retain and invest escrow balances and earn profits that exceed the statute's required interest payments.

In *McClellan*, a national bank challenged a Massachusetts law, which prohibited national banks from accepting preferential transfers of real property from insolvent debtors to satisfy or secure antecedent debts. The national bank claimed that the Massachusetts law undermined the "stability" of national banks by interfering with their

---

[19] Brief in Behalf of Anderson Nat'l Bank in *Anderson Nat'l Bank v. Reeves*, 1944 WL 42454, at *18 (U.S., Jan. 18, 1944).

ability to "tak[e] security" in the form of transfers of real property "whenever necessary for the protection of their property and assets."[20]

In *Commonwealth*, 76 U.S. at 358-63, a national bank challenged a Kentucky law that required national banks to pay the state's tax on bank shares on behalf of their shareholders. The national bank contended that Kentucky's law forced the bank to act as a "State servant" in carrying out the "burdensome duty" of collecting Kentucky's bank shares tax from its shareholders "[w]ithout remuneration."[21]

The Supreme Court rejected the national banks' preemption claims in *Anderson*, *McClellan*, and *Commonwealth* after determining that the challenged state laws did not discriminate against national banks and did not conflict with federal banking laws. The Supreme Court found that the challenged state statutes were reasonable laws designed to accomplish legitimate state purposes – protecting long-dormant deposits in *Anderson*, preventing insolvent debtors from making preferential transfers to favored creditors in *McClellan*, and

---

[20] *McClellan*, 164 U.S. at 352-53, 358-59 (summarizing the national bank's argument).
[21] *Commonwealth*, 76 U.S. at 358 (summarizing the national bank's argument).

collecting a lawful state tax owed by bank shareholders in *Commonwealth*.[22]  Similarly, R.I.G.L. § 19-9-2(a) does not discriminate against national banks, does not conflict with any federal banking statute, and is a valid state consumer protection law.

Thus, a "nuanced comparative analysis" of R.I.G.L. § 19-9-2(a) with the state laws challenged in *Barnett Bank* and the other six decisions identified in *Cantero*, 144 S. Ct. at 1300-01, confirms that the "nature and degree of [§ 19-9-2(a)'s] interference" with the "exercise" of national bank "powers" is far less substantial than any of the state laws evaluated in those seven decisions.  Accordingly, this Court should reject Citizens' preemption claim and hold that § 19-9-2(a) applies to national banks because § 19-9-2(a) does not "prevent or significantly interfere" with the "exercise" of national bank "powers."

## II.  The OCC's Preemption Rule Violates 12 U.S.C. § 25b and Is Not Entitled to Judicial Deference.

Citizens has argued that R.I.G.L. § 19-9-2(a) is preempted by a federal regulation, 12 C.F.R. § 34.4(a), which the OCC adopted in 2004

---

[22] *See* Wilmarth, *Policy Brief*, *supra* note 8, at 18-22 (explaining why the Supreme Court rejected the national banks' preemption arguments in *Anderson*, *McClellan*, and *Commonwealth*).

and reissued in 2011.[23]  Both versions of § 34.4(a) provide that a "national bank may make real estate loans . . . without regard to state law limitations concerning: . . . (6) Escrow accounts."[24]

The district court noted that § 34.4(a)(6) exempted national banks from compliance with state interest-on-escrow laws.  *Conti*, at \*2.  As shown below, the OCC's regulation is unlawful and not entitled to any judicial deference.  The 2011 version of that regulation violates numerous provisions of 12 U.S.C. § 25b, and the 2004 version was repudiated by Congress and the Supreme Court.

### A. The OCC's Regulation Violates 12 U.S.C. § 25b.

Under 12 U.S.C. § 25b(b)(1), the OCC has authority to issue a regulation or order preempting a state consumer financial law "only if— . . . (B) in accordance with the legal standard for preemption in . . . [*Barnett Bank*]," that state law "prevents or significantly interferes with the exercise by the national bank of its powers."  Under 12 U.S.C. §

---

[23] Defendant Citizens Bank, N.A.'s Reply Memorandum of Law in *Conti*, at \*6-\*9, 2021 WL 12269840 (D.R.I., Dec. 20, 2021).

[24] Bank Activities and Operations; Real Estate Lending and Appraisals, 69 Fed. Reg. 1904, 1917 (Jan. 13, 2004) [hereinafter 2004 OCC Preemption Rule]; Office of Thrift Supervision Integration; Dodd-Frank Act Implementation, 76 Fed. Reg. 43549, 43569 (July 21, 2011) [hereinafter 2011 OCC Preemption Rule].

25b(c), the OCC may not issue a preemptive regulation or order unless "substantial evidence, made on the record of the proceeding, supports the [OCC's] specific finding regarding the preemption of such [state law] in accordance with the legal standard of . . . [*Barnett Bank*]."

The OCC must act on a "case-by-case basis" when it issues a preemptive rule or order. *Id.* § 25b(b)(1)(B). To satisfy that "case-by-case" requirement, the OCC must consider "the impact of a particular State consumer financial law on any national bank that is subject to that law, or the law of any other State with substantively equivalent terms." *Id.* § 25b(b)(3)(A). Additionally, the OCC must "first consult" with the Consumer Financial Protection Bureau (CFPB) and "take the views of the [CFPB] into account" before the OCC determines that "a State consumer financial law of another State has substantively equivalent terms as one that the [OCC] is preempting." *Id.* § 25b(b)(3)(B).

The OCC adopted the current version of 12 C.F.R. § 34.4(a) in 2011. That regulation violates several provisions of 12 U.S.C. § 25b and is therefore invalid. First, the OCC's 2011 rule does not incorporate *Barnett Bank*'s "prevents or significantly interferes" preemption test, as

24

required by the unambiguous terms of 12 U.S.C. § 25b(b)(1)(B). In *Cantero*, 144 S. Ct. at 1297, the Supreme Court confirmed that *Barnett Bank*'s "prevents or significantly interferes" test provides the "controlling legal standard" for determining whether "a 'State consumer financial law'. . . is preempted with respect to national banks."

The OCC intentionally omitted *Barnett Bank*'s "prevents or significantly interferes" standard from its 2011 rule. The OCC's preamble to that rule erroneously asserted that "the Dodd-Frank Act does not create a new, stand-alone 'prevents or significantly interferes' preemption standard."[25] The Acting Comptroller of the Currency has acknowledged, "in light of the recent *Cantero* decision," that the OCC "need[s] to develop a more nuanced and balanced approach to *Barnett*."[26] The OCC's 2011 rule is plainly unlawful and void for failing to incorporate *Barnett Bank*'s "prevents or significantly interferes" preemption test. That failure creates a direct and fatal conflict with the

---

[25] 2011 OCC Preemption Rule, *supra* note 24, at 43555.
[26] Remarks of Acting Comptroller of the Currency Michael Hsu before the Exchequer Club, "Size, Complexity, and Polarization in Banking," at 15-16 (July 17, 2024), https://www.occ.treas.gov/news-issuances/speeches/2024/pub-speech-2024-79.pdf.

unambiguous terms of 12 U.S.C. § 25b(b)(1)(B) and the Supreme Court's decision in *Cantero*.

Second, like the OCC's 2004 rule, the 2011 version of § 34.4(a) declares that fourteen broad categories of state consumer financial laws are preempted across the nation, including state laws regulating mortgage escrow accounts.[27]  In adopting the 2011 rule's sweeping nationwide preemptions, the OCC did not comply with § 25b's mandates requiring the OCC (i) to make preemption determinations on a "case-by-case basis," (ii) to support those determinations with "substantial evidence, made on the record of the proceeding," and (iii) to consult with the CFPB before preempting "substantively equivalent" laws enacted by more than one state.  12 U.S.C. §§ 25b(b)(1)(B), (b)(3) & (c).

The OCC erroneously claimed that its 2011 rule did not need to comply with § 25b's requirements.  According to the OCC, the agency's 2011 rule was based on its 2004 regulation, which remained valid after Congress enacted § 25b in 2010.[28]  The OCC's claim is untenable.  Under § 25b(b)(1)(B), a State consumer financial law is preempted "only

---

[27] 2004 OCC Preemption Rule, *supra* note 24, at 1917; 2011 OCC Preemption Rule, *supra* note 24, at 43569.
[28] 2011 OCC Preemption Rule, *supra* note 24, at 43557.

if" the OCC or a court makes a preemption determination in full compliance with § 25b's requirements.  As a narrow exception to that mandate, Dodd-Frank included a grandfather clause, which preserved the applicability of preexisting OCC regulations and orders to "any contract entered into on or before July 21, 2010, by national banks . . . or subsidiaries thereof."  12 U.S.C. § 5553.

Dodd-Frank's limited grandfather clause makes clear that the OCC's preexisting preemption rules and orders – including its 2004 regulation – do not apply to transactions by national banks after July 21, 2010, unless the OCC reissues those preemption determinations in compliance with § 25b.  The OCC's contrary claim would make § 5553 meaningless, thereby violating "the canon against surplusage [that] is strongest when an interpretation would render superfluous another part of the same statutory scheme."  *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013).

Third, § 25b(d) requires the OCC to conduct a review of each preemption determination at least once every five years, after providing notice and opportunity for public comment.  Following each review, the OCC must issue a public notice and a report to Congress stating

27

whether the OCC intends to continue, rescind, or amend that preemption determination. The OCC has not conducted any review of 12 C.F.R. § 34.4(a) pursuant to § 25b(d), even though that regulation was issued in 2011.

Thus, 12 C.F.R. § 34.4(a) is an invalid regulation that violates 12 U.S.C. § 25b in several respects. The OCC's regulation does not preempt R.I.G.L. § 19-9-2(a) because the regulation exceeds the OCC's delegated authority[29] and represents an unlawful attempt by the OCC to engage in "backdoor" preemption."[30]

## B. The OCC's Regulation Is Not Entitled to Judicial Deference.

Under 12 U.S.C. § 25b(b)(5)(A), the OCC's preemptive rules and orders are entitled to judicial deference only if a reviewing court finds

---

[29] *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) ("[A] federal agency may pre-empt state law only when and if it is acting within the scope of its congressionally delegated authority. . . . [A]n agency literally has no power to act, let alone pre-empt the validly enacted legislation of a sovereign State, unless and until Congress confers power upon it.").

[30] *See* Catherine M. Sharkey, *Preemption by Preamble: Federal Agencies and the Federalization of Tort Law*, 56 DePaul L. Rev. 227, 227-30, 251-52, 258-59 (2007) (criticizing federal agencies for seeking to achieve "backdoor federalization" by including unauthorized preemption claims in the preambles to their rules).

that the OCC's preemption determinations are "persuasive," based on the criteria specified in *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) (*Skidmore*).[31]  Following the Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*, 144 U.S. 2244, 2259, 2262, 2267 (2024), all OCC interpretations of federal statutes governing national banks are entitled only to *Skidmore* deference.  Under *Skidmore*, 12 C.F.R. § 34.4(a) is not entitled to any judicial deference because Congress and the Supreme Court repudiated the 2004 version of that regulation, and the 2011 version violates several provisions of 12 U.S.C. § 25b, as shown above.

Congress passed Dodd-Frank in 2010, in response to a "financial crisis that nearly crippled the U.S. economy."  S. Rep. No. 111-176, at 2 (2010).  The Senate Banking Committee determined that "a major cause" of the financial crisis was the "failure" of the OCC and other federal regulators "to stop abusive lending, particularly unsustainable home mortgage lending."  *Id.* at 15 (quoting Travis Plunkett's testimony).  Instead of supporting the States' efforts to combat

---

[31] *Lusnak*, 883 F.3d at 1192 (discussing the limited *Skidmore* deference granted to the OCC's preemption determinations under 12 U.S.C. § 25b(b)(5)(A)); Wilmarth, *Dodd-Frank*, *supra* note 5, at 932-34 (same).

predatory mortgage lending, the OCC preempted those efforts by adopting 12 C.F.R. § 34.4(a) in 2004. The OCC's 2004 regulation "exempted all national banks from State lending laws, including the anti-predatory lending laws." *Id.* at 16. The Senate Banking Committee determined that the OCC's 2004 rule "actively created an environment where abusive mortgage lending could flourish without State controls." *Id.* at 17.[32]

Congress repudiated the OCC's 2004 regulation when it passed 12 U.S.C. § 25b(b)(1)(B) as part of Dodd-Frank. Under § 25b(b)(1)(B), as the Senate Banking Committee explained, "[t]he standard for preempting State consumer financial law would return to what it had been for decades, those [sic] recognized by the Supreme Court in *Barnett Bank v. Nelson*, 517 U.S. 25 (1996), undoing broader standards adopted by rules, orders, and interpretations issued by the OCC in 2004." S. Rep. No. 111-176, at 175 (2010). The Senate Banking

---

[32] *See also* Financial Crisis Inquiry Comm'n, *The Financial Crisis Inquiry Report* 13, 96-97, 111-13, 126 (2011) (criticizing the OCC's 2004 regulation for preempting state anti-predatory lending laws) [hereinafter FCIC Report], https://fcic-static.law.stanford.edu/cdn_media/fcic-reports/fcic_final_report_full.pdf; Wilmarth, *Dodd-Frank*, *supra* note 5, at 909-19 (same).

30

Committee and the House Conference Committee emphasized that *Barnett Bank*'s "prevents or significantly interferes" test would be the governing standard for determining whether a state consumer financial law is preempted by reason of its interference with "a national bank's exercise of its power." *Id.* at 175-76; *accord*, H.R. Rep. No. 111-517, at 875 (2010) (Conf. Rep.), 2010 U.S.C.C.A.N. 722, 731.

In *Cuomo v. Clearing House Ass'n, LLC*, 557 U.S. 519 (2009), the Supreme Court rejected the OCC's underlying rationale for its 2004 preemption rule. The OCC's 2004 rule and a companion regulation declared that state laws applied to national banks only if they provided the "legal infrastructure that surrounds and supports the ability of national banks . . . to do business."[33] The Supreme Court disavowed the OCC's "infrastructure" rationale because it "can be found nowhere within the text of the statute" and "attempts to do what Congress declined to do: exempt national banks from all state banking laws, or at least state enforcement of those laws." *Cuomo*, 557 U.S. at 533.

---

[33] *Cuomo*, 557 U.S. at 532-33 (quoting Bank Activities and Operations, 69 Fed. Reg. 1895, 1896 (Jan. 13, 2004)); *see also* 2004 OCC Preemption Rule, *supra* note 24, at 1912, 1913 (presenting the same "infrastructure" rationale).

Granting any deference to 12 C.F.R. § 34.4(a) would severely undermine the States' authority to protect consumers, thereby inflicting great harm on the American public extending far beyond mortgage escrow accounts.  The OCC's regulation asserts that real estate loans made by national banks are exempted from fourteen broad categories of state consumer financial laws, including state laws regulating loan-to-value ratios, terms of credit, disclosure, advertising, mortgage origination and servicing, and use of credit reports.  Granting any deference to that regulation would greatly weaken the States' ability to protect consumers from abusive lending practices.  Such an outcome would frustrate Dodd-Frank's goal of empowering the States to provide "new consumer protections as problems arise," thereby giving "an important signal to Congress and Federal regulators of the need for Federal action."  S. Rep. No. 111-176, at 174-75 (2010).

Deferring to 12 C.F.R. § 34.4(a) would threaten to return this nation to the disastrous situation that prevailed after the OCC adopted the first version of that regulation in 2004.  As discussed above, the Senate Banking Committee condemned the OCC's 2004 rule because it "created an environment where abusive mortgage lending could flourish

without State controls." S. Rep. No. 111-176, at 16-17 (2010). Illinois Attorney General Lisa Madigan highlighted the devastating consequences of the OCC's 2004 preemption rule in her testimony to the Financial Crisis Inquiry Commission in 2010. As she explained, after the OCC adopted its 2004 rule, "many of the largest mortgage-lenders shed their state licenses and sought shelter behind the shield of a national charter," thereby hamstringing the States' efforts to combat predatory mortgage lending and leading to "the worst lending abuses in our nation's history."[34]

This Court should reject any further claim by Citizens that 12 C.F.R. § 34.4(a) preempts R.I.G.L. § 19-9-2(a). The OCC's regulation is invalid, and is not entitled to any deference, because Congress and the Supreme Court repudiated the 2004 version of that rule, and the OCC adopted the 2011 version in a manner that was "not in accordance with law." *Loper Enterprises*, 144 S. Ct. at 2261 (quoting 5 U.S.C. § 706(2)(A)).

---

[34] FCIC Report, *supra* note 32, at 13, 96-97, 113 (quoting Ms. Madigan's testimony).

## Conclusion

The decision below should be reversed.

Respectfully submitted,

MATTHEW LAMBERT
   *Deputy General Counsel*
CONFERENCE OF STATE BANK
   SUPERVISORS
1300 I St. NW, Suite 700 East
Washington, DC 20005

ARTHUR E. WILMARTH, JR.
   *Professor Emeritus of Law*
GEORGE WASHINGTON UNIVERSITY
   LAW SCHOOL
2000 H Street, N.W.
Washington, DC 20052

/s/ Stefan L. Jouret
STEFAN L. JOURET
   *Counsel of Record*
JOURET LLC
265 Franklin Street, Suite 1702
Boston, MA 02110
(617) 523-0133
jouret@jouretllc.com

*Counsel for Amici Curiae*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32(g), I hereby certify that this document complies with the type-volume limitations set forth in Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 6,449 words.

I further certify that this document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in a 14-point Century Schoolbook font.

Dated:  September 5, 2024

<u>/s/ Stefan L. Jouret</u>

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this same date, I electronically filed the foregoing document with the United States Court of Appeals for the First Circuit by using the CM/ECF system, which electronically served a copy on all counsel of record.

Dated:  September 5, 2024

<u>/s/ Stefan L. Jouret</u>