No. 22-1770

**UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT**

_____

JOHN CONTI, on behalf of himself and all others similarly situated,
*Plaintiff - Appellant*,

v.

CITIZENS BANK, N.A.,
*Defendant - Appellee*,

DOES 1 through 10, inclusive,
*Defendant.*

_____

ON APPEAL FROM THE JUDGMENT OF THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND

**BRIEF OF DEFENDANT-APPELLEE CITIZENS BANK, N.A.**

Dated: October 28, 2024

Geoffrey W. Millsom (#1137858)
Brenna Anatone Force (#1160398)
Daniel J. Procaccini (#1157994)
Colten H. Erickson (#1212847)
ADLER POLLOCK & SHEEHAN P.C.
100 Westminster Street, 16th Floor
Providence, RI 02903
Tel: (401) 274-7200
Fax: (401) 351-4607
gmillsom@apslaw.com
bforce@apslaw.com
dprocaccini@apslaw.com
cerickson@apslaw.com
*Attorneys for Defendant-Appellee*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, Defendant-Appellee Citizens Bank, N.A. is a wholly owned subsidiary of Citizens Financial Group, Inc.  Citizens Financial Group, Inc. is a publicly traded company.  As of June 30, 2024, the Vanguard Group, Inc. and BlackRock, Inc. beneficially own over 10% of the shares of Citizens Financial Group, Inc.

# <u>TABLE OF CONTENTS</u>

**Corporate Disclosure Statement**...............................................................................i

**Table of Authorities** ..........................................................................................iv

**Reasons Why Oral Argument Should Be Heard** ...............................................x

**Introduction** .........................................................................................................1

**Jurisdictional Statement**......................................................................................3

**Counterstatement of the Issue** .............................................................................3

**Counterstatement of the Case**.............................................................................3

    I.     THE DUAL BANKING SYSTEM: FEDERALISM IN ACTION...........3

          A.     The First and Second Banks of the United States ...........................4

          B.     The Free Banking Era: 1837-1863 .................................................5

          C.     The National Bank Act ...................................................................7

          D.     The Federal Reserve Act ................................................................8

          E.     The Advantages of a Balanced Dual Banking System...................9

    II.    MORTGAGE ESCROW ACCOUNTS AND NBA PREEMPTION .......12

    III.   FACTUAL AND PROCEDURAL BACKGROUND .............................16

**Summary of Argument** ......................................................................................**18**

**Standard of Review**............................................................................................**20**

**Argument** ...........................................................................................................**21**

    I.     OVERVIEW OF THE *BARNETT BANK* STANDARD ..........................21

II. THE NBA PREEMPTS RHODE ISLAND'S INTEREST-ON-ESCROW STATUTE ..................................................................22

    A. Rhode Island's Interest-on-Escrow Statute Significantly Interferes with National Banks' Real Estate Lending Power Because it Dictates the Terms of Mortgage Escrow Accounts, Depriving National Banks of Flexibility and Efficiency.................23

    B. Rhode Island's Interest-on-Escrow Statute Significantly Interferes with National Banks' Real Estate Lending Power by Imposing Multiple, Inconsistent Limitations on National Banks' Ability to Offer Mortgages with Escrow Accounts ............31

III. CONTI'S INTERPRETATION OF RELEVANT PRECEDENT CONFLICTS WITH THE ACTUAL HOLDINGS OF THOSE DECISIONS AND THE SUPREME COURT'S INSTRUCTIONS IN *CANTERO* .........................................................................36

IV. THE DODD-FRANK ACT DOES NOT ADDRESS NBA PREEMPTION OF STATE INTEREST-ON-ESCROW LAWS ............43

    A. 15 U.S.C. § 1639d Does Not Apply to Conti's Mortgage..............43

    B. 15 U.S.C. § 1639d Does Not Address Preemption.........................44

V. THIS COURT SHOULD DECIDE THE ISSUE OF PREEMPTION RATHER THAN REMAND THE CASE TO THE DISTRICT COURT ........................................................................47

VI. CONTI'S UNJUST ENRICHMENT CLAIM FAILS WITHOUT REGARD TO WHETHER THE NBA PREEMPTS RHODE ISLAND'S INTEREST-ON-ESCROW STATUTE ...............................48

Conclusion.................................................................................................50

Certificate of Compliance .......................................................................51

Certificate of Service...............................................................................52

iii

## TABLE OF AUTHORITIES

**CASES**                                                                              **PAGE**

*Aguilar v. U.S. Immigr. & Customs Enf't Div. of Dep't of Homeland Sec.*,
    510 F.3d 1 (1st Cir. 2007).....................................................................20

*Akiki v. Bank of Am., N.A.*,
    632 F. App'x 965 (11th Cir. 2015) ...........................................14, 42

*Am. Bd. of Internal Med. v. Salas Rushford*,
    114 F.4th 42 (1st Cir. 2024)................................................................47

*Anderson Nat'l Bank v. Luckett*,
    321 U.S. 233 (1944)...........................................................22, 41-42

*Arnold Tours, Inc. v. Camp*,
    472 F.2d 427 (1st Cir. 1972)......................................................... 13-14

*Barnett Bank of Marion Cnty., N.A. v. Nelson*,
    517 U.S. 25 (1996)....................................................................*passim*

*Campos-Chaves v. Garland*,
    144 S. Ct. 1637 (2024).......................................................................37

*Cannon v. Univ. of Chicago*,
    441 U.S. 677 (1979)...........................................................................45

*Cantero v. Bank of Am., N. A.*,
    602 U.S. 205 (2024)...................................................................*passim*

*Easton v. Iowa*,
    188 U.S. 220 (1903)...........................................................................31

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*,
    458 U.S. 141 (1982)..................................................21-23, 26-27, 38

*First Nat'l Bank of San Jose v. California*,
    262 U.S. 366 (1923)........................................... 10, 22, 27, 32, 39, 42

iv

*Flagstar Bank, N.A. v. Kivett*,
    144 S. Ct. 2628 (2024) ........................................................................16

*Franklin Nat'l Bank of Franklin Square v. New York*,
    347 U.S. 373 (1954)............................................22-23, 29-30, 38

*Kivett v. Flagstar Bank, FSB*,
    No. 21-15667, 2024 WL 3901188 (9th Cir. Aug. 22, 2024) .............................16

*McClellan v. Chipman*,
    164 U.S. 347 (1896)........................................................ 22, 39-40

*McCulloch v. Maryland*,
    17 U.S. 316 (1819)..............................................................5

*Nat'l Bank v. Commonwealth*,
    76 U.S. 353 (1869)........................................................ 22, 39-41

*Pickett v. Ditech Fin., LLC*,
    322 F. Supp. 3d 287 (D.R.I. 2018) ....................................................49

*S. Cty. Post & Beam, Inc. v. McMahon*,
    116 A.3d 204 (R.I. 2015) ..........................................................48

*Sonoiki v. Harvard Univ.*,
    37 F.4th 691 (1st Cir. 2022).......................................................20, 47

*SPGGC, LLC v. Ayotte*,
    488 F.3d 525 (1st Cir. 2007)........................................ 20, 28-29, 47

*Taft v. Comm'r of Internal Revenue*,
    304 U.S. 351 (1938).............................................................. 45-46

*Tomasella v. Nestlé USA, Inc.*,
    962 F.3d 60 (1st Cir. 2020).........................................................49

*United States v. Locke*,
    529 U.S. 89 (2000)................................................................46

*Veazie Bank v. Fenno*,
   75 U.S. 533 (1869) .................................................................................8

*Watters v. Wachovia Bank*, N.A.,
   550 U.S. 1 (2007) ................................................... 12-13, 31-32, 36

*Wilson v. HSBC Mortg. Servs., Inc.*,
   744 F.3d 1 (1st Cir. 2014) ...............................................................17

**STATUTES**

12 U.S.C. § 21, *et seq.* ............................................................................7

12 U.S.C. § 24 .........................................................................................13

12 U.S.C. § 25b ...........................................................................12, 21, 45

12 U.S.C. § 2601, *et seq.* .......................................................................24

12 U.S.C. § 2609 .....................................................................................24

12 U.S.C. § 36 .........................................................................................44

12 U.S.C. § 371 ...........................................................................9, 12, 24, 41

12 U.S.C. § 85 .........................................................................................44

12 U.S.C. § 92a .......................................................................................44

15 U.S.C. § 1639d .......................................................................... 43-44, 46

28 U.S.C. § 1291 .......................................................................................3

28 U.S.C. § 1332 .......................................................................................3

Conn. Gen. Stat. § 49-2a .........................................................................33

Mass. Gen. Laws ch. 183, § 61 ..............................................................34

N.H. Rev. Stat. Ann. § 383-A:2-201 ......................................................33

N.H. Rev. Stat. Ann. § 383-B:2-201.................................................................33

N.H. Rev. Stat. Ann. § 383-B:3-303.................................................................33

N.H. Rev. Stat. Ann. § 397-A:1.......................................................................33

N.H. Rev. Stat. Ann. § 397-A:4.......................................................................33

N.H. Rev. Stat. Ann. § 397-A:9.......................................................................33

N.Y. G.O.L. § 5-601.......................................................................................34

R.I. Gen. Laws § 19-9-2...................................................................3, 11, 17, 34

Vt. Stat. Ann. tit. 8, § 10404...........................................................................34

**REGULATIONS AND GUIDANCE**

12 C.F.R. § 34.4.....................................................................................15, 17

12 C.F.R. Pt. 34.............................................................................................24

*Bank Activities and Operations; Real Estate Lending and Appraisals*,
   69 Fed. Reg. 1904-01 (Jan. 13, 2004).....................................................15

OCC, Conditional Approval No. 276, 1998 WL 363812 (May 8, 1998).......... 13-14

OCC, Corporate Decision, 1999 WL 74103 (Jan. 29, 1999)...................................13

OCC, Interpretive Letter No. 1041, 2005 WL 3629258 (Sept. 28, 2005)...............13

**RULES**

Fed. R. App. P. 26.1..........................................................................................i

Fed. R. App. P. 32...........................................................................................51

Fed. R. App. P. 34...........................................................................................x

Fed. R. Civ. P. 12...........................................................................................47

L.R. 34.0.................................................................................................x

**OTHER AUTHORITIES**

1 Grant S. Nelson, Real Estate Fin. Law § 4:17 (6th ed. 2014) .............................14

Arthur J. Rolnick & Warren E. Weber, *Free Banking, Wildcat Banking, and Shinplasters*, Fed. Rsrv. Bank of Minneapolis Q. Rev., Fall 1982 ..............7

Black's Law Dictionary (11th ed. 2019) ...........................................................13, 43

Bray Hammond, *Banks and Politics in America from the Revolution to the Civil War* (1957) ...................................................................................6

Bruce E. Foote, *Mortgage Escrow Accounts: An Analysis of the Issues* (Cong. Research Serv. 1998) .......................................................................13, 15

Comptroller General of the United States, GAO, *Study of the Feasibility of Escrow Accounts on Residential Mortgages Becoming Interest Bearing* (1973) ...................................................................................25

Dan Awrey, *Bad Money*, 106 Cornell L. Rev. 1 (2020) ...........................................6

David Min, *Federalizing Bank Governance*, 51 Loy. U. Chi. L.J. 833 (2020).........8

Escrow Account Reform Act of 1991, H.R. 3542, 102d Cong. (1991) .................25

Escrow Account Reform Act of 1993, H.R. 27, 103d Cong. (1993) ............... 24-25

FDIC, *A Brief History of Deposit Insurance in the United States* (1998)...............10

Fed. Rsrv. Bank of Phila., *The First Bank of the United States: A Chapter in the History of Central Banking* (Mar. 2021), https://www.philadelphiafed.org/-/media/frbp/assets/institutional/education/publications/the-first-bank-of-the-united-states.pdf .................................................................................4

Fed. Rsrv. Bank of Phila., *The State and National Banking Eras: A Chapter in the History of Central Banking* (Dec. 2016), https://www.philadelphiafed.org/-/media/frbp/assets/institutional/education/publications/the-state-and-national-banking-eras.pdf................................................................................... 6-7

Gerald P. Dwyer, Jr., *Wildcat Banking, Banking Panics, and Free Banking in the United States*, Fed. Rsrv. Bank Atlanta Econ. Rev., Dec. 1996 ............. 5-6

Jay B. Sykes, Cong. Rsch. Serv., RL 45726, *Federal Preemption in the Dual Banking System: An Overview and Issues for the 116th Congress* (2019), https://crsreports.congress.gov/product/pdf/R/R45726 ............... 4-6, 8-9

Jill M. Considine, *A State's Response to the United States Treasury Department Proposals to Modernize the Nation's Banking System*, 59 Fordham L. Rev. S243 (1991) ....................................................... 9

John Wilson Million, *The Debate on the National Bank Act of 1863*, 2 J. Pol. Econ. 251 (1894) .................................................................... 8

Kirby M. Smith, *Banking on Preemption: Allowing National Bank Act Preemption for Third-Party Sales*, 83 U. Chi. L. Rev. 1631 (2016) ................... 7

Mark D. Rollinger, *Interstate Banking and Branching Under the Riegle-Neal Act of 1994*, 33 Harv. J. on Legis. 183 (1996) ................................ 5

News Release, John D. Hawke, Jr., Comptroller of the Currency, Remarks by John D. Hawke, Jr. Comptroller of the Currency Before the New York State Department of Banking (Oct. 15, 2001), https://www.occ.gov/news-issuances/news-releases/2001/nr-occ-2001-89.html .......................................... 10

OCC, *National Banks and the Dual Banking System* (Sept. 2003), https://www.occ.treas.gov/publications-and-resources/publications/banker-education/files/pub-national-banks-and-the-dual-banking-system.pdf ...... 5, 9-10

Remarks by Chairman Alan Greenspan, *Our banking history*, Before the Annual Meeting and Conference of the Conference of State Bank Supervisors, Nashville, Tennessee (May 2, 1998) .............................................. 7

## <u>REASONS WHY ORAL ARGUMENT SHOULD BE HEARD</u>

Pursuant to Fed. R. App. P. 34(a)(1) and L.R. 34.0(a), Citizens respectfully requests that this Court hear oral argument on this appeal.  Citizens believes that oral argument will aid this Court because this case concerns a complex issue of federal preemption under the National Bank Act.  This preemption issue is of vital importance to the many national banking associations that operate among an incoherent mix of state laws governing the payment of interest on mortgage escrow accounts.  This issue was the subject of a recent United States Supreme Court decision clarifying the applicable preemption standard.

## INTRODUCTION

Plaintiff-Appellant John Conti, on behalf of himself and a putative class of mortgage borrowers residing in five states, seeks to hold Defendant Citizens Bank, N.A. ("Citizens") liable for breach of contract and unjust enrichment for failing to pay interest on funds deposited into his mortgage escrow account. Citizens, however, is a national bank, chartered under the National Bank Act ("NBA") and principally regulated by the United States Department of the Treasury, Office of the Comptroller of the Currency ("OCC"). The District Court correctly held that the NBA preempts Rhode Island's interest-on-escrow statute and dismissed Conti's Complaint.

Courts considering whether the NBA preempts state law must apply the test articulated in *Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25, 33 (1996), which holds that the NBA preempts state laws that purport to regulate national banks unless the state law "does not prevent or significantly interfere with the national bank's exercise of its powers." As the Supreme Court recently clarified in *Cantero v. Bank of America, N. A.*, 602 U.S. 205, 215 (2024), however, *Barnett Bank* is not a bright-line test. When assessing preemption under this statute, courts should look to *Barnett Bank*, cases that *Barnett Bank* examined in reaching its decision, other relevant precedent, the text of the statute at issue, and common sense. *Id.* at 220 n.3.

1

*Barnett Bank* and other relevant precedent establish that the NBA preempts state laws that interfere with national banks' flexible and efficient exercise of their powers. State interest-on-escrow laws unquestionably deprive national banks of the flexibility to determine whether to offer mortgage escrow accounts that pay interest, and if so, the applicable rate of interest. These laws further hobble national banks' right to offer mortgages with escrow accounts by making those accounts inefficient to maintain. Currently, at least twelve states have enacted statutes requiring the payment of interest on mortgage escrow accounts. Each statute imposes an array of unique obligations. Often, these obligations conflict with duties imposed by other states. Absent federal preemption with respect to the regulation of mortgage escrow accounts, a national bank like Citizens that operates in many states would be subject to varying and conflicting laws governing the same type of account.

Because Rhode Island's interest-on-escrow statute significantly interferes with national banks' real estate lending power, this Court must affirm the District Court's holding. Regardless, the Court should affirm the District Court's dismissal of Conti's unjust enrichment claim, which is legally deficient even if the NBA does not preempt Rhode Island's interest-on-escrow law.

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction under 28 U.S.C. § 1332(d). This Court has jurisdiction under 28 U.S.C. § 1291.

## COUNTERSTATEMENT OF THE ISSUE

Does the National Bank Act preempt state statutes, such as R.I. Gen. Laws § 19-9-2, that require banks to pay interest on mortgage escrow accounts?

## COUNTERSTATEMENT OF THE CASE

### I.     THE DUAL BANKING SYSTEM: FEDERALISM IN ACTION.

The dual nature of U.S. banking has been its defining characteristic for nearly two centuries. As it exists today, the system mirrors the federalist structure of the United States. Just as the U.S. Constitution balances power between the federal government and the states, regulatory authority is divided among several sovereigns. State-chartered banks occupy one side of the balance. The intrinsic diversity of state laws regulating local matters creates fertile conditions for innovation. National banks act as a counterweight, elevating uniformity, efficiency, and stability by exercising congressionally authorized powers at scale that are subject to federal standards and shielded by the Supremacy Clause from substantial local interference. Notwithstanding these differences, national banks remain subject to generally applicable state laws, and state-chartered banks remain

subject to generally applicable federal laws.  The market—rather than any one sovereign—holds sway over which products and services succeed or fail.

The American dual banking system is eccentric.  Its history has been marked by periods of imbalance, and the limits on a state's regulatory powers have been heavily litigated.  Nevertheless, the system endures.  Congress has not sought to replace it, and for good reason.  History has proven that this multi-sovereign, compound structure creates distinct opportunities for experimentation that benefit consumers and the economy.

### A.    The First and Second Banks of the United States.

Early in its financial history, the United States made several attempts to establish a central federal bank.  In 1791, at the urging of Alexander Hamilton, Congress chartered the First Bank of the United States to jumpstart the nation's economy.  Fed. Rsrv. Bank of Phila., *The First Bank of the United States: A Chapter in the History of Central Banking* 4 (Mar. 2021), https://www. philadelphiafed.org/-/media/frbp/assets/institutional/education/publications/the-first-bank-of-the-united-states.pdf.  Unlike most modern national banks, the First Bank acted principally as the federal government's fiscal agent to collect revenues and pay debts.  *See* Jay B. Sykes, Cong. Rsch. Serv., RL 45726, *Federal Preemption in the Dual Banking System: An Overview and Issues for the 116th Congress* 3 (2019), https://crsreports.congress.gov/product/pdf/R/R45726.  The

concentrated power of the First Bank did not sit well with some lawmakers, however, who were concerned that it "threatened state sovereignty and undermined the operations of state-chartered banks." *Id.* Congress ultimately declined to renew the First Bank's charter in 1811 by a single vote. *Id.*

Attitudes shifted after the War of 1812. The nation was plagued by economic turmoil, and Congress responded by chartering the Second Bank of the United States in 1816. *Id.* The Second Bank shared many of its predecessor's powers; it also shared many of its critics—individuals who believed the bank "threatened state banks and infringed upon states' rights." Mark D. Rollinger, *Interstate Banking and Branching Under the Riegle-Neal Act of 1994*, 33 Harv. J. on Legis. 183, 188 (1996).[1] These scruples, together with the Second Bank's decision to tighten credit in response to the Panic of 1819, led President Jackson to veto the renewal of its charter in 1835. Sykes, *supra*, at 4.

### B.    The Free Banking Era: 1837–1863.

Only state-chartered banks remained after the Second Bank's demise. Federal oversight was nonexistent, and regulation was left to the states alone.[2] By

---

[1] The Supreme Court famously affirmed Congress's power to charter the Second Bank of the United States in *McCulloch v. Maryland*, 17 U.S. 316 (1819), which was brought about by states' attempt to "drive the branches of the Second Bank from their jurisdictions," by, among other things, levying heavy taxes on the Bank. OCC, *National Banks and the Dual Banking System* 5 (Sept. 2003), https://www.occ.treas.gov/publications-and-resources/publications/banker-education/files/pub-national-banks-and-the-dual-banking-system.pdf.

[2] "The defining characteristic of free banking is that if the requirements of a given state's free banking law are met, any person or group of persons is permitted to open a bank." Gerald P.

most accounts, this era was marked by "a large number of bank failures, financial instability, and inefficiencies that accompanied a heterogeneous currency." Sykes, *supra*, at 4.

"During this 'Free Banking era,' the country lacked a uniform national currency and relied instead on notes issued by state banks, which circulated at a discount from their face value that reflected the issuing bank's location and credit quality." *Id.* However, "[t]here is some debate amongst scholars about whether the free banking era should be viewed as a triumph of free market capitalism or as a cautionary tale regarding the dangers of laissez faire monetary policy." Dan Awrey, *Bad Money*, 106 Cornell L. Rev. 1, 12–13 (2020).

Some states weathered this era reasonably well. For others, it was a fiasco. At least one financial historian has concluded that citizens of states that prohibited banking altogether "were better off than the people of Michigan, Wisconsin, Indiana, and Illinois," who had free banking. Bray Hammond, *Banks and Politics in America from the Revolution to the Civil War* 626 (1957). So-called "wildcat banks"—local banks "that took advantage of lax state laws" to issue "an excessive amount of banknotes"—were another well-documented ill of this period that has been attributed to insufficient government intervention. *See* Fed. Rsrv. Bank of

---

Dwyer, Jr., *Wildcat Banking, Banking Panics, and Free Banking in the United States*, Fed. Rsrv. Bank Atlanta Econ. Rev., Dec. 1996, at 1.

Phila., *The State and National Banking Eras: A Chapter in the History of Central Banking* 6 (Dec. 2016), https://www.philadelphiafed.org/-/media/frbp/assets/ institutional/education/publications/the-state-and-national-banking-eras.pdf; Arthur J. Rolnick & Warren E. Weber*, Free Banking, Wildcat Banking, and Shinplasters*, Fed. Rsrv. Bank of Minneapolis Q. Rev., Fall 1982, at 1.  While scholars debate the degree of national instability during this period, "it is fairly clear that the strength of banks varied from state to state, with regulation and supervision uneven."  Remarks by Chairman Alan Greenspan, *Our banking history*, Before the Annual Meeting and Conference of the Conference of State Bank Supervisors, Nashville, Tennessee (May 2, 1998).

> ### C.      The National Bank Act.

National banking began its resurgence in the 1860s in response to the currency woes of the Free Banking Era.  The popular narrative is that "Congress passed the NBA at the height of the Civil War in 1864 to create a stable national currency and banking system during and after the Civil War."  Kirby M. Smith, *Banking on Preemption: Allowing National Bank Act Preemption for Third-Party Sales*, 83 U. Chi. L. Rev. 1631, 1633 (2016).  Whatever the impetus, Congress passed the National Currency Act in 1863 and the National Bank Act in 1864.[3]  Its

---

[3] The National Currency Act and the National Bank Act collectively are commonly referred to as the "National Bank Act," or "NBA," 12 U.S.C. § 21, *et seq.*

purpose in doing so was clear: incentivize state banks to convert to national

charters and eradicate state-chartered banks.  As one scholar has observed,

"Nothing can be more obvious from the debates than that the national system was

to supersede the system of state banks."  John Wilson Million, *The Debate on the

National Bank Act of 1863*, 2 J. Pol. Econ. 251, 267 (1894).  To that end, in 1865,

Congress imposed a ten percent tax on banknotes issued by state-chartered banks.

Sykes, *supra*, at 5.  The U.S. Supreme Court upheld this tax, overruling the

objections of state banks that claimed the tax was "so excessive as to indicate a

purpose on the part of Congress to destroy the franchise of the bank."  *Veazie Bank

v. Fenno*, 75 U.S. 533, 548 (1869).

A unified national banking system may have been Congress' aim, but state-

chartered banks persevered, avoiding the tax on their banknotes "by inventing bank

deposits and checking accounts as a means to avoid this tax."  David Min,

*Federalizing Bank Governance*, 51 Loy. U. Chi. L.J. 833, 861–62 (2020).  "As a

result, state-chartered banks have outnumbered national banks since 1895."  Sykes,

*supra*, at 5.

### D.    The Federal Reserve Act.

By the early twentieth century, the need for a centralized banking system

was evident.  Congress passed the Federal Reserve Act ("FRA") and created the

Federal Reserve in 1913 in response to a 1907 banking panic that highlighted the

need for a 'lender of last resort' to replenish banks' reserves when they experience liquidity shortfalls." Sykes, *supra*, at 6. The FRA also permitted national banks to engage in real estate lending (a power previously reserved to state-chartered banks). *See* 12 U.S.C. § 371(a). It did not, however, eliminate federally chartered banks. Instead, along with the Banking Act of 1933, the FRA created the dual banking system as we know it today. *See* Jill M. Considine, *A State's Response to the United States Treasury Department Proposals to Modernize the Nation's Banking System*, 59 Fordham L. Rev. S243, S244 (1991).

### E.    The Advantages of a Balanced Dual Banking System.

The existence of fifty-one distinct regulatory regimes "enable[s] state systems to serve as laboratories for innovation." OCC, *National Banks and the Dual Banking System* 8–9 (Sept. 2003), https://www.occ.treas.gov/publications-and-resources/publications/banker-education/files/pub-national-banks-and-the-dual-banking-system.pdf. "[T]his potential diversity of standards is a valued attribute of the state component of the dual banking system." *Id.* at 9. These state laboratories have proven successful. *See* Considine, *supra*, at S244. When innovative state banking regulations are effective, other regulators adopt them. For example, the deposit insurance system that exists today was developed with the benefit of "the experience of the various states that adopted insurance programs,"

particularly that of New York. FDIC, *A Brief History of Deposit Insurance in the United States* 19 (1998).

While State regulators have the advantage of proximity to the banks they oversee and familiarity with the customers they serve, "the national banking system is a laboratory, too, but what it demonstrates is the value of applying uniform national standards to activities and products that, today, have national markets." *National Banks and the Dual Banking System*, *supra*, at 10. National Banks draw their innovative advantage from "the efficiencies and benefits that flow from uniform national standards." *Id.* "Just by way of example, national banks issued the first negotiable certificate of deposit in 1961, securitized loans for the first time in 1984, and introduced a whole range of new financial products and services to the banking public over the past several decades." News Release, John D. Hawke, Jr., Comptroller of the Currency, Remarks by John D. Hawke, Jr. Comptroller of the Currency Before the New York State Department of Banking (Oct. 15, 2001), https://www.occ.gov/news-issuances/news-releases/2001/nr-occ-2001-89.html. National banks' ability to offer banking products consistently across the several states has long been upheld by the U.S. Supreme Court. *See, e.g.,¸ First Nat'l Bank of San Jose v. California*, 262 U.S. 366, 370 (1923) ("The depositors of a national bank often live in many different states and countries, and

certainly it would not be an immaterial thing if the deposits of all were subject to seizure by the state where the bank happened to be located.").

Because state and national banks can experiment within the confines of their respective spheres, customers have a diverse array of products to choose from. The Court need look no further than the facts of this case to find an example. A Rhode Island resident can obtain a mortgage from a state-chartered bank required to pay interest on the escrow account maintained by the bank for the purpose of paying real estate taxes and insurance premiums. *See* R.I. Gen. Laws § 19-9-2(a). Perhaps such a term is attractive to the customer, but as the law stands today, he may choose to forgo the interest payment for a mortgage offered by a national bank that could, hypothetically, offer a lower interest rate on the loan while maintaining a similar profit margin by offsetting the cost of servicing the mortgage. It may be that the payment of interest on escrow accounts is so attractive to Rhode Island customers that they flock to state-chartered banks for their mortgage needs, and federally chartered banks will be compelled to offer a similar product. The likelihood of this scenario is beside the point. What matters is that Rhode Islanders have a greater variety of banking products to choose from, because the dual banking system allows the free market to guide a customer's decision.

11

Congress refined the relationship between the states and national banks in the Dodd-Frank Wall Street Reform Act of 2010 ("Dodd-Frank Act"). Among other things, the Dodd-Frank Act codified the U.S. Supreme Court's decision in *Barnett Bank*. *See* 12 U.S.C. § 25b(b)(1)(B). Under *Barnett Bank*, the NBA preempts state laws if such laws "prevent or significantly interfere with [a] national bank's exercise of its powers." 517 U.S. at 33. While Congress affirmed the U.S. Supreme Court's precedents on NBA preemption, it chose to maintain the nation's dual banking system that has endured for 160 years.

Conti now seeks to do what Congress has not done—decisively tip the scales in favor of state regulation of bank products. Doing so will disrupt fundamental characteristics of federally chartered banks and threaten the dynamic tension that has distinguished this unique financial structure through its history.

## II.  MORTGAGE ESCROW ACCOUNTS AND NBA PREEMPTION.

The NBA expressly authorizes national banks to engage in real estate lending, subject only to restrictions imposed by the OCC. 12 U.S.C. § 371(a) ("Any national banking association may make, arrange, purchase or sell loans or extensions of credit secured by liens on interests in real estate, subject to . . . such restrictions and requirements as the Comptroller of the Currency may prescribe by regulation or order."); *see Watters v. Wachovia Bank*, N.A., 550 U.S. 1, 6 (2007), *abrogated on other grounds by* 12 U.S.C. § 25b(b)(2), (e). The NBA also grants

national banks the authority "[t]o exercise . . . all such incidental powers as shall be necessary to carry on the business of banking; by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt; by receiving deposits; . . . [and] by loaning money on personal security."  12 U.S.C. § 24(Seventh); *accord Watters*, 550 U.S. at 6.  An "incidental power" is one that "is convenient or useful in connection with the performance of one of the bank's established activities pursuant to its express powers under the National Bank Act." *Arnold Tours, Inc. v. Camp*, 472 F.2d 427, 432 (1st Cir. 1972).

A national bank's "incidental powers" include the provision of mortgage escrow account services.  *E.g.*, OCC, Interpretive Letter No. 1041, 2005 WL 3629258, at *2 (Sept. 28, 2005); OCC, Corporate Decision, 1999 WL 74103, at *2 (Jan. 29, 1999); OCC, Conditional Approval No. 276, 1998 WL 363812, at *9 (May 8, 1998); *see also Cantero*, 602 U.S. at 210.  An escrow account is "[a]n account of accumulated funds held by a lender for payment of taxes, insurance, or other periodic debts against real property."  *Account*, Black's Law Dictionary (11th ed. 2019).  Borrowers typically prepay a set amount into the escrow account on a regular basis, and lenders withdraw those funds on a periodic basis to ensure timely payment of borrowers' property taxes and insurance premiums.  Bruce E. Foote, *Mortgage Escrow Accounts: An Analysis of the Issues* 1 (Cong. Research Serv. 1998) [hereinafter *Mortgage Escrow Accounts*].

13

A bank's power to condition the extension of a mortgage loan on the borrower's establishment of an escrow account is more than "convenient or useful," *see Arnold Tours*, 472 F.2d at 432, it is crucial.  Escrow accounts dramatically reduce the risk of loss to both the bank and its borrowers.  *See, e.g.*, *Akiki v. Bank of Am., N.A.*, 632 F. App'x 965, 970 (11th Cir. 2015) (quoting 1 Grant S. Nelson, Real Estate Fin. Law § 4:17 (6th ed. 2014)) ("[T]he use of escrow accounts for the payment of taxes and insurance became 'widespread' after the 'depression experience of the 1930's,'" in which many homeowners lost their homes due to inability to pay property taxes.); *see also Cantero*, 602 U.S. at 210 ("Mortgage-escrow accounts are designed to protect both the bank and the borrower.").  Borrowers benefit because the escrow account "relieves them of the tasks of paying such regular tax and insurance obligations in a lump sum" and ensures timely payment of those obligations.  Conditional Approval No. 276, 1998 WL 363812, at *9; *see also Cantero*, 602 U.S. at 210–11 (The escrow "arrangement helps the borrower by simplifying expenses and budgeting.  Instead of having to pay large lump-sum insurance and tax payments once or twice a year, the borrower can instead make small payments throughout the year.").  Likewise, the bank benefits because the escrow account reduces the risk that the bank will lose its security interest in the property by virtue of an insurable loss (like a fire) or a tax lien (which may be senior to any mortgage liens on a property).  *See, e.g.*,

14

*Mortgage Escrow Accounts*, *supra*, at 1; *see also Cantero*, 602 U.S. at 211 ("[T]he [escrow] arrangement . . . assists the bank by ensuring that the borrower's insurance and tax bills are timely paid, thus protecting the loan collateral (the home) against tax foreclosure or uninsured damage.").

Starting in the 1970s, states began passing laws requiring banks to pay borrowers interest on funds deposited into escrow accounts. *Mortgage Escrow Accounts*, *supra*, at 3. Today, at least twelve states have enacted some type of interest-on-escrow law. *Id.* These state laws vary widely in their scope and terms, including interest rates. *Id.* at 3–4. The OCC, which is charged with interpreting the NBA, decades ago determined that the NBA preempts these state laws. *Bank Activities and Operations; Real Estate Lending and Appraisals*, 69 Fed. Reg. 1904-01 (Jan. 13, 2004). Specifically, pursuant to OCC regulations, "[a] national bank may make real estate loans . . . without regard to state law limitations concerning: . . . Escrow accounts, impound accounts, and similar accounts." 12 C.F.R. § 34.4(a)(6).

In the last decade, however, enterprising plaintiffs began to challenge the longstanding belief that the NBA preempts state interest-on-escrow laws. In *Cantero*, the Supreme Court, without deciding whether the NBA preempts state interest-on-escrow laws, vacated a Second Circuit decision holding that New York's interest-on-escrow law was preempted on the ground that the Second

Circuit failed to apply the *Barnett Bank* test.  Thereafter, the Second Circuit set a supplemental briefing schedule; the case remains pending.  In *Flagstar Bank, N.A. v. Kivett*, 144 S. Ct. 2628 (2024), the Supreme Court—again without deciding the issue of NBA preemption—remanded the case to the Ninth Circuit with instructions to reconsider its decision in light of *Cantero*.  The Ninth Circuit, without inviting supplemental briefing, issued a cursory decision less than one month later concluding that its initial holding was correct.  *See Kivett v. Flagstar Bank, FSB*, No. 21-15667, 2024 WL 3901188 (9th Cir. Aug. 22, 2024).  The Appellant petitioned for rehearing *en banc*; its petition remains pending.  That brings us to this case.

## III.    FACTUAL AND PROCEDURAL BACKGROUND.

In July 2011, Plaintiff John Conti ("Conti") purchased a residential property in Cranston, Rhode Island.  App. 11 ¶ 16.  To finance this purchase, Conti obtained a loan from Citizens, which was secured by a mortgage on the property.  *Id.*  Conti does not, and cannot in good faith, allege that this mortgage was a jumbo loan or was made, guaranteed, or insured by a state or federal governmental lending or insuring agency.  *See* App. 6–19.  As a condition of providing Conti with a mortgage loan, Citizens required him to make certain advance payments of property taxes and homeowners' insurance into an escrow account.  App. 11 ¶ 16.

The Mortgage between Citizens and Conti provided that, "[u]nless an agreement is made in writing or Applicable Law requires interest to be paid on the [escrow] Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds."  App. 16 ¶ 31.  The Mortgage defined "Applicable Law" as "all controlling federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions."  App. 23.[4]

With certain irrelevant exceptions, Rhode Island law requires banks to pay interest on amounts that customers deposit into mortgage escrow accounts.  R.I. Gen. Laws § 19-9-2(a).  Citizens, however, is a national banking association that is organized and existing pursuant to the NBA.  App. 8 ¶ 6.  Citizens, in good faith reliance on the OCC's determination that national banks are not subject to state laws like R.I. Gen. Laws § 19-9-2, *see* 12 C.F.R. § 34.4(a)(6), did not pay Conti interest on the amounts that he contributed to his mortgage escrow account.  *See* App. 11 ¶ 17.

---

[4] Although Conti did not attach the Mortgage to the Complaint, this Court may consider it because it is referenced in the Complaint, as well as because it is a public record (filed with the Cranston, Rhode Island Recorder of Deeds).  *See, e.g.*, *Wilson v. HSBC Mortg. Servs., Inc.*, 744 F.3d 1, 4 (1st Cir. 2014) (on a motion to dismiss, accepting as true the facts alleged in the complaint, "supplementing as necessary with information found in the mortgage itself, public records, documents incorporated into the complaint by reference, and other matters susceptible to judicial notice.").

On July 15, 2021, Conti brought this putative class action against Citizens in Rhode Island federal court, alleging that Citizens breached its mortgage agreement with Conti and other class members, or alternatively, was unjustly enriched, when it failed to pay interest on amounts deposited into customers' mortgage escrow accounts in violation of state law. *See* App. 6–19. Conti sought to certify a class of individuals not just from Rhode Island, but also from Connecticut, Massachusetts, New York, New Hampshire, and Vermont—all of which have statutes that require banks to pay interest on amounts deposited into mortgage escrow accounts. App. 10–12 ¶¶ 13–14, 18. Alternatively, Conti sought to certify a class of Rhode Island customers. App. 11–12 ¶ 18.

On September 17, 2021, Citizens moved to dismiss the Complaint on the ground that the NBA preempted Conti's claims. On September 28, 2022, the District Court granted Citizens' motion to dismiss and entered judgment in Citizens' favor. Conti appealed the District Court's decision to this Court. Shortly thereafter, at the parties' request, this Court held Conti's appeal in abeyance pending the U.S. Supreme Court's decision in *Cantero*.

## SUMMARY OF ARGUMENT

The District Court correctly held that the NBA preempts Rhode Island's interest-on-escrow statute. *Barnett Bank* and other relevant precedent establish that a state law significantly interferes with a national bank's powers if, *inter alia*,

18

(a) the state law attempts to dictate the terms of a banking product in a manner that compromises national banks' efficient or flexible exercise of their powers under the NBA, or (b) state regulation of a national bank would open the bank up to diverse regulation that might impose limitations and restrictions as various and as numerous as the States.

Here, Rhode Island's interest-on-escrow law significantly interferes with national banks' power to make real estate loans because it attempts to dictate the terms of these loans in a manner that deprives national banks of the flexibility accorded by the NBA.  State interest-on-escrow laws also pose a significant interference with national banks' real estate lending power because the existing state laws vary greatly from state to state and impose diverse limitations and restrictions on national banks' use of mortgage escrow accounts.  While Conti attempts to frame the relevant case law as requiring a finding of significant interference only when the state statute at issue prohibits national banks from exercising their powers under the NBA, Conti's interpretation of these cases and the *Barnett Bank* test is simply incorrect.  The *Barnett Bank* test and relevant case law make clear that the NBA preempts any state law that *either* prevents a national bank's exercise of its power *or* significantly interferes with a national bank's exercise of its power.

19

At minimum, the Court should affirm the District Court's dismissal of Conti's unjust enrichment claim, which is legally deficient even if the NBA does not preempt Rhode Island's interest-on-escrow statute.

Finally, to the extent that Conti asks this Court to remand the case to the District Court for reconsideration in light of *Cantero*, remand is entirely unnecessary and would only serve to delay final resolution of this case, as this Court exercises de novo review on questions of law and can affirm the District Court's decision on any basis.

## <u>STANDARD OF REVIEW</u>

This Court "review[s] the dismissal of a complaint de novo, taking the factual allegations in the complaint and the inferences reasonably drawn from the complaint as true to determine whether the plaintiff has plausibly stated a claim upon which relief can be granted." *Sonoiki v. Harvard Univ.*, 37 F.4th 691, 703 (1st Cir. 2022). This Court also "review[s] a district court's determination that a state statute is preempted *de novo*." *SPGGC, LLC v. Ayotte*, 488 F.3d 525, 530 (1st Cir. 2007). This Court may affirm a district court's order of dismissal "on any alternative ground made manifest in the record." *Aguilar v. U.S. Immigr. & Customs Enf't Div. of Dep't of Homeland Sec.*, 510 F.3d 1, 21 (1st Cir. 2007).

## ARGUMENT

### I.    OVERVIEW OF THE *BARNETT BANK* STANDARD.

In analyzing whether the NBA preempts state interest-on-escrow laws, courts apply the preemption standard elucidated in *Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25 (1996). *Cantero*, 602 U.S. at 214. *Barnett Bank* instructs courts to presume that the NBA preempts state laws that regulate national banks, because Congress's "grants of both enumerated and incidental 'powers' to national banks [are] grants of authority not normally limited by, but rather ordinarily pre-empting, contrary state law." 517 U.S. at 32. Accordingly, the NBA preempts state law *unless* the state law "does not prevent or significantly interfere with the national bank's exercise of its powers." *Id.* at 33.

Congress codified the *Barnett Bank* preemption test in the Dodd-Frank Act. *See* 12 U.S.C. § 25b(b)(1)(B). But, as the Supreme Court recently held in *Cantero*, *Barnett Bank* "did not purport to establish a clear line to demarcate when a state law 'significantly interfere[s] with the national bank's exercise of its powers.'" 602 U.S. at 215 (quoting *Barnett Bank*, 517 U.S. at 33). Instead, *Barnett Bank* "analyzed the [Supreme] Court's precedents" concerning NBA preemption, looking both "to prior cases of [the Supreme] Court where the state law was preempted, as well as several cases where the state law was not preempted." *Id.* Those "prior cases" include *Fidelity Federal Savings & Loan Association v. De la*

*Cuesta,* 458 U.S. 141 (1982), *Franklin National Bank of Franklin Square v. New York*, 347 U.S. 373 (1954), *Anderson National Bank v. Luckett*, 321 U.S. 233 (1944), *First National Bank of San Jose v. California*, 262 U.S. 366 (1923), *McClellan v. Chipman*, 164 U.S. 347 (1896), and *National Bank v. Commonwealth*, 76 U.S. 353 (1870). *Id.* at 216–20.

*Cantero* instructs that "courts addressing preemption questions . . . must do as *Barnett Bank* did and likewise take account of those prior decisions of [the Supreme] Court and similar precedents." *Id.* at 215–16. Specifically, courts should "reach[] . . . conclusions about the nature and degree of the state laws' alleged interference with the national banks' exercise of their powers based on the text and structure of the laws, comparison to other precedents, and common sense." *Id.* at 220 n.3.

## II.    THE NBA PREEMPTS RHODE ISLAND'S INTEREST-ON-ESCROW STATUTE.

Under a commonsense analysis of the text of Rhode Island's interest-on-escrow statute, the substance of the *Barnett Bank* test, the precedents analyzed by *Barnett Bank*, and similar First Circuit and Supreme Court cases applying *Barnett Bank*, Rhode Island's interest-on-escrow law significantly interferes with national banks' exercise of their real estate lending power. As the Court emphasized in *Cantero*, *Barnett Bank* and its doctrinal kin establish that a state law's interference with a national bank's power is "significant" if the state law "interfere[s] with 'the

flexibility given'" to banks by federal law or "interfere[s] with the national bank's ability to [exercise its powers] efficiently."  602 U.S. at 216–17 (quoting *Franklin*, 347 U.S. at 377–78; *Fidelity*, 458 U.S. at 155).

That is precisely the case here.  Rhode Island's interest-on-escrow law interferes with Citizens' flexible and efficient exercise of its real estate lending power by dictating the terms upon which it must offer mortgage loans with escrow accounts.  The proliferation of state interest-on-escrow laws across the country markedly magnifies this harm.  In the dual banking system, national banks like Citizens are distinguished by efficiency and uniformity.  If state interest-on-escrow laws are not preempted, national banks will be thrust into a legal landscape checkered with the inconsistent regulations of at least twelve states.  The real estate lending powers of national banks will shrink every time a state chooses to enact its own interest-on-escrow law.  This is the antithesis of efficiency and flexibility and cannot survive scrutiny under *Barnett Bank*.

A.     **Rhode Island's Interest-on-Escrow Statute Significantly Interferes with National Banks' Real Estate Lending Power Because it Dictates the Terms of Mortgage Escrow Accounts, Depriving National Banks of Flexibility and Efficiency.**

Rhode Island's interest-on-escrow statute significantly interferes with national banks' real estate lending power because it dictates the terms by which national banks can offer mortgage loans, depriving national banks of the flexibility and efficiency afforded to them under the NBA.  The NBA identifies the only

23

restrictions on national banks' real estate lending power as those imposed by the OCC.  *See* 12 U.S.C. § 371(a); *see also Cantero*, 602 U.S. at 210 (noting that national banks have the enumerated power to make real estate loans and the incidental power to offer mortgage escrow accounts).  The OCC has promulgated a comprehensive set of standards to which national banks must adhere when making real estate loans.  *See* 12 C.F.R. Pt. 34.  These regulations do not include a provision mandating the payment of interest on mortgage escrow accounts.  *See id.*

Moreover, the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601, *et seq.*, "extensively regulates national banks' operation of escrow accounts."  *Cantero*, 602 U.S. at 211.  For instance, RESPA caps the amount that national banks can require borrowers to deposit into mortgage escrow accounts, requires national banks to provide certain notifications and account statements, and mandates that national banks "promptly" return any amounts remaining in the escrow account once the borrower repays the loan.  12 U.S.C. §§ 2605(g), 2609(a)–(c).  RESPA, however, does not require national banks to pay interest on mortgage escrow accounts.  *See* 12 U.S.C. § 2601, *et seq.*; *see also Cantero*, 602 U.S. at 211 (holding it "relevant" that RESPA, unlike New York, "does not mandate that national banks pay interest to borrowers on the balances of their escrow accounts").  Indeed, on three separate occasions, Congress declined to require national banks to pay interest on mortgage escrow accounts.  *See* Escrow

Account Reform Act of 1993, H.R. 27, 103d Cong. (1993); Escrow Account

Reform Act of 1991, H.R. 3542, 102d Cong. (1991); Comptroller General of the

United States, GAO, *Study of the Feasibility of Escrow Accounts on Residential*

*Mortgages Becoming Interest Bearing* (1973).

Congress and the OCC made a deliberate choice not to require national

banks to pay interest on mortgage escrow accounts, instead giving national banks

the flexibility to pay interest as they see fit, within the confines of the federal

regulatory framework.  In states with interest-on-escrow laws, however, national

banks no longer have the flexibility to offer mortgage products with escrow

accounts that incur no interest or less interest than required by state law.  Stated

otherwise, state interest-on-escrow laws force national banks to either: (a) limit

their offering of mortgage loans with escrow accounts to only those with escrow

accounts that accrue interest in the manner dictated by state law; or (b) stop

offering customers mortgage loans with escrow accounts altogether, except where

required by federal law.

When a state law attempts to dictate the terms of a product sold by a national

bank in a manner that impedes the bank's efficient or flexible exercise of its

federally granted power, the state law significantly interferes with that power and

is preempted.  The governing precedent referenced in *Cantero* and *Barnett Bank*

leads directly to this conclusion.

For instance, in *Fidelity* (one of the cases analyzed by *Barnett Bank*), federal law permitted, but did not require, federal savings and loan associations to include due-on-sale clauses in their mortgage agreements. *Cantero*, 602 U.S. at 216 (citing *Fidelity*, 458 U.S. at 155). California enacted a law that attempted to impose preconditions on federal savings and loan associations' use of due-on-sale clauses. *Id.* at 216–17 (citing *Fidelity*, 458 U.S. at 154–55). The law did not flatly prohibit federal savings and loan associations from offering mortgage contracts with due-on-sale clauses, and such associations could still "readily comply" with state and federal law. *Id.* (citing *Fidelity*, 458 U.S. at 154–55). Nevertheless, the Supreme Court held that the California law was preempted because it interfered with "the flexibility given" to federal savings and loan associations by federal law. *Id.* (quoting *Fidelity*, 458 U.S. at 155).

To be sure, *Fidelity* dealt with regulation of federal savings and loan associations rather than national banks. The distinction, however, is immaterial. The Supreme Court in *Barnett Bank* and *Cantero* expressly concluded that *Fidelity* "illustrate[s] the kinds of state laws that significantly interfere with the exercise of a national bank power and thus are preempted." *Id.* at 217; *see also Barnett Bank*, 517 U.S. at 33 (citing the state law at issue in *Fidelity* as an instance of significant interference). Stated otherwise, according to the Supreme Court, a state law significantly interferes with a national bank's power when it "interfere[s] with 'the

flexibility given'" to national banks by the NBA.  *Cantero*, 602 U.S. at 217 (quoting *Fidelity*, 458 U.S. at 155).

The California law in *Fidelity* and the state interest-on-escrow laws at issue here both work in the same way—they each restrict a federally-chartered bank's broad authority to make real estate loans by dictating the terms of those loans. Any law that dictates the terms of a loan necessarily interferes with the "flexibility" given to the lender—here, a national bank chartered under federal law. Under *Fidelity* and *Barnett Bank,* such laws always significantly interfere with a national bank's exercise of its powers and are therefore preempted by federal law.

Similarly, over 100 years ago, the Supreme Court held in *First National Bank of San Jose* (another case analyzed by *Barnett Bank*) that the NBA preempted a California law that purported to require banks to turn over inactive deposit accounts to the state after 20 years, without proof that the accounts had actually been abandoned.  262 U.S. at 369–70.  The Court reasoned that because the California law "attempts to qualify in an unusual way [deposit] agreements between national banks and their customers," the statute significantly interfered with national banks' power to accept deposits.  *Id.*; *accord Cantero*, 602 U.S. at 218.  Just as California could not alter the terms of national banks' deposit agreements in such a way that required banks to turn over dormant, but not abandoned, deposit accounts after 20 years, states cannot force national banks to

include terms in their mortgage loan agreements that require banks to pay interest on mortgage escrow accounts.

This Court's own, well-reasoned precedent also establishes that the NBA preempts state laws that attempt to impose terms on the products that national banks offer if doing so would deprive the banks of the flexibility and efficiency accorded by the NBA. *Cf. Cantero*, 602 U.S. at 215–16 (instructing courts analyzing NBA preemption to not only consider *Barnett Bank* and the decisions cited in *Barnett Bank*, but to also consider "similar precedents"). In *SPGGC*, this Court applied *Barnett Bank* and held that the NBA preempted a New Hampshire law that attempted to dictate the terms by which national banks could offer gift cards. 488 F.3d at 533.

In *SPGGC*, a national bank issued gift cards with expiration dates that were subject to administrative fees. *Id.* at 529. The national bank's nonbank agent marketed and sold the gift cards in the State of New Hampshire. *Id.* New Hampshire law, however, prohibited the sale of gift cards valued at less than $100 if they contained an expiration date or were subject to administrative fees. *Id.* at 528. This Court first determined that national banks have the incidental power to sell gift cards under the NBA, including through nonbank agents. *Id.* at 531–32. Then, this Court concluded that because the New Hampshire law "regulate[ed] the terms and conditions of the giftcards issued by [national banks], *i.e.*, expiration

28

dates and administrative fees," the law "'significantly interfere[d]' with [national banks'] statutory power." *Id.* at 533. In reaching its decision, this Court undertook an analysis of Supreme Court precedent similar to that performed in *Barnett Bank* and *Cantero* and determined that a state law poses a "significant interference" when it dictates the terms of a product offered by national banks. *Id.* at 531–33.

This case is substantially similar to *SPGGC*. Like the New Hampshire law that dictated the terms of gift card sales, state interest-on-escrow laws strip national banks of the flexibility to set the parameters of products offered pursuant to their incidental real estate lending powers. They do so by mandating the terms upon which mortgage escrow accounts can be offered. Just as this Court concluded in *SPGGC*, 488 F.3d at 531–33, that New Hampshire's attempt to dictate the terms of gift cards sold by national banks significantly interfered with national banks' incidental powers to sell gift cards, so too should this Court conclude that Rhode Island's interest-on-escrow law significantly interferes with national banks' incidental powers to offer real estate loans with mortgage escrow accounts.

Finally, it bears noting that state law significantly interferes with national banks' powers even when the law does not attempt to force banks to adopt certain inflexible and inefficient terms when offering products. For example, in *Franklin* (analyzed by *Barnett Bank*), a New York law prohibited most banks from using the words "saving" and "savings" in advertisements. 347 U.S. at 374. The New York

law did not bar banks from offering savings accounts, or even from advertising that they offered savings accounts; banks simply could not use the words "saving" or "savings" in their advertisements.  *Id.* at 378.  Although the New York law did not limit the circumstances in which national banks' could offer savings accounts, the Supreme Court held that the NBA preempted New York's law because the state law interfered with national banks' ability to advertise savings accounts.  *Id.* at 378–79.

As the Supreme Court instructed in *Cantero*, this Court must analyze NBA preemption with "common sense."  602 U.S. at 220 n.3.  If a state law prohibiting national banks' use of a word to advertise a product significantly interferes with national banks' federally rooted powers, *see id.* at 216, a state law prohibiting national banks' use of an entire category of products (mortgage escrow accounts that do not accrue interest) must be an even greater interference.  It cannot be otherwise.  Applying well-established precedent leads to the unyielding conclusion that Rhode Island's interest-on-escrow statute significantly interferes with national banks' exercise of their real estate lending power, and is therefore preempted by the NBA.

**B.     Rhode Island's Interest-on-Escrow Statute Significantly Interferes with National Banks' Real Estate Lending Power by Imposing Multiple, Inconsistent Limitations on National Banks' Ability to Offer Mortgages with Escrow Accounts.**

In the relatively recent case of *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 7–8 (2007), the Supreme Court considered whether the NBA preempted a state law that required subsidiaries of national banks that engaged in mortgage lending to register with the state, pay an annual fee, file an annual report, and make their records available for inspection by state authorities. The Court, applying *Barnett Bank*, concluded that the state law posed a significant interference with national banks' real estate lending power because national banks' subsidiaries would be subject to differing laws in the states in which they operate. *Id.* at 13–14. In so holding, the Court reasoned:

> *Diverse* . . . superintendence of national banks' engagement in the business of banking . . . is precisely what the NBA was designed to prevent: "Th[e] [NBA] has in view the erection of a system extending throughout the country, and independent, so far as powers conferred are concerned, of state legislation which, if permitted to be applicable, *might impose limitations and restrictions as various and as numerous as the States*."

*Id.* (emphasis added) (quoting *Easton v. Iowa*, 188 U.S. 220, 229 (1903)). The Court also noted that it is "[b]eyond genuine dispute [that] state law may not *significantly burden* a national bank's own exercise of its real estate lending power, just as it may not *curtail or hinder* a national bank's *efficient exercise* of any other

power, incidental or enumerated under the NBA." *Id.* at 13 (emphasis added) (citing *Barnett Bank*, 517 U.S. at 33–34).

Similarly, in *First National Bank of San Jose*, 262 U.S. at 369–70 (analyzed by *Barnett Bank*), the Supreme Court held that the NBA preempted a California law that required banks to escheat deposit accounts to the state after 20 years of inactivity, whether or not the depositor had abandoned the account.  In holding that the California law impermissibly interfered with national banks' power to accept deposits, the Court emphasized the potential inconsistencies among national banks' obligations if states were permitted to force national banks to haphazardly turn over non-abandoned deposit accounts:

> If California may thus interfere other states may do likewise, and, instead of 20 years, varying limitations may be prescribed—3 years, perhaps, or 5, or 10, or 15.  We cannot conclude that Congress intended to permit such results.  They seem incompatible with the purpose to establish a system of governmental agencies specifically empowered and expected freely to accept deposits from customers irrespective of domicile with the commonly consequent duties and liabilities.

*Id.* at 370.

Like the statutes at issue in *Watters* and *First National Bank of San Jose*, state interest-on-escrow laws significantly interfere with national banks' authority to engage in real estate lending because they impose "limitations and restrictions as various and as numerous as the states." *See Watters*, 550 U.S. at 14.  As the table

32

below illustrates, the five[5] interest-on-escrow laws at issue in this case, which represent less than half of the twelve state interest-on-escrow statutes, impose diverse, inconsistent obligations on national banks with respect to real estate loans:

| State | Types of Mortgages Subject to Statute | Interest Rate | Frequency of Payment |
|---|---|---|---|
| **Connecticut (Conn. Gen. Stat. § 49-2a)** | Mortgaged property | Not less than the deposit index set by the Banking Commissioner for each year (the average of the national rates for savings deposits and money market deposits for the last week in November of the prior year, as published by the FDIC) and rounded to the nearest 1/10th of 1 percentage point | Annually on December 31st |

---

[5] Conti originally sought to represent a class of individuals from six states with interest-on-escrow statutes, including New Hampshire. App. 11–12 ¶ 18. New Hampshire has two interest-on-escrow statutes, neither of which applies to national banks. *See* N.H. Rev. Stat. Ann. §§ 383-A:2-201(a)(21), 383-B:2-201(a), 383-B:3-303(a)(7)(E) (mandating that "[a]ny depository bank" pay interest on escrow accounts, but limiting the definition of a "depository bank" to a New Hampshire-chartered bank); *id.* §§ 397-A:1(VI-b), 397-A:4(I), 397-A:9 (requiring certain non-depository entities to pay interest on mortgage escrow accounts). After Citizens pointed out that New Hampshire's interest-on-escrow statutes do not apply to national banks, Conti withdrew his New Hampshire-related class claims. *See* Pl.'s Mem. Opp'n to Def.'s Mot. to Dismiss at 3 n.3, *Conti v. Citizens Bank, N.A.*, No. 21-CV-00296 (D.R.I. Nov. 16, 2021), ECF No. 21-1.

| | | | |
|---|---|---|---|
| **Massachusetts (Mass. Gen. Laws ch. 183, § 61)** | Dwelling houses of 4 or fewer separate households occupied or to be occupied in whole or in part by the mortgagor | At a rate determined by the mortgagee (lender) | At least once per year |
| **New York (N.Y. G.O.L. § 5-601)** | (1) 1-6 family, owner-occupied residences; and (2) property owned by a cooperative apartment corporation | 2% per year or any rate set by the state Superintendent of Financial Services | Quarterly |
| **Rhode Island (R.I. Gen. Laws § 19-9-2)** | Owner-occupied residential property consisting of not more than 4 living units, except: (1) mortgages insured or guaranteed by the Farmer's Home Loan Administration, Federal Housing Administration, or Veterans' Administration; (2) private mortgage insurers licensed to do business in Rhode Island; and (3) mortgages made by the Rhode Island Housing and Mortgage Finance Corporation | A rate equal to the rate paid by the bank on its regular savings account, if offered; otherwise, a rate not less than the prevailing market rate of interest for regular savings accounts offered by local financial institutions as directed by the Director of Business Regulation | Annually |
| **Vermont (Vt. Stat. Ann. tit. 8, § 10404)** | Residential real estate occupied by the borrower | Interest paid under the same conditions as the lender's regular savings account, if offered; otherwise, a rate not less than the prevailing market rate of interest for regular savings accounts offered by local financial | Interest paid under the same conditions as the lender's regular savings account, if offered; otherwise, the first day |

| | | institutions, calculated on the basis of the average monthly balance in the account | of each quarter |
|---|---|---|---|

The significant interference posed by this patchwork is clear on the face of these statutes.  In Connecticut, the interest-on-escrow law appears to apply to all mortgaged property in the state, whereas in Massachusetts the interest-on-escrow law applies to dwelling houses of four or fewer separate households that are occupied or will be occupied in whole or in part by the borrower.  Absent preemption, national banks would have to constantly monitor mortgage accounts to determine whether the borrower actually occupies (or worse, intends to occupy) the property.

As for interest rates, New York's interest rate is the higher of 2% or any rate set by the state Superintendent of Financial Services.  Massachusetts permits banks to set their own interest rates, and Rhode Island and Vermont require banks to offer the same interest rates to escrow accounts as they offer for savings accounts, or if the banks do not offer savings accounts, they must pay interest at the prevailing local rate.  Likewise, the five states impose varying requirements on *when* a bank must pay interest, ranging from annually, to quarterly, to an unspecified time. These "[d]iverse" requirements are "precisely what the NBA was designed to prevent"; they impede national banks' "efficient[]" exercise of their real estate

lending powers and thus constitute a significant interference with national banks' exercise of those powers.  *See Watters*, 550 U.S. at 13–14.

### III.  CONTI'S INTERPRETATION OF RELEVANT PRECEDENT CONFLICTS WITH THE ACTUAL HOLDINGS OF THOSE DECISIONS AND THE SUPREME COURT'S INSTRUCTIONS IN *CANTERO*.

In urging this Court to reverse the District Court's finding of preemption, Conti makes numerous analytical errors that are at odds with the Supreme Court's instructions in *Cantero* and relevant precedent.  First, Conti appears to argue that Citizens was required to present evidence of significant interference, and that because it did not do so, the District Court's decision must be reversed.  Appellant's Br. at 28, 42–44.  Conti is wrong, and his argument is directly at odds with *Cantero*.  In that unanimous ruling, the Supreme Court instructs courts to "reach[] . . . conclusions about the nature and degree of the state laws' alleged interference with the national banks' exercise of their powers based on the text and structure of the laws, comparison to other precedents, and common sense." *Cantero*, 602 U.S. at 220 n.3.  Nowhere does the Supreme Court imply—let alone actually hold—that courts must consider evidence before making a preemption determination.  *See id.*

Conti compounds this analytical error by incorrectly arguing that the Supreme Court finds state laws preempted by the NBA only when those laws prohibit national banks from exercising their powers.  Appellant's Br. at 29–35.

36

For instance, consider Conti's interpretation of *Barnett Bank*. In *Barnett Bank*, the Supreme Court held that because the NBA permitted national banks to sell insurance in small towns, the NBA preempted a Florida law that prohibited national banks from selling insurance in small towns. 517 U.S. at 27–28. Conti claims that because state interest-on-escrow laws do not prohibit national banks from utilizing mortgage escrow accounts, *Barnett Bank* supports the conclusion that the NBA does not preempt state interest-on-escrow laws. Appellant's Br. at 29–30.

Conti's overbroad argument is fundamentally at odds with the actual language of *Barnett Bank*. Under that test, the NBA preempts state laws that "prevent *or* significantly interfere with" national banks' exercise of their powers. *Barnett Bank*, 517 U.S. at 33 (emphasis added). The presence of the word "or" rather than the word "and" in the *Barnett Bank* test indicates that to be preempted by the NBA, a state statute needs to either "prevent" a national bank from exercising its powers *or* "significantly interfere" with a national bank's exercise of its powers. "Or" expresses a choice between two possibilities; the law is preempted if it does one thing or other, but need not do both. *See Campos-Chaves v. Garland*, 144 S. Ct. 1637, 1647 (2024) ("The word 'or' is 'almost always disjunctive,' . . . and is generally used 'to indicate . . . an alternative.'" (internal quotations omitted) (citations omitted)). Thus, *Barnett Bank*'s ultimate holding—

that the NBA preempted a state statute because it outright prevented national banks from exercising their power to sell insurance in small towns—sheds no light on what types of statutes constitute a "significant interference" with national banks' powers.

Conti stubbornly clings to this flawed analysis by attempting to reframe the Supreme Court's precedent in his favor. For instance, Conti claims that the Supreme Court found that the NBA preempted state laws in *Franklin*, *Fidelity*, and *First National Bank of San Jose* because those state laws outright prohibited national banks from exercising their powers. Appellant's Br. at 30–34.

This is untrue. As discussed *supra*, in *Franklin*, *Fidelity*, and *First National Bank of San Jose*, the Supreme Court found that the NBA preempted state laws that simply attempted to limit national bank's powers by imposing terms on products (or the mere advertisement of products) offered by national banks in a manner that impaired the banks' flexibility or efficiency. *See Fidelity*, 458 U.S. at 154–55 (holding that federal law preempted a California law that imposed preconditions on, but did not prohibit, federal savings and loan associations' use of due-on-sale clauses); *Franklin*, 347 U.S. at 378–79 (holding that the NBA preempted a New York law that did not regulate the terms of savings accounts or otherwise prohibit national banks from advertising savings accounts, as long as national banks did not use the words "saving" or "savings" in their

38

advertisements); *First Nat'l Bank of San Jose*, 262 U.S. at 369–70 (holding that the NBA preempted a California law that required banks to turn over inactive deposit accounts to the state after 20 years, without proof that the accounts had actually been abandoned, because it attempted to interfere with the terms of national banks' deposit agreements).[6]

Conti also incorrectly claims that the *McClellan*, *National Bank*, and *Anderson* cases support the conclusion that the NBA does not preempt state interest-on-escrow laws. These cases, however, are either irrelevant or support preemption. The *National Bank* and *McClellan* cases stand for the uncontroversial proposition that national banks are subject to state contract, property, and debt collection laws of general application—which are not the type of laws at issue in this case. *See Nat'l Bank*, 76 U.S. at 362–63; *McClellan*, 164 U.S. at 358–59.

In *National Bank*, the Supreme Court upheld a Kentucky law that taxed shareholders' shares of bank stock because the law was a general business law that did not attempt to regulate national banks' banking operations, and Congress had specifically authorized state taxation of bank shares. *Nat'l Bank*, 76 U.S. at 362–63. Likewise, in *McClellan*, the Supreme Court held that national banks were

---

[6] Regardless, even if Conti correctly characterized *Franklin*, *Fidelity*, and *First National Bank of San Jose* as involving state laws that outright prohibited national banks from exercising their powers, those cases still would support preemption here. State interest-on-escrow laws prohibit national banks from exercising their incidental power to utilize mortgage escrow accounts absent compliance with state law.

subject to a Massachusetts law that invalidated debtors' preferential transfers of property to creditors on the eve of insolvency.  164 U.S. at 357–58.  The Massachusetts statute was a generally applicable law designed to prevent fraudulent conveyances of property, not a law that specifically targeted national banks or the products they offered.  *See id.*

The Supreme Court explained the takeaway from these decisions in *Cantero*. Specifically, the NBA did not preempt the state laws at issue in *National Bank* and *McClellan* because national banks "remain subject to state law governing 'their daily course of business' such as generally applicable state contract, property, and debt-collection laws."  *Cantero*, 602 U.S. at 219 (quoting *Nat'l Bank*, 76 U.S. at 361–62).  A national bank cannot lie to a customer to fraudulently induce them to enter into a mortgage agreement and later shield itself from state law claims using the NBA—and no one is saying they can.  Instead, the NBA preempts state laws that "'may interfere with, or impair [national banks'] efficiency in performing the functions' that federal law authorizes them to perform."  *Id.* (quoting *Nat'l Bank*, 76 U.S. at 362); *see also McClellan*, 164 U.S. at 358 (holding that Massachusetts' law applied to national banks because it did not "in any way impair[] the efficiency of national banks, or frustrate[] the purpose for which they were created").

Unlike the generally applicable state laws at issue in *National Bank* and *McClellan*, state interest-on-escrow laws are designed to target banks' mortgage

products and dictate the terms of those products when offered with escrow accounts. They do so even though the NBA identifies national banks' real estate lending power as subject only to those restrictions imposed by the OCC. *See* 12 U.S.C. § 371(a). Thus, state interest-on-escrow laws unquestionably "interfere with, or impair [national banks'] efficiency in performing the functions' that federal law authorizes them to perform." *See Cantero*, 602 U.S. at 219 (quoting *Nat'l Bank*, 76 U.S. at 362).

Finally, in *Anderson*, the Supreme Court held that the NBA did not preempt a Kentucky escheatment law that required banks to escheat dormant bank accounts to the state upon proof of abandonment. *Anderson*, 321 U.S. at 251–52. The Court reasoned that, because the escheat of various types of abandoned property to the state was "as old as the common law itself," depositors would expect the state to also escheat their abandoned deposit accounts. *Id.* at 251. Moreover, the Kentucky law did not attempt to impose additional obligations on national banks, because the payment of a deposit account on lawful demand "is nothing more than performance of a duty by the bank imposed by the federal banking laws, and not a denial of its privileges as a federal instrumentality." *Id.* at 252. *Anderson* distinguished the holding in *First National Bank of San Jose*—that the NBA preempted a California escheatment law—on the ground that the California law

required escheatment of dormant bank accounts without proof of abandonment and thus interfered with banks' deposit contracts.  *Id.* at 250.

In *Cantero*, the Supreme Court noted that "*Anderson*'s reasons for differentiating the California law at issue in *First National Bank of San Jose* help demonstrate when a state law regulating national banks crosses the line from permissible to preempted."  *Cantero*, 602 U.S. at 218.  Here, unlike in *Anderson*, state interest-on-escrow statutes do not apply a generally applicable legal principle "as old as the common law itself" to mortgage escrow accounts as to all other types of property, nor do they require banks to do something already mandated by federal law.  Rather, mortgage escrow accounts are a relatively new phenomenon, *see Akiki*, 632 F. App'x at 970, and state interest-on-escrow laws specifically target these accounts to the exclusion of other types of accounts, even though the NBA does not require national banks to pay interest on mortgage escrow accounts.  Accordingly, mortgage escrow accounts are more akin to the preempted law in *First National Bank of San Jose*, which interfered with national banks' deposit contracts and which exposed national banks to state legislation that imposed "varying limitations" on deposit accounts.  *See First Nat'l Bank of San Jose*, 262 U.S. at 369–70.

## IV. THE DODD-FRANK ACT DOES NOT ADDRESS NBA PREEMPTION OF STATE INTEREST-ON-ESCROW LAWS.

Conti halfheartedly argues that 15 U.S.C. § 1639d of the Dodd-Frank Act "reinforces Congress's view" that state interest-on-escrow laws do not significantly interfere with national banks' powers. Appellant's Br. at 41. Section 1639d is not only irrelevant, but also contains no such expression of Congress's view.

### A. 15 U.S.C. § 1639d Does Not Apply to Conti's Mortgage.

Section 1639d of the Dodd-Frank Act requires lenders to establish escrow accounts in four circumstances: (1) state or federal law requires the establishment of an escrow account; (2) the loan is "made, guaranteed, or insured by a State or Federal governmental lending or insuring agency"; (3) the loan is a "jumbo"[7] mortgage; or (4) regulations require the establishment of an escrow account. 15 U.S.C. § 1639d(b)(1)–(4). Section 1639d further provides that with respect to mortgage loans for which lenders must establish an escrow account, "[i]f prescribed by applicable State or Federal law, each creditor shall pay interest to the consumer on the amount held in any . . . escrow account that is subject to this section in the manner as prescribed by that applicable State or Federal law." *Id.* § 1639d(g)(3).

---

[7] A "jumbo" mortgage is "[a] mortgage loan in a principal amount that exceeds the dollar limits for a government guarantee." *Mortgage*, Black's Law Dictionary (11th ed. 2019).

Conti has not alleged that his loan fell into any of these four categories and, in fact, his loan does not fall into any of these categories.  *See* App. 6–19, 22–37.  Section 1639d is utterly irrelevant to this case; it has no bearing on whether the NBA preempts state interest-on-escrow laws with respect to non-jumbo mortgage loans that are not "made, guaranteed, or insured by a State or Federal governmental lending or insuring agency."  *See* 15 U.S.C. § 1639d(b)(1)–(4).  The Court need not (and should not) consider Section 1639d at all.

## B.     15 U.S.C. § 1639d Does Not Address Preemption.

Even if 15 U.S.C. § 1639d were relevant, no fair reading of the statute permits the conclusion that Congress intended to speak on whether the NBA preempts state interest-on-escrow laws.  Section 1639d does not mention preemption at all.  When Congress intends to make national banks subject to state laws, it does so by explicitly referring to national banks, expressly granting national banks a power, and unambiguously providing that national banks must comply with state law in exercising that power.  *E.g.*, 12 U.S.C. § 36(c) (stating that national banks may operate branches "subject to the restrictions as to location imposed by the law of the State."); 12 U.S.C. § 85 (stating that national banks may charge "interest at the rate allowed by the laws of the State . . . where the bank is located"); 12 U.S.C. § 92a(a) (permitting national banks, "when not in contravention of State or local law, the right to act as trustee, executor,

administrator, registrar of stocks and bonds, guardian of estates, assignee, receiver, or in any other fiduciary capacity."); *Barnett Bank*, 517 U.S. at 34 ("[W]here Congress has not expressly conditioned the grant of 'power' upon a grant of state permission, the Court has ordinarily found that no such condition applies."). Indeed, when Congress passed the Dodd-Frank Act, it addressed NBA preemption in several sections and expressly delineated the circumstances in which NBA preemption would not apply. *See, e.g.*, 12 U.S.C. § 25b(h)(2) ("No provision of [certain federal statutes] shall be construed as preempting, annulling, or affecting the applicability of State law to any subsidiary, affiliate, or agent of a national bank (other than a subsidiary, affiliate, or agent that is chartered as a national bank).").

Section 1639d does not mention national banks or preemption.  It also does not state that national banks are subject to state interest-on-escrow laws.  When Congress legislates, it is presumed to be familiar with existing laws, regulations, and agency interpretations.  *E.g.*, *Cannon v. Univ. of Chicago*, 441 U.S. 677, 696–97 (1979) ("It is always appropriate to assume that our elected representatives, like other citizens, know the law."); *Taft v. Comm'r of Internal Revenue*, 304 U.S. 351, 357 (1938) (assuming that Congress was familiar with the Department of the Treasury's construction of a statute when Congress amended the statute).  As a result, if Congress passes legislation or amends a statute without expressly addressing relevant regulations or agency interpretations, courts assume that

Congress did not intend to alter the preexisting legal landscape.  *E.g.*, *Taft*, 304 U.S. at 357 ("Since 1929 the regulations have excluded deductions such as those in issue here.  Meantime the estate tax provisions have been amended four times and the section under which the regulations were promulgated has been amended twice.  We must assume that Congress was familiar with the construction put upon the section by the Treasury and was satisfied with it.").

Had Congress intended to legislate with respect to NBA preemption of state interest-on-escrow laws, it would not have done so through an enigmatic reference to "applicable State or Federal law" in a statute that only applies to four types of mortgage loans.  15 U.S.C. § 1639d(g)(3); *see also Barnett Bank*, 517 U.S. at 34; *United States v. Locke*, 529 U.S. 89, 106 (2000) ("We think it quite unlikely that Congress would use a means so indirect . . . to upset the settled division of authority [between state and federal law].").  Congress was silent.  And the Court should interpret Congress's silence as no more than that—silence.  *See, e.g.*, *Locke*, 529 U.S. at 106; *Taft*, 304 U.S. at 357.  Indeed, had Section 1639d reflected Congress's intent to speak to NBA preemption, the Supreme Court would have held as such rather than remanded the *Cantero* and *Kivett* cases with instructions to apply the *Barnett Bank* test.

**V.    THIS COURT SHOULD DECIDE THE ISSUE OF PREEMPTION RATHER THAN REMAND THE CASE TO THE DISTRICT COURT.**

Conti asks this Court to reverse the District Court's decision and find no preemption, or alternatively, to vacate and remand the case to the District Court, so that the District Court can apply the *Barnett Bank* test in light of the Supreme Court's *Cantero* decision.  Appellant's Br. at 44.  Vacatur and remand, however, is entirely unnecessary and would be a gratuitous waste of resources for the parties and the District Court.  This Court reviews a district court's order finding preemption or dismissing a case under Fed. R. Civ. P. 12(b)(6) de novo.  *Sonoiki*, 37 F.4th at 703; *SPGGC*, 488 F.3d at 530.  Under a de novo standard, if this Court determines that the district court reached the right result for the wrong reasons, this Court can affirm the district court's decision on an alternative ground.  *See, e.g.*, *Am. Bd. of Internal Med. v. Salas Rushford*, 114 F.4th 42, 56 (1st Cir. 2024) ("We see no need to remand to the district court a claim that, in our de novo review, is clearly meritless, and we thus affirm the dismissal of the breach of contract claim on the alternative basis advanced by [appellee]," even though the district court's reason for dismissing the claim was unsound.).  Thus, if this Court determines that the District Court failed to apply *Barnett Bank*, it can—and should—affirm the District Court's decision on the ground that, under *Barnett Bank*, Rhode Island's interest-on-escrow statute significantly interferes with national banks' exercise of their real estate lending powers.

47

## VI.   CONTI'S UNJUST ENRICHMENT CLAIM FAILS WITHOUT REGARD TO WHETHER THE NBA PREEMPTS RHODE ISLAND'S INTEREST-ON-ESCROW STATUTE.

Conti predicates his breach of contract and unjust enrichment claims entirely on an incorrect assumption that Citizens was required to pay interest on his and the putative class's mortgage escrow accounts.  App. 16–18 ¶¶ 30–41.  These claims fail because the NBA preempts Rhode Island's interest-on-escrow statute. Nevertheless, even if the NBA does not preempt Rhode Island's interest-on-escrow law, Conti's unjust enrichment claim independently fails, because Conti's relationship with Citizens is governed by contract.  Thus, at a minimum, this Court should affirm the dismissal of Conti's unjust enrichment claim.

To state a claim for unjust enrichment under Rhode Island law, a plaintiff must show: "'(1) that he or she conferred a benefit upon the party from whom relief is sought; (2) that the recipient appreciated the benefit; and (3) that the recipient accepted the benefit under such circumstances that it would be inequitable for [the recipient] to retain the benefit without paying the value thereof.'"  *S. Cty. Post & Beam, Inc. v. McMahon*, 116 A.3d 204, 210–11 (R.I. 2015) (citations omitted).

Conti alleges that Citizens was unjustly enriched at his expense because Citizens used the money that he deposited into his mortgage escrow account on an interest-free basis, in violation of state law, prior to making tax and insurance

payments on his behalf. App. 17–18 ¶¶ 38–41. However, a cause of action for unjust enrichment is not available when a contract governs the parties' relationship. *E.g.*, *Pickett v. Ditech Fin., LLC*, 322 F. Supp. 3d 287, 293 (D.R.I. 2018) ("Where there exists an express contract between the parties, equitable doctrines such as unjust enrichment are unavailable.").

There is no question that Conti and the other putative class members entered into mortgage agreements with Citizens. App. 11, 16–17 ¶¶ 16, 30–36. Thus, Conti may not pursue an unjust enrichment claim even if the NBA does not preempt Rhode Island's interest-on-escrow statute. *See Pickett*, 322 F. Supp. 3d at 293 ("In this case, the mortgage is an express contract between the parties, which governed the disbursement of the insurance proceeds; accordingly, Mr. Pickett cannot state a claim for unjust enrichment against[] BONY."). This is true even if Conti's breach of contract claim is nonviable, because "'[i]t is the availability of a remedy at law, not the viability of that remedy, that prohibits a claim for unjust enrichment.'" *Tomasella v. Nestlé USA, Inc.*, 962 F.3d 60, 82–83 (1st Cir. 2020) (citations omitted). Indeed, Conti appears to concede as much, because his appellate brief is silent as to the viability of his cause of action for unjust enrichment, knowing that Citizens made this very same argument before the District Court. Because Conti has an adequate (though nonviable) remedy at law

in his breach of contract claim, if this Court finds that NBA preemption does not apply, the dismissal of his unjust enrichment claim should be affirmed.

## **CONCLUSION**

For the foregoing reasons, this Court should affirm the District Court's judgment in favor of Citizens.

Respectfully submitted,

/s/ Geoffrey W. Millsom
Geoffrey W. Millsom (#1137858)
Brenna Anatone Force (#1160398)
Daniel J. Procaccini (#1157994)
Colten H. Erickson (#1212847)
ADLER POLLOCK & SHEEHAN P.C.
100 Westminster Street, 16th Floor
Providence, RI 02903
Tel: (401) 274-7200
Fax: (401) 351-4607
gmillsom@apslaw.com
bforce@apslaw.com
dprocaccini@apslaw.com
cerickson@apslaw.com

*Attorneys for Defendant-Appellee*
*Citizens Bank, N.A.*

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

The undersigned hereby certifies that:

1.      This brief is in compliance with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 11,593 words excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

<u>/s/ Geoffrey W. Millsom</u>

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on October 28, 2024, I electronically filed the foregoing document with the United States Court of Appeals for the First Circuit by using the CM/ECF system.  I certify that the following parties or their counsel of record are registered as ECF Filers and that they will be served by the CM/ECF system:

Patrick F. Dowling, Jr.
D'AMICO & BURCHFIELD LLP
536 Atwells Ave
Providence, RI 02909

Michael Liskow
Janine Lee Pollack
GEORGE FELDMAN MCDONALD PLLC
745 5th Ave, Suite 500
New York, NY 10151

Deepak Gupta
Jonathan Taylor
GUPTA WESSLER LLP
2001 K St NW, Suite 850 N
Washington, DC 20006

/s/ Geoffrey W. Millsom