# No. 22-1770

In the

# United States Court of Appeals for the First Circuit

JOHN CONTI, on behalf of himself and all others similarly situated,

*Plaintiff–Appellant*,

v.

CITIZENS BANK, N.A.,

*Defendant–Appellee*,

DOES 1 through 10, inclusive,

*Defendant.*

On Appeal from the United States District Court
for the District of Rhode Island, Providence
Case No. 1:21-cv-00296-MSM Hon. Mary S. McElroy, Judge

## BRIEF OF THE BANK POLICY INSTITUTE, AMERICAN BANKERS ASSOCIATION, THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, CONSUMER BANKERS ASSOCIATION, AND MORTGAGE BANKERS ASSOCIATION AS *AMICI CURIAE* IN SUPPORT OF DEFENDANT-APPELLEE

Gregg L. Rozansky
Tabitha Edgens
THE BANK POLICY
INSTITUTE
600 13th Street, N.W.
Suite 400
Washington, DC  20005
(202) 289-4322

H. Rodgin Cohen (#1114886)
Matthew A. Schwartz (#1214398)
Shane M. Palmer (#1214397)
Brandyn J. Rodgerson (#1214438)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY  10004
(212) 558-4000

*Counsel for Amici Curiae*

*(Additional counsel listed on inside cover)*

November 4, 2024

David Pommerehn
CONSUMER BANKERS ASSOCIATION
1225 Eye Street, N.W.
Suite 550
Washington, DC  20005
(202) 552-6366

Thomas Pinder
Andrew Doersam
THE AMERICAN BANKERS
ASSOCIATION
1120 Connecticut Avenue, N.W.
Washington, DC  20036
(202) 663-5000

Jonathan D. Urick
Tyler S. Badgley
U.S. CHAMBER LITIGATION
CENTER
1615 H Street, N.W.
Washington, DC  20062
(202) 463-5337

Justin Wiseman
Alisha Sears
MORTGAGE BANKERS
ASSOCIATION
1919 M Street NW, 5th Floor
Washington, DC  20036
(202) 557-2700

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the Bank Policy Institute ("BPI"), American Bankers Association ("ABA"), the Chamber of Commerce of the United States of America ("Chamber"), the Consumer Bankers Association ("CBA"), and the Mortgage Bankers Association ("MBA"; collectively, "*Amici*") state that they are not subsidiaries of any other corporation. *Amici* are nonprofit trade groups and have no shares or securities that are publicly traded.

# TABLE OF CONTENTS

*Page*

STATEMENT OF INTEREST ...................................................1

INTRODUCTION ...................................................................3

ARGUMENT .........................................................................7

I.    MORTGAGE ESCROW ACCOUNTS ARE CRITICAL TOOLS IN THE U.S. BANKING SYSTEM ...............................7

II.   RHODE ISLAND'S PRICING SCHEME "SIGNIFICANTLY INTERFERES" WITH THE EXERCISE OF NATIONAL BANK POWERS ........................10

    A.    The Required Analysis Confirms That Rhode Island's Pricing Scheme Is Preempted ...............................11

    B.    In Light Of The Supreme Court's Direction In *Cantero*, Remand Is Unnecessary ........................................19

    C.    OCC's Regulations Support The Conclusion That Rhode Island's Pricing Scheme Significantly Interferes With National Bank Powers ................................27

    D.    The TILA Amendment Is Irrelevant To The NBA Preemption Analysis ...........................................30

CONCLUSION ......................................................................31

CERTIFICATE OF COMPLIANCE ........................................32

APPENDIX A .......................................................................33

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Anderson Nat'l Bank* v. *Luckett*,
    321 U.S. 233 (1944) ................................................................... 16

*Ass'n of Banks in Ins., Inc.* v. *Duryee*,
    270 F.3d 397 (6th Cir. 2001) ..................................................... 16

*Bank of Am.* v. *City & Cty. of S.F.*,
    309 F.3d 551 (9th Cir. 2002) ..................................................... 33

*Baptista* v. *JPMorgan Chase Bank, N.A.*,
    640 F.3d 1194 (11th Cir. 2011) .................................................. 33

*Barnett Bank of Marion Cnty., N.A.* v. *Nelson*,
    517 U.S. 25 (1996) ............................................................ *passim*

*Cantero* v. *Bank of Am., N.A.*,
    602 U.S. 205 (2024) ........................................................... *passim*

*Conti* v. *Citizens Bank, N.A.*,
    2022 WL 4535251 (D.R.I. Sept. 28, 2022) ................................ *passim*

*Deming* v. *Merrill Lynch & Co.*,
    528 F. App'x 775 (9th Cir. 2013) ............................................... 33

*Fed. Nat'l Mortg. Ass'n* v. *Lefkowitz*,
    390 F. Supp. 1364 (S.D.N.Y. 1975) ........................................... 19

*Fid. Fed. Sav. & Loan Ass'n* v. *De la Cuesta*,
    458 U.S. 141 (1982) ................................................... 13, 14, 25

*First Nat'l Bank of San Jose* v. *Cal.*,
    262 U.S. 366 (1923) ................................................................ 17

*Fitzgerald* v. *Harris*,
    549 F.3d 46 (1st Cir. 2008) ...................................................... 20

*Franklin Nat'l Bank of Franklin Square* v. *New York*,
 347 U.S. 373 (1954) ................................................................ *passim*

*Kivett* v. *Flagstar Bank, FSB*,
 2024 WL 3901188 (9th Cir. Aug. 22, 2024) ........................................ 18

*Martinez* v. *Wells Fargo Home Mortg., Inc.*,
 598 F.3d 549 (9th Cir. 2010) ...................................................... 33

*McClellan* v. *Chipman*,
 164 U.S. 347 (1896) ............................................................... 18

*Metrobank* v. *Foster*,
 193 F. Supp. 2d 1156 (S.D. Iowa 2002) ............................................ 33

*Monroe Retail, Inc.* v. *RBS Citizens, N.A.*,
 589 F.3d 274 (6th Cir. 2009) .................................................. 27, 33

*Montgomery* v. *Bank of Am. Corp.*,
 515 F. Supp. 2d 1106 (C.D. Cal. 2007) ............................................ 33

*Nat'l Bank* v. *Commonwealth*,
 76 U.S. 353 (1870) ............................................................ 17, 18

*NNDJ, Inc.* v. *Nat'l City Bank*,
 540 F. Supp. 2d 851 (E.D. Mich. 2008) ............................................ 33

*People* v. *Franklin Nat'l Bank of Franklin Square*,
 305 N.Y. 453 (1953) .............................................................. 12

*Pereira* v. *Regions Bank*,
 918 F. Supp. 2d 1275 (M.D. Fla. 2013) ............................................ 33

*Powell* v. *Huntington Nat'l Bank*,
 226 F. Supp. 3d 625 (S.D. W. Va. 2016) ........................................... 33

*SPGGC, LLC* v. *Ayotte*,
 488 F.3d 525 (1st Cir. 2007) .................................................. *passim*

*Watters* v. *Wachovia Bank, N.A.*,
 550 U.S. 1 (2007) ............................................................ 16, 27

**Statutes**

12 U.S.C. § 24 .................................................................................. 21

12 U.S.C. § 25b ............................................................................... 29

12 U.S.C. § 371(a) ...................................................................... 21, 24

15 U.S.C. § 1639d .................................................................. 7, 30, 31

National Bank Act of 1864, Act of June 3, 1864,
    § 8, 13 Stat. 99, 101 (1864) ...................................... *passim*

R.I. Gen. Laws § 19-9-2(a) .......................................................... *passim*

Real Estate Settlement Procedures Act of 1974,
    12 U.S.C. §§ 2601 *et seq.* (1974) ...................................... 27

**Regulatory and Congressional Authorities**

12 C.F.R. § 34.4(a)(6) .............................................................. 6, 28

OCC, *Bank Activities and Operations; Real Estate Lending
    and Appraisals*, 69 Fed. Reg. 1904 (Jan. 13, 2004) ........................ 28

OCC, *Interpretive Ruling Concerning National Bank Service
    Charges*, 48 Fed. Reg. 54,319 (Dec. 2, 1983) ...................... 22

OCC, *Office of Thrift Supervision Integration; Dodd-Frank
    Act Implementation*, 76 Fed. Reg. 43,557 (July 21, 2011) ....... 6, 22, 27

**Other Authorities**

Bruce E. Foote, Cong. Research Serv., *Mortgage Escrow
    Accounts: An Analysis of the Issues* 1 (1998) ........................ 7

Fannie Mae, *Selling Guide: Fannie Mae Single Family* 221
    (2024) ...................................................................... 9

FHFA & CFPB, *A Profile of 2016 Mortgage Borrowers:
    Statistics from the National Survey of Mortgage
    Originations* 1 (2018) .................................................. 9

Freddie Mac, *Servicer Guide* § 4201.23 (2019) ....................................... 10

Nathan B. Anderson & Jane K. Dokko, Fed. Reserve Board,
    *Liquidity Problems and Early Payment Default Among*
    *Subprime Mortgages* 2 (2010) ............................................................. 23

OCC, *Comptroller's Handbook, Mortgage Banking* (2014) ................... 27

Statement of Comptroller of the Currency John D. Hawke,
    Jr. Regarding the Issuance of Regulations Concerning
    Preemption and Visitorial Powers (Jan. 7, 2004) ............................. 28

U.S. Gen. Accounting Off., *Study of the Feasibility of Escrow*
    *Accounts on Residential Mortgages Becoming Interest*
    *Bearing* 5 (1973) .......................................................................... 7, 8, 9

## STATEMENT OF INTEREST

Pursuant to Federal Rule of Appellate Procedure 29, *Amici* respectfully submit this brief in support of Defendant-Appellee and affirmance of the District Court's ruling.[1]

**BPI**. BPI is a nonpartisan public policy, research, and advocacy group, that represents universal banks, regional banks, and the major foreign banks doing business in the United States. BPI produces academic research and analysis on regulatory and monetary policy topics, analyzes and comments on proposed regulations, and represents the financial services industry with respect to cybersecurity, fraud, and other information security issues.

**ABA**. Established in 1875, the ABA is the united voice of America's $23.4 trillion banking industry, comprised of small, regional, and large national and State banks that safeguard nearly $18.6 trillion in deposits, and extend more than $12.3 trillion in loans.

---

[1]    The parties have consented to the filing of this *amici curiae* brief. *See* Fed. R. App. P. 29(a)(2). The undersigned counsel certify that no party's counsel authored this brief in whole or in part, and no party or party's counsel, or any other person, other than the *Amici*, their members, or their counsel, contributed money that was intended to fund preparing or submitting this brief. *See* Fed. R. App. P. 29(a)(4)(E).

***Chamber***.   The Chamber is the world's largest business federation.  It represents approximately 300,000 members and indirectly represents the interests of more than three million businesses and professional organizations of every size, in every industry sector, and from every region of the country.  An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts.

***CBA***.  The CBA is the trade association for banking services geared toward consumers and small businesses.  Its members include the nation's largest financial institutions, as well as many regional banks, which operate in all 50 States and collectively hold two-thirds of the country's total deposits.

***MBA***.  The MBA is the national association representing the real estate finance industry, an industry that employs more than 300,000 people in virtually every community in the country.  Its membership of more than 2,200 companies includes all elements of real estate finance: independent mortgage banks, mortgage brokers, commercial banks, thrifts, REITs, Wall Street conduits, life insurance companies, credit unions, and others in the mortgage lending field.

*Amici* routinely submit *amicus curiae* briefs in cases that present questions critical to the banking and financial systems, including questions of national preemption under the National Bank Act of 1864 ("NBA"). *Amici* believe that the argument for preemption in this case is firmly grounded in common sense and precedent, and therefore submit this brief to assist the Court in considering in light of the Supreme Court's decision in *Cantero* v. *Bank of America, N.A.*, 602 U.S. 205 (2024), whether the NBA preempts the State law requirements that Defendant-Appellee is alleged to have violated.

## INTRODUCTION

This appeal presents a federal question with far-reaching consequences: whether the National Bank Act of 1864 ("NBA") preempts a State from imposing price controls on the products and services of national banks. Although this question is presented here in the specific form of R.I. Gen. Laws § 19-9-2(a)—which requires all mortgage lenders to pay interest on borrowers' funds held in escrow accounts "at a rate equal to the rate paid to the mortgagee on its regular savings account, if offered, and otherwise at a rate not less than the prevailing market rate of interest for regular savings accounts offered by local financial

institutions as determined by the director"—this Court's decision could impact State attempts to set price controls on many other core national bank products, such as loan rates and checking account interest.

Following the U.S. Supreme Court's decision in *Cantero* v. *Bank of America, N.A.*, 602 U.S. 205 (2024), this Court is tasked with conducting a "nuanced comparative analysis," comparing the nature of the interference caused by Section 19-9-2(a) with the interference in prior Supreme Court decisions to determine whether Section 19-9-2(a) is preempted. If the law "prevents or significantly interferes with the national bank's exercise of its powers" in a manner akin to the interference in cases where the Supreme Court found preemption, then it too is preempted. *Id.* at 220 (citing *Barnett Bank of Marion Cnty., N.A.* v. *Nelson*, 517 U.S. 25 (1996)). This analysis entails a "practical assessment" of the State law, accounting for past precedent, the law's text and structure, and, critically, common sense. 602 U.S. at 219 & 220 n.3. Based on *Cantero*, this Court should affirm the decision below and hold that Section 19-9-2(a) is preempted.

*First*, the "comparative analysis" required by the Supreme Court establishes that the NBA preempts State-imposed price controls.

As Justice Kavanaugh explained at the *Cantero* oral argument, State-imposed price controls intrude on national banks' core powers to a far greater extent than laws the Supreme Court has found to be preempted in the past. *See infra* at Part II.A. After all, setting prices—in this case, interest rates—is fundamental to the business of banking. By imposing what Justice Kavanaugh—who wrote the unanimous *Cantero* opinion—suggested was comparable to a "tax," *see Cantero* Tr. at 13-14, national banks face additional costs, which in the case of escrow accounts must be offset by passing on increased costs to borrowers, or originating fewer loans altogether. Because of the "significant interference" State-imposed pricing schemes have on national banks' operations, federal courts consistently find that State-imposed pricing schemes are preempted as to national banks. *See, e.g.*, Appendix A (listing federal court cases holding that State-imposed pricing mandates are preempted under the NBA).

*Second*, Plaintiff's theory of *Cantero* should be rejected. According to Plaintiff, Defendant-Appellee is required to accumulate "abundant record evidence" to establish "the text's importance" and why the State law "pose[]s significant practical impediment" to the exercise of

a national bank power.  Pl. Br. at 32, 42-44.  But this theory would effectively require a bank-by-bank, rate-by-rate analysis to determine compliance, which is the opposite of the "practical" or "common sense" approach mandated by the Supreme Court.  Indeed, the Court rejected Plaintiff's argument that lower courts must amass a factual record demonstrating the law's effects before determining preemption.  602 U.S. at 221.

*Third*, the Office of the Comptroller of the Currency's ("OCC") regulations support the determination that State laws "concerning … [e]scrow accounts" for real estate loans are preempted.  *See* 12 C.F.R. § 34.4(a)(6).  This is because State laws regulating national banks' ability to "manage credit risk exposures" or "loan-related assets," and "State laws that would alter standards of a national bank's depository business—setting standards for permissible types and terms of accounts," significantly interfere with national banks' management of core business decisions.  *See* OCC, *Office of Thrift Supervision Integration; Dodd-Frank Act Implementation*, 76 Fed. Reg. 43,557 (July 21, 2011).

6

*Finally*, the Supreme Court has clarified that 15 U.S.C. § 1639d, by which Congress amended the Truth in Lending Act ("TILA"), plays no role in the analysis where, as here, the loans are not governed by TILA. *See* 602 U.S. at 211 n.1.

## ARGUMENT

### I. MORTGAGE ESCROW ACCOUNTS ARE CRITICAL TOOLS IN THE U.S. BANKING SYSTEM.

Mortgage escrow accounts play an indispensable role in residential mortgage lending, enhancing efficiency and stability within the banking and financial systems. Mortgage escrow accounts can be traced to the Great Depression, when many homeowners could not afford to pay property taxes and lost their homes through foreclosure. U.S. Gen. Accounting Off., *Study of the Feasibility of Escrow Accounts on Residential Mortgages Becoming Interest Bearing* 6 (1973) ("GAO Study"). Because a tax lien could take precedence over a lender's mortgage lien, lenders were saddled with the real risk that they could lose part or all of the value in their security interest in a foreclosed-upon property. *See* Bruce E. Foote, Cong. Research Serv., *Mortgage Escrow Accounts: An Analysis of the Issues* 1 (1998). Likewise, homeowners failing to pay insurance premiums could result in insurance coverage

7

lapsing, leading to potential impairment to the investments made by both the lending institution and the borrower.  GAO Study at 5.  Mortgage escrow accounts provided a solution to these issues, and so, in response, government agencies began requiring them for certain loans.  *See*, *e.g.*, GAO Study at 6 (discussing the requirement that lenders collect a monthly sum for loans insured by the Federal Housing Administration to cover property taxes).

These escrow accounts proved to be beneficial.  As the Supreme Court explained, "[w]hen the borrower makes a mortgage payment, the borrower puts money into an escrow account operated by the bank; the bank then uses the funds in escrow to pay the borrower's insurance premium and property taxes on the borrower's behalf." *Cantero*, 602 U.S. at 210.  Mortgage escrow accounts thus provide a convenient method for homeowners to pay certain expenses, benefiting homeowners that could otherwise face difficulty managing lump-sum payments required for taxes and insurance.  *See* GAO Study at 5; *see also Cantero*, 602 U.S. at 210-11 (explaining that mortgage escrow accounts benefit borrowers by "simplifying expenses and budgeting").  But the utility of mortgage escrow accounts extends far beyond mere

8

convenience.  By ensuring that certain property-related obligations are managed effectively, they help "protect[] the loan collateral (the home) against tax foreclosure or uninsured damaged." *Cantero*, 602 U.S. at 211; *see* GAO Study at 5.  By mitigating risk against such tax liens and property losses, lenders are able to offer homeowners loans at reduced rates.  Put simply, mortgage escrow accounts have become a fundamental aspect of risk management in residential mortgage lending, safeguarding the interests of both lenders and borrowers.

In light of these benefits, mortgage escrow accounts have become ubiquitous in the U.S. residential mortgage market, with the vast majority of loan originations including escrow accounts.  *See* FHFA & CFPB, *A Profile of 2016 Mortgage Borrowers:  Statistics from the National Survey of Mortgage Originations* 1, 27, 30 (2018) (noting that 79% of mortgage originations in 2016 included an escrow account).  And several federal agencies continue to require the use of escrow accounts in relation to the purchase or insurance of certain home mortgages.  *See, e.g.*, Fannie Mae, *Selling Guide:  Fannie Mae Single Family* 221 (2024), https://singlefamily.fanniemae.com/media/39241/display    ("[E]scrow deposits for the payment of premiums for borrower-purchased mortgage

9

insurance (if applicable) are mandatory."); Freddie Mac, *Servicer Guide* § 4201.23 (2019), https://guide.freddiemac.com/app/guide/section/4201.23 (requiring escrow accounts with respect to the collection of borrower-paid mortgage insurance).

## II. RHODE ISLAND'S PRICING SCHEME "SIGNIFICANTLY INTERFERES" WITH THE EXERCISE OF NATIONAL BANK POWERS.

In *Cantero*, the Supreme Court held that State laws "prevent[ing] or significantly interfer[ing] with the national bank's exercise of its powers" are preempted as to national banks. 602 U.S. at 220. "[T]o determine whether a state law regulating national banks falls on the permissible or preempted side of the significant-interference line," courts must undertake a "nuanced comparative analysis" between the State law and the Supreme Court's jurisprudence. *Id*. at 219-20. That is, courts should "make a practical assessment of the nature and degree of the interference caused by a state law," considering "the text and structure of the laws, comparison to other precedents, and common sense." *Id*. at 219 & 220 n.3.

Applied properly, *Cantero* leads to a clear conclusion:  by dictating the interest rates for escrow accounts, the Rhode Island pricing

scheme sets terms on fundamental banking operations and is thus preempted under the NBA as to national banks.

## A. The Required Analysis Confirms That Rhode Island's Pricing Scheme Is Preempted.

As the Supreme Court explained in *Cantero*, "[i]f the state law's interference with national bank powers is more akin to the interference" where preemption was found (as opposed to not found) in a prior Supreme Court decision, "then the state law is preempted." *Id*. at 220.

"The paradigmatic example of significant interference identified by *Barnett Bank*" is *Franklin National Bank of Franklin Square* v. *New York*. *Cantero*, 602 U.S. at 216 (citing 347 U.S. 373 (1954)). In *Franklin*, the Supreme Court considered a New York State law that prohibited banks "from using the word 'saving' or 'savings' in their advertising or business." *Franklin*, 347 U.S. at 374. The Supreme Court held that the NBA preempted this law because it impaired national banks' power "to receive savings deposits," *id*. at 374, 378-79, even though "the New York law did not bar national banks from receiving savings deposits, 'or even' from 'advertising that fact.'" *Cantero*, 602 U.S. at 216 (citing *Franklin*, 347 U.S. at 378). In other words, national banks were

11

able to comply with the law, and there were no "seriously harmful effects." *See People* v. *Franklin Nat'l Bank of Franklin Square*, 305 N.Y. 453, 462 (1953). Even so, the law significantly interfered with national banks' ability to efficiently "engage in a business" and "to let the public know about it." *Cantero*, 602 U.S. at 216 (citing *Franklin*, 347 U.S. at 377-78).[2]

There is no genuine dispute that the interference caused by Rhode Island's pricing scheme is far more significant than the law at issue in *Franklin*. As Justice Kavanaugh said at the *Cantero* oral argument, "the pricing of the product almost by definition interfere[s] more with the operations of the bank than something that affects advertising." *Cantero* Tr. at 13. When counsel disagreed, Justice Kavanaugh continued: "Why not? That sounds like significant

---

[2] Although the *Franklin* court acknowledged that the trial court "accumulated a large record," it found no need to take that record into account and made its decision based on the fact that the New York law, as a matter of common sense, interfered with a national bank's power to offer savings accounts and advertise for them. Contrary to Plaintiff's suggestion, no such "large record" is needed. *See* Pl. Br. at 31. Plaintiff points to no other Supreme Court case that required a "large record" to determine preemption. And *Cantero* rejected the argument that a factual record needed to be developed to determine preemption. *See Cantero*, 602 U.S. at 221 (rejecting petitioners' argument for a fact-intensive analysis).

interference when it's … almost putting a tax on the bank to sell the product, which strikes me as a much more significant interference than simply saying you can't use the word 'savings' in your advertising, which was the issue in *Franklin*." *Id.* at 13-14. And at another point, Justice Kavanaugh asked rhetorically, "[T]ell someone you have to pay out large sums of money collectively, rather than how you describe your product in your advertising, isn't one more significant interference than the other[?]" *Id.* at 37.

The fact that State-imposed price controls significantly interfere with national bank powers is not just common sense, but also widely established federal jurisprudence. In *Fidelity Federal Savings & Loan Association* v. *De la Cuesta*, 458 U.S. 141 (1982), for instance, the Court held that a California State regulation that modified product terms and interfered with "the flexibility" afforded under federal law was preempted. Specifically, federal law allowed (but did not compel) "federal savings and loans to include due-on-sale clauses in their contracts," but "California law 'limited' that right to circumstances where the federal savings and loan association could make a showing that enforcing the due-on-sale clause was reasonably necessary." *Cantero*, 602 U.S. at 216-

17 (citing *Fidelity*, 458 U.S. at 154-55).  Although the federal savings and loan association could "readily" comply with the law, it was preempted because it restricted "the flexibility given" under federal law to formulate the terms of mortgage loan instruments.  *Id.* at 217.

Moreover, as the District Court explained, this Court's own decision in *SPGGC, LLC* v. *Ayotte* considered and confirmed that the NBA preempts State laws imposing pricing on national banks' services and products.  *See Conti* v. *Citizens Bank, N.A.*, 2022 WL 4535251, at *3 (D.R.I. Sept. 28, 2022) (citing 488 F.3d 525 (1st Cir. 2007), *cert. denied*, 552 U.S. 1185 (2008)).  In *Ayotte*, a national bank was issuing giftcards that contained expiration dates and were subject to administrative fees. 488 F.3d at 529.  A nonbank agent marketed and sold the national bank's giftcards within New Hampshire, but a provision of the New Hampshire Consumer Protection Act "regulate[d] the terms and conditions of the giftcards issued by [a national bank], *i.e.*, expiration dates and administrative fees." *Id.* at 533.  Just as in this case, the national bank was not prohibited from selling giftcards, but critically, the New Hampshire law placed conditions on its ability to do so by permitting the sale of giftcards valued at $100 or less only if those giftcards did not

have expiration dates or administrative fees.  *Id.* at 531.  By imposing such limits, the New Hampshire law "significantly interfered" with national banks' power to sell gift cards, including through nonbank agents, and was therefore preempted under the NBA.  *Id.* at 531-33.  In so holding, this Court aligned this Circuit with federal courts around the country.  *See* Appendix A (listing federal cases holding that the NBA preempts State regulations of the rates and terms of national banks' products and services).

Plaintiff attempts to skirt this unavoidable conclusion by arguing that (i) this case is distinguishable from other Supreme Court precedents because Section 19-9-2(a) does not interfere with an "express power"; (ii) the level of interference is more akin to cases where the Court held that State laws were not preempted; and (iii) the "consensus" is that State interest-on-escrow laws do not significantly interfere with national banking powers.  All these arguments fail.

*First*, Plaintiff argues that Supreme Court cases where preemption was found—including *Franklin* and *Barnett*—are inapposite because they involved an "express power."  Pl. Br. at 29-30, 32-33, 35.  But this is a distinction without a difference.  As the Supreme Court has

held, it is "[b]eyond genuine dispute" that States may not burden the exercise of national banks' lending power or "curtail or hinder a national bank's efficient exercise of any other power, incidental or enumerated." *Watters* v. *Wachovia Bank, N.A.*, 550 U.S. 1, 13 (2007).[3]

*Second*, Plaintiff argues that this Court should ignore *Franklin*, and instead rely on inapposite cases like *Anderson National Bank* v. *Luckett*, which the Supreme Court has described as "the primary example of a case where state law was not preempted." *Cantero*, 602 U.S. at 217 (citing 321 U.S. 233 (1944)). According to Plaintiff, this case is akin to *Anderson* because the State law merely "required national banks to hand over money to the state even though they would have preferred to hold and earn interest on it indefinitely." Pl. Br. at 37. But the holding in *Anderson* is premised on the finding that there was interference with

---

[3]    Plaintiff also urges this Court to discount comparisons with *Barnett* because, unlike there, the Rhode Island law does not "forbid" national bank powers. To be clear, "significantly interfere" does not require an outright prohibition to establish preemption. Conflation of these standards would render the two prongs of the *Barnett* standard— prevention and significant interference—meaningless. *See Ass'n of Banks in Ins., Inc.* v. *Duryee*, 270 F.3d 397, 409 (6th Cir. 2001) (rejecting an "attempt to redefine 'significantly interfere' as 'effectively thwart'" because it "would render the two prongs of the *Barnett Bank* standard redundant").

*no* national bank power, not that the interference was somehow minimal.
At issue was a Kentucky law requiring banks to relinquish deposit funds deemed abandoned to the State.  As the Supreme Court explained, even though collecting deposits is a national banking power, the "obligation to pay" deposits "to the persons entitled to demand payment" according to State law is "an inseparable incident" of that power.  321 U.S. at 248-49.
Accordingly, because the Kentucky law "demand[ed] payment of the accounts in the same way and to the same extent that the depositors could," under a rule "as old as the common law itself," there was no interference with a national banking power.  *Id.* at 249, 251; *cf. First Nat'l Bank of San Jose* v. *Cal.*, 262 U.S. 366, 369-70 (1923) (holding that a similar California law was preempted because it placed conditions on "agreements between national banks and their customers" and thus interfered with "the efficiency of the bank").

Likewise, in *National Bank* v. *Commonwealth*, 76 U.S. 353 (1870), the Supreme Court held that a State law taxing the shares of all banks—national or State—was not preempted.  According to the Court, State laws "governing 'their daily course of business' such as generally applicable state contract, property, and debt-collection laws" are not

17

preempted. *Cantero*, 602 U.S. at 219 (citing *Commonwealth*, 76 U.S. at 361-62). Contrary to Rhode Island's pricing scheme, the law scrutinized in *Commonwealth* "*in no manner* hindered the national bank's banking operation, and produced no greater interference with the functions of the bank than any other law governing businesses, [so] the law was not preempted." *Id.* (citation omitted) (emphasis added). And Plaintiff's reliance on *McClellan* v. *Chipman*, 164 U.S. 347 (1896), fares no better, as the law at issue was a "generally applicable" contract law that in no way impaired "the efficiency of national banks." *Cantero*, 602 U.S. at 219 (citing *McClellan*, 164 U.S. at 358). Here, in contrast, the Rhode Island pricing scheme directly affects the terms under which national banks can offer escrow services.

　　　　*Third*, contrary to Plaintiff's suggestion, none of the cases relied on establishes a "consensus" that the NBA does not preempt Rhode Island's pricing scheme. *See* Pl. Br. at 3. The *Cantero* district court opinion, for example, is currently under appeal, while *Kivett* v. *Flagstar Bank, FSB*, 2024 WL 3901188 (9th Cir. Aug. 22, 2024)—issued without *any* post-remand briefing or judicial analysis of *Cantero*—is currently being petitioned for rehearing. And *Federal National Mortgage*

*Association* v. *Lefkowitz*, 390 F. Supp. 1364 (S.D.N.Y. 1975), is completely irrelevant, as it was not decided under the NBA and its result hinged on the fact that the mortgages at issue—unlike here—had been acquired on a secondary market and were instead "created under the laws of New York State." *Id.* at 1370. Because the burden constituted "state regulation of a legal relationship antecedent to [the plaintiff's] involvement," the Southern District held that the case was distinct from other Supremacy Clause preemption cases because there was no burden that "fell directly on the activity of the federal instrumentality." *Id.* at 1371.[4]

In the end, by imposing mandatory interest rates for escrow accounts, Rhode Island's pricing scheme is clearly more akin to other pricing schemes that significantly interfere with the operational autonomy of national banks and are preempted by the NBA.

### B.  In Light Of The Supreme Court's Direction In *Cantero*, Remand Is Unnecessary.

The legal framework established in *Cantero* leads to an unequivocal conclusion:  Section 19-9-2(a) is preempted as to national

---

[4]     In any event, *Lefkowitz* did not acknowledge *Franklin* or undertake the type of analysis the Supreme Court has mandated in *Cantero*.

banks. Despite this, Plaintiff urges this Court to remand the case for further proceedings, advocating for the District Court to engage in a fact-intensive approach. But Plaintiff's insistence on a fact-intensive inquiry contradicts the Supreme Court's guidance.

To begin, as the Supreme Court explained, the inquiry focuses on the nature of the interference at issue, as a matter of common sense, not on each case's specific facts as to the impact of a specific rate or the feasibility of compliance by banks. *See Cantero*, 602 U.S. at 220 n.3. Indeed, the Court rejected a comparable proposal by the *Cantero* petitioners, as it "would yank the preemption standard to the opposite extreme, and would preempt virtually no non-discriminatory state laws that apply to both state and national banks." *Id.* at 221. The appropriate standard thus turns on whether the law significantly interferes with national banking powers, which is a legal question "amenable to resolution by a motion to dismiss the complaint," not one requiring prolonged factual investigation. *Conti*, 2022 WL 4535251, at *1 (citing *Fitzgerald* v. *Harris*, 549 F.3d 46, 52 (1st Cir. 2008)); *see also Ayotte*, 488

20

F.3d at 532-33 (holding State law is preempted without engaging in detailed fact-finding regarding the law's effects).[5]

Laws like Section 19-9-2(a) are perfect examples of why a fact-intensive approach is misguided. There is no dispute that the NBA "expressly supplies national banks with the power to 'make, arrange, purchase or sell loans or extensions of credit secured by liens on interests in real estate'—in other words, to administer home mortgage loans"— and "all such incidental powers as shall be necessary to carry on the business of banking." *See Cantero*, 602 U.S. at 210 (citing 12 U.S.C. §§ 24, 371(a)). As described above, *see supra* at Part I, mortgage escrow accounts have become a critical tool in administering home mortgage

---

[5]    Plaintiff's suggestion that the case should be remanded because the District Court applied a so-called "control" test, comparable to that rejected by the Supreme Court in *Cantero*, should also be rejected. *See* Pl. Br. at 1, 24. The District Court correctly recognized that the preemption determination turned on whether the State law "prevent[s] or significantly interfere[s] with the national bank's exercise of its powers." 2022 WL 4535251, at *3 (citing *Barnett*, 517 U.S. at 33). And, to apply that standard, the District Court appropriately compared the interference caused by Rhode Island's pricing scheme to *Ayotte*. But in any event, *Cantero* mandates a *legal analysis* based on the State law's text and structure, precedent, and common sense; this Court can readily apply that legal analysis without remand to the District Court, which would only produce unnecessary delay.

loans or, in the OCC's words, are "an integral part of or a logical outgrowth of the lending function." *See* OCC, Conditional Approval No. 276, 1998 WL 363812, at *9 (May 8, 1998).

The ability to set rates is inherent in the ability to establish and maintain these accounts, as it allows national banks to manage risk, thus minimizing loss and assisting homeowners. As the OCC has explained, "the safety and soundness of banks depends in significant part on their ability to devise price structures appropriate for their needs." OCC, *Interpretive Ruling Concerning National Bank Service Charges*, 48 Fed. Reg. 54,319 (Dec. 2, 1983). If Section 19-9-2(a) and other similar State laws were not preempted, the result would be to strip national banks of their ability to set their own price structures and, by extension, to "manage credit risk exposures," 76 Fed. Reg. at 43,557 (July 21, 2011), thus decreasing the availability and increasing the cost of credit. National banks would face higher underwriting costs to comply with a patchwork of differing State regulations, and would be required to pay higher interest rates. But banks cannot, without compromising their safety and soundness, offer a product or service that produces insufficient returns. In other words, imposing pricing on national banks creates an

untenable situation, whereby national banks must either (i) require borrowers to make higher down payments and/or charge higher mortgage interest rates, or (ii) simply not make loans to certain borrowers with credit profiles that are already at or approaching the outer limit of acceptable risk.    Either way, these consequences would harm homeowners and the U.S. housing market generally.  *See* Nathan B. Anderson & Jane K. Dokko, Fed. Reserve Board, *Liquidity Problems and Early Payment Default Among Subprime Mortgages* 2 (2010) (explaining how "liquidity constraints" among subprime mortgage borrowers, due in part to the absence of escrow accounts, "contributed to the largest financial crisis since the Great Depression").  Consequently, there should be no doubt that by removing national banks' ability to determine whether, and if so the amount, to apply an interest rate on mortgage escrow accounts, this State law "significantly interferes" with a national bank power, regardless of the specific rate at issue.[6]

_____

[6]    The fact that Rhode Island's pricing scheme interferes with national banks' real estate powers further supports preemption.  After all, national banks' power to "make, arrange, purchase or sell loans or extensions of credit secured by liens on interests in real estate" is limited only by "section 1828(o) of this title and such restrictions and

Furthermore, under Plaintiff's approach, whether a given rate substantially interferes with bank powers would vary based on prevailing interest rates, a particular State's market conditions, and a specific bank's line of business and financial condition. And because there is no statutory standard for courts to apply in deciding whether the specific rate is unacceptably high, the issue would be inherently subjective from judge to judge. This cannot be what Congress intended in codifying the *Barnett* standard or what the Supreme Court meant when it directed courts to use "common sense" in preemption determinations.

But even if the specific rate were relevant to the analysis, Plaintiff is wrong that this is a "modest" interest rate. *See* Pl. Br. at 1; *see also* CSBS & AARMR *Amicus* Br. at 12 (arguing the mandatory minimum interest rate is "modest" and "reasonable"). This conclusory statement is based upon purported compliance by other banks and impact on competition, none of which is relevant to the analysis.

---

requirements as the [OCC] may prescribe by regulation or order." 12 U.S.C. § 371(a). Neither Section 1828(o) nor OCC regulations have restricted national banks' ability to set interest rates.

*First*, whether Defendant-Appellee or other national banks can plausibly comply with the specific rate of interest without going out of business is not the test. Put simply, "significant interference" does not require the imposed rate to be so burdensome or costly that it becomes impossible for a bank to operate or continue offering the regulated product. *See, e.g.*, *Cantero*, 602 U.S. at 217 (noting that the State law scrutinized in *Fidelity* was preempted even though the appellant could "readily" comply with the State law). That is why, in *Franklin*, the Court's decision did not hinge on whether national banks could feasibly comply with the State law while still operating savings accounts. Indeed, the Supreme Court found that law to be preempted despite the fact that the Court of Appeals for New York explicitly stated that national banks *were* able to comply. *See supra* at Part II.A. And, as explained in *Cantero*, a "non-discriminatory state banking law can be preempted even if it is possible for the national bank to comply with both federal and state law." 602 U.S. at 214.

*Second*, Plaintiff's argument that Section 19-9-2(a) does not "significantly interfere" with national banks simply because "state banks have been complying with" it is fundamentally flawed. *See* Pl. Br. at 32.

This reasoning overlooks the dual standards for preemption provided for in Dodd-Frank—*i.e.*, a State law is preempted if it "(i) discriminates against national banks as compared to state banks; or (ii) prevents or significantly interferes" with national bank powers. *Cantero*, 602 U.S. at 213 (citation omitted). By codifying two distinct standards under which preemption may be found, Congress recognized that State laws can be preempted even if they apply equally to both State and national banks.

*Third*, this Court should reject *amici*'s suggestion that the law should not be preempted simply because it would purportedly give national banks a "competitive edge" against State-chartered banks. *See* CSBS & AARMR *Amicus* Br. at 10. This is not the relevant standard, nor could it be. If it were, preemption would be precluded in *all* cases where State banks remained covered by the impugned law. By virtue of having a dual banking system, it is inevitable that national and State banks may be subject to different laws, with national banks following "federal oversight and regulation" and State banks following "state oversight and regulation." *Cantero*, 602 U.S. at 210. Accordingly, even though a specific State law may be found to be preempted as to national banks, national banks remain subject to an extensive federal regulatory

regime.  *See*, *e.g.*, *Cantero*, 602 U.S. at 211 (describing regulations on national banks' operations of escrow accounts under the Real Estate Settlement Procedures Act of 1974); OCC, *Comptroller's Handbook, Mortgage Banking* (Feb. 2014), https://tinyurl.com/5ytdc2e9 (outlining federal guidance for national banks' escrow account activities, which State banks need not abide by).  The NBA preemption regime merely ensures that national banks are governed consistently by federal law across all States, aligning with the NBA's intent to provide a uniform, nationwide regulatory environment for national banks.  *See Watters*, 550 U.S. at 11 (observing that the NBA aims "[t]o prevent inconsistent or intrusive state regulation from impairing the national system").

In the end, whether a State law "significantly interferes" with national bank powers is "not [a] very high" threshold.  *See Monroe Retail, Inc.* v. *RBS Citizens, N.A.*, 589 F.3d 274, 283 (6th Cir. 2009).  For the reasons stated, this threshold is satisfied easily here.

## C. OCC's Regulations Support The Conclusion That Rhode Island's Pricing Scheme Significantly Interferes With National Bank Powers.

The Supreme Court has also invited this Court to consider the impact of the OCC's preemption determinations, *see* 602 U.S. at 221 n.4,

27

which support the conclusion that Section 19-9-2(a) is preempted as to national banks. Relevant here, after public notice and comment, the OCC published a 2004 final rule listing State laws that are preempted by the OCC, which included State laws "concerning … [e]scrow accounts" for real estate loans. 12 C.F.R. § 34.4(a)(6). Those preemption determinations were based on the OCC's "experience with types of state laws that can materially affect and confine—and thus are inconsistent with—the exercise of national banks' real estate lending powers," OCC, *Bank Activities and Operations; Real Estate Lending and Appraisals*, 69 Fed. Reg. 1904, 1910-11 (Jan. 13, 2004), and were made in accordance with the *Barnett* standard. *Id.* And, as explained by the then-Comptroller of the Currency, this list captures State laws that "impos[e] conditions on lending and deposit relationships" because such laws lead to "higher costs and operational burdens that the banks either must shoulder, or pass on to consumers," and thus "create impediments to the ability of national banks to exercise powers that are granted under federal law." Press Release, John D. Hawke, Jr., Comptroller of the Currency, *Statement of Comptroller of the Currency John D. Hawke, Jr. Regarding the Issuance of Regulations Concerning Preemption and*

*Visitorial Powers* (Jan. 7, 2004), https://www.occ.gov/news-issuances/news-releases/2004/nr-occ-2004-3a.pdf.[7]

Plaintiff erroneously argues that the OCC's regulations should be ignored because, following Dodd-Frank's enactment, it did not review its prior determinations on a "case-by-case" basis and thus "made no effort to comply with Dodd-Frank's limits on its authority to make preemption determinations." Pl. Br. at 18, 34. But Congress did not simply codify the *Barnett* standard in Dodd-Frank; as part of an overall compromise concerning changes to the national bank system, Congress also declined to overrule prior preemption determinations of the OCC. As Senators Carper and Warner, the authors of the Dodd-Frank preemption provision, have explained, "consistent with [the] desire to provide legal certainty to all parties, [Section 25b] is not intended to retroactively repeal the OCC's 2004 preemption rulemaking." *See Cantero* BPI *et al. Amicus* Br. at 6 (citing Senators Carper & Warner's 2011 Letter to the OCC). So although the OCC was restricted to making

---

[7]    During a 2011 rulemaking process, the OCC reiterated the 2004 list was based on the "standard of the *Barnett* decision." *See* 76 Fed. Reg. at 43,556.

preemption determinations on a case-by-case basis moving forward, *prior* OCC preemption determinations were not overruled. Moreover, Dodd-Frank did not change the substantive preemption standard. *See Cantero*, 602 U.S. at 214 n.2 ("Because we conclude that Dodd-Frank adopted *Barnett Bank*, and because *Barnett Bank* was also the governing preemption standard before Dodd-Frank, the timing of Cantero's mortgage agreement does not affect the preemption analysis here."). Thus, the OCC's pre-Dodd-Frank *Barnett* analysis remains equally instructive post-Dodd-Frank.

### D. The TILA Amendment Is Irrelevant To The NBA Preemption Analysis.

Finally, Plaintiff contends that this Court should rely upon the 2010 Dodd-Frank Act's TILA amendment, arguing it evidences Congress's view that national banks are able to comply with State laws mandating minimum interest rates on escrow accounts. *See* Pl. Br. at 41 (arguing TILA's Section 1639d "reinforces Congress's view that laws like Rhode Island's do not significantly interfere with any powers that are 'necessary to carry on the business of banking'"); *see also* CSSB & AARMR *Amicus* Br. at 14 (arguing that Section 19-9-2(a) "is consistent with the congressional policy expressed in 15 U.S.C. § 1639d(g)(3)"). The

District Court rejected this argument, reasoning that, "[b]ecause the plaintiff's mortgage loan is not of the types subject to § 1639d, that statute is irrelevant to this case, and it serves only as an indicator of congressional intent with respect to the types of loans that it covers." 2022 WL 4535251, at *4. As the Supreme Court has now confirmed, the District Court was correct that this provision is irrelevant to the NBA preemption determination in cases like this, where Section 1639d does not apply to the mortgages at issue. *Cantero*, 602 U.S. at 211 n.1.

## CONCLUSION

For these reasons, *Amici* respectfully urge the Court to affirm the District Court's order.


Dated:  New York, New York
        November 4, 2024

                                        /s/ *Matthew A. Schwartz*
                                        H. Rodgin Cohen (#1114886)
                                        Matthew A. Schwartz (#1214398)
                                        Shane M. Palmer (#1214397)
                                        Brandyn J. Rodgerson (#1214438)
                                        Sullivan & Cromwell LLP
                                        125 Broad Street
                                        New York, NY  10004
                                        (212) 558-4000

                                        *Attorneys for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I certify that:

This brief complies with the length limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because this brief, inclusive of Appendix A hereto, contains 6,305 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word Professional Plus 2010 Century Schoolbook 14-point font.

Dated:  New York, New York
       November 4, 2024

*/s/ Matthew A. Schwartz*
H. Rodgin Cohen (#1114886)
Matthew A. Schwartz (#1214398)
Shane M. Palmer (#1214397)
Brandyn J. Rodgerson (#1214438)
Sullivan & Cromwell LLP
125 Broad Street
New York, NY  10004
(212) 558-4000

*Attorneys for Amici Curiae*

# APPENDIX A

*Deming* v. *Merrill Lynch & Co.*, 528 F. App'x 775 (9th Cir. 2013) (loan administrative and compliance fees)

*Baptista* v. *JPMorgan Chase Bank, N.A.*, 640 F.3d 1194 (11th Cir. 2011) (non-account holder check-cashing fees)

*Martinez* v. *Wells Fargo Home Mortg., Inc.*, 598 F.3d 549 (9th Cir. 2010) (underwriting and tax service fees)

*Monroe Retail, Inc.* v. *RBS Citizens, N.A.*, 589 F.3d 274 (6th Cir. 2009) (account service fees)

*SPGGC, LLC* v. *Ayotte*, 488 F.3d 525 (1st Cir. 2007) (gift card expiration dates and administrative fees)

*Bank of Am.* v. *City & Cty. of S.F.*, 309 F.3d 551 (9th Cir. 2002) (deposit and lending-related service fees)

*Powell* v. *Huntington Nat'l Bank*, 226 F. Supp. 3d 625 (S.D. W. Va. 2016) (payments ordering and late fees)

*Pereira* v. *Regions Bank*, 918 F. Supp. 2d 1275 (M.D. Fla. 2013), *aff'd*, 752 F.3d 1354 (11th Cir. 2014) (check-cashing and settlement fees)

*NNDJ, Inc.* v. *Nat'l City Bank*, 540 F. Supp. 2d 851 (E.D. Mich. 2008) (non-account holder official check-cashing fees)

*Montgomery* v. *Bank of Am. Corp.*, 515 F. Supp. 2d 1106 (C.D. Cal. 2007) (nonsufficient funds and overdraft fees)

*Metrobank* v. *Foster*, 193 F. Supp. 2d 1156 (S.D. Iowa 2002) (non-account holder ATM fees)