# United States Court of Appeals
## For the First Circuit

No. 22-1770

JOHN CONTI, on behalf of himself and all others similarly situated,

Plaintiff, Appellant,

v.

CITIZENS BANK, N.A.,

Defendant, Appellee,

DOES 1 through 10, inclusive,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. Mary S. McElroy, U.S. District Judge]

Before

Rikelman, Howard, and Aframe,
Circuit Judges.

Jonathan E. Taylor, with whom Deepak Gupta, Gupta Wessler LLP, David J. George, Brittany L. Brown, Janine L. Pollack, Michael Liskow, Lori G. Feldman, George Feldman McDonald, PLLC, Patrick Dowling, Jr., and D'Amico Burchfield, LLP were on brief, for Appellant.

Geoffrey W. Millsom, with whom Brenna Anatone Force, Daniel J. Procaccini, Colten H. Erickson, and Adler Pollock & Sheehan P.C. were on brief, for Appellee.

Stefan L. Jouret, Jouret LLC, Matthew Lambert, Deputy General Counsel, Conference of State Bank Supervisors, and Arthur E. Wilmarth, Jr., Professor Emeritus of Law, George Washington University Law School, on brief, for Conference of State Bank Supervisors and American Association of Residential Mortgage Regulators, amici curiae.

Matthew A. Schwartz, H. Rodgin Cohen, Shane M. Palmer, Brandyn J. Rodgerson, Sullivan & Cromwell LLP, Gregg L. Rozansky, Tabitha Edgens, the Bank Policy Institute, David Pommerehn, Consumer Bankers Association, Thomas Pinder, Andrew Doersam, the American Bankers Association, Jonathan D. Urick, Tyler S. Badgley, U.S. Chamber Litigation Center, Justin Wiseman, Alisha Sears, and Mortgage Bankers Association, on brief, for the Bank Policy Institute, American Bankers Association, the Chamber of Commerce of the United States of America, the Consumer Bankers Association, and the Mortgage Bankers Association, amici curiae.

———————————

September 22, 2025

———————————

**AFRAME**, **Circuit Judge**.   Rhode Island General Laws section 19-9-2(a) requires all banks operating within the state to pay mortgage borrowers interest on the funds they deposit into mortgage-escrow accounts.   See R.I. Gen. Laws § 19-9-2(a).   In July 2021, John Conti, representing a putative class, sued Citizens Bank, N.A. ("Citizens"), a national banking association chartered under the National Bank Act, 12 U.S.C. § 21 et seq., alleging that Citizens failed to pay interest on mortgage-escrow accounts as required by the Rhode Island statute.

Citizens moved to dismiss the case, see Fed R. Civ. P. 12(b)(6), arguing that the National Bank Act preempts the application of the Rhode Island statute to national banks.   The district court agreed and dismissed Conti's complaint.   Conti appealed.   While the appeal was pending, the United States Supreme Court decided Cantero v. Bank of America, N.A., 602 U.S. 205 (2024), which clarified the legal standard for preemption under the National Bank Act.

We conclude that the district court, writing without the benefit of Cantero, incorrectly granted Citizens' motion to dismiss on the ground that the National Bank Act preempted the Rhode Island statute.   We therefore vacate the judgment and remand for further proceedings.

**I.**

In July 2011, Conti financed the purchase of a residential property in Rhode Island with a mortgage loan from Citizens.  The mortgage agreement required Conti to make advance payments of municipal property taxes and homeowner's insurance into a Citizens-maintained escrow account.[1]  Per the mortgage agreement, Citizens did not pay Conti interest or earnings on the escrow-account proceeds.

A decade later, Conti sued Citizens in the United States District Court for the District of Rhode Island for breach of contract and unjust enrichment.[2]  Conti asserted that Citizens failed to pay its customers interest on their escrow accounts in violation of the Rhode Island statute.  The statute requires banks operating in Rhode Island to pay interest on borrower funds deposited into mortgage-escrow accounts:

---

[1]    An escrow account is "[a]n account of accumulated funds held by a lender for payment of taxes, insurance, or other periodic debts against real property." Account, Black's Law Dictionary (12th ed. 2024).  These accounts provide banks with assurance that their loan collateral is protected against unexpected damage or tax foreclosure, while also allowing borrowers to periodically set aside funds for tax and insurance obligations and thereby avoid having to make one-time bulk payments.  See Cantero, 602 U.S. at 210-11.

[2]    Conti brought the action on behalf of himself and a class of Citizens customers across Rhode Island, Connecticut, Massachusetts, New York, New Hampshire, and Vermont.  Conti also sued in the alternative on behalf of a narrower class comprising only Rhode Island-based customers.

- 4 -

> Every mortgagee holding funds of a mortgagor
> in escrow for the payment of taxes and
> insurance premiums with respect to mortgaged
> property located in this state shall pay or
> credit interest on those funds at a rate equal
> to the rate paid to the mortgagee on its
> regular savings account, if offered, and
> otherwise at a rate not less than the
> prevailing market rate of interest for regular
> savings accounts offered by local financial
> institutions . . . .

R.I. Gen. Laws § 19-9-2(a).

In due course, Citizens moved to dismiss Conti's suit on federal preemption grounds. It argued that pursuant to the National Bank Act, it was not subject to any state law requiring a bank to pay interest on escrow accounts. The district court agreed and dismissed the case.

Conti timely appealed. While the appeal was pending, the Supreme Court granted a petition for writ of certiorari to review the Second Circuit Court of Appeals' decision in Cantero v. Bank of America, N.A., 49 F.4th 121 (2d Cir. 2022), cert. granted, 144 S. Ct. 324 (2023). The case involved a substantively identical issue to the one presented here -- whether the National Bank Act preempted a New York law requiring banks to pay interest on escrow accounts. See Cantero, 602 U.S. at 212.[3] We stayed Conti's appeal

---

[3]    Following Cantero, the Supreme Court also granted a petition for writ of certiorari in a Ninth Circuit Court of Appeals case involving a California interest-on-escrow law. See Kivett v. Flagstar Bank, FSB, No. 21-15667, 2022 WL 1553266 (9th Cir. May 17, 2022), cert. granted, vacated sub nom., Flagstar Bank, N.A. v.

to await the Supreme Court's action.  See Order, Conti v. Citizens Bank, N.A., No. 22-1770 (1st Cir. Nov. 27, 2023).  Following the Cantero decision, Conti's appeal resumed with full post-Cantero briefing.

Conti now makes two arguments.  He first contends that the district court failed to apply the proper test for preemption as outlined in Cantero.  Additionally, he argues that, applying Cantero, Citizens has failed to show that the Rhode Island statute significantly interferes with federal-banking power such that it should be preempted under the National Bank Act.  For its part, Citizens responds that, even assuming the district court did not effectively apply the legal test as outlined in Cantero, we should affirm the dismissal of Conti's complaint without a remand because Conti's claim is preempted under Cantero in any event, and we may affirm dismissal on any basis.  We begin by describing the legal framework.

## II.

In 1863, Congress passed the National Bank Act.  See Van Allen v. Assessors, 70 U.S. (3 Wall.) 573, 589 (1865) (Chase, C.J., concurring).  The Act creates a federal regulatory scheme to govern national banks.  See Cantero, 602 U.S. at 210.  The Act enumerates

---

Kivett, 144 S. Ct. 2628 (2024).  The Supreme Court vacated the judgment and remanded the case for further consideration post-Cantero.  See Flagstar Bank, 144 S. Ct. at 2628.

express powers for such banks including the power to "make contracts," "sue and be sued," and "elect or appoint" a "board of directors." 12 U.S.C. § 24. Subsequent amendments have granted national banks additional express powers, including the ability to "make, arrange, purchase or sell loans or extensions of credit secured by liens on interests in real estate," i.e., to provide mortgage loans. 12 U.S.C. § 371(a).

The National Bank Act also empowers banks to employ "all such incidental powers as shall be necessary to carry on the business of banking." 12 U.S.C. § 24, Seventh. Incidental powers are those that are "convenient or useful in connection with the performance of one of the bank's established activities pursuant to its express powers under the National Bank Act." Arnold Tours, Inc. v. Camp, 472 F.2d 427, 432 (1st Cir. 1972).

In establishing a comprehensive regulatory scheme for national banks, the National Bank Act has long been understood to preempt some, but not all, state regulation of such banks. See Barnett Bank of Marion Cnty., N.A. v. Nelson, 517 U.S. 25, 32-33 (1996) (describing the history of "national bank legislation" as "one of interpreting grants of both enumerated and incidental 'powers' to national banks as grants of authority not normally limited by, but rather ordinarily pre-empting, contrary state law" but adding that "[t]o say this is not to deprive [s]tates of the power to regulate national banks"); Cuomo v. Clearing House Ass'n

L.L.C., 557 U.S. 519, 534–35 (2009) (describing how, for over a century, states have enforced general laws and "banking-related laws against national banks").

In 2010, the Dodd–Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), Pub. L. No. 111–203, 124 Stat. 1376 (codified at 12 U.S.C. § 25b(b)), clarified the scope of preemption under the National Bank Act for state-consumer-financial laws. See Cantero, 602 U.S. at 213. Section 25b defines "state consumer financial laws" as those laws that "directly and specifically regulate[] the manner, content, or terms and conditions of any financial transaction (as may be authorized for national banks to engage in), or any account related thereto, with respect to a consumer." 12 U.S.C. § 25b(a)(2). Under section 25b(b)(1), state-consumer-financial laws are preempted "only if" they: (1) have a discriminatory effect on national banks as compared to state-chartered banks or (2) prevent or significantly interfere with the exercise of national-bank powers "in accordance with the legal standard for preemption in the decision of the Supreme Court of the United States in [Barnett Bank]." Id. § 25b(b)(1)(A), (B).[4] In codifying this standard, Congress stressed that federal-banking

---

[4]    Section 25b grants courts and the Office of the Comptroller of the Currency ("OCC") concurrent power to make preemption determinations. 12 U.S.C. § 25b(b)(1)(B). Preemption determinations by the OCC may be made by "regulation or order . . . on a case-by-case basis." Id.

law "does not occupy the field in any area of [s]tate law."  Id.
§ 25b(b)(4).

In Cantero, the Supreme Court elaborated on the
application of section 25b.  As mentioned already, the case
involved a New York interest-on-escrow law.  See Cantero, 602 U.S.
at 212.  The Second Circuit had initially held the law preempted
under the National Bank Act, concluding that "any state law that
'purport[ed] to exercise control over a federally granted banking
power,' regardless of 'the magnitude of its effects'"
significantly interfered with federal-banking power such that the
law is preempted.  Id. at 213 (quoting Cantero, 49 F.4th at 131).

The Supreme Court rejected that approach.  It first
established that whether a state law significantly interferes with
federal-banking power is not a "categorical test that would preempt
virtually all state laws that regulate national banks . . . other
than generally applicable state laws."  Cantero, 602 U.S. at
220-21.  Instead, it instructed that courts must make "a practical
assessment of the nature and degree of the interference caused by
a state law."  Id. at 219-20.  To do this, Cantero directs courts
to perform a "nuanced comparative analysis" of the preemption cases
relied on in Barnett Bank.  Id. at 220-21.  Cantero specifically
identifies two categories of precedents for courts to consider.

The first category comprises cases in which the Supreme
Court found preemption: Franklin National Bank of Franklin Square

v. New York, 347 U.S. 373 (1954); Fidelity Federal Savings & Loan
Ass'n v. De la Cuesta, 458 U.S. 141 (1982); First National Bank of
San Jose v. California, 262 U.S. 366 (1923); as well as Barnett
Bank itself.  See Cantero, 602 U.S. at 220.  The second category
consists of cases in which the Court found no preemption: Anderson
National Bank v. Luckett, 321 U.S. 233 (1944); National Bank v.
Commonwealth, 76 U.S. (9 Wall.) 353 (1869); and McClellan v.
Chipman, 164 U.S. 347 (1896).  See Cantero, 602 U.S. at 220.  "If
the state law's interference with national bank powers is more
akin to the interference in [the first category of] cases . . . ,
then the state law is preempted" but "[i]f the state law's
interference with national bank powers is more akin to the
interference in [the second category of] cases . . . then the state
law is not preempted."  Id.  The Court further observed that in
Barnett Bank and these earlier precedents, it "reached its
conclusions about the nature and degree of the state laws' alleged
interference with the national banks' exercise of their powers
based on the text and structure of the laws, comparison to other
precedents, and common sense."  Id. at 220 n.3.

### III.

### A.

Having described the pertinent background, we first
consider whether the district court performed the analysis
required by Cantero in deciding that the National Bank Act

preempted the Rhode Island statute.    We review de novo the district court's grant of a motion to dismiss, see Fed. R. Civ. P. 12(b)(6), taking the complaint's factual allegations as true and affording the plaintiff all reasonable inferences that can be drawn therefrom.  See Union of Concerned Scientists v. Wheeler, 954 F.3d 11, 16 (1st Cir. 2020).  We likewise review de novo the district court's preemption determination.    See Capron v. Off. of Att'y Gen. of Mass., 944 F.3d 9, 22 (1st Cir. 2019).  "[T]he burden of proving preemption lies with the part[y] asserting it . . . ." Me. Forest Prods. Council v. Cormier, 51 F.4th 1, 6 (1st Cir. 2022).

The district court held that the National Bank Act preempts a state law wherever the law places "limits" on federal-banking power.  On this basis, the court concluded that, because the Rhode Island statute limits "the power to establish escrow accounts," it "'significantly interfere[d]' with a national bank['s] incidental powers to utilize mortgage-escrow accounts." Accordingly, the court found the Rhode Island statute preempted pursuant to the National Bank Act and dismissed Conti's suit.[5]

The district court's preemption analysis diverged from the analysis mandated by Cantero in two respects.  First, in

---

[5]    The district court disposed of the matter before addressing class certification.  See Fed. R. Civ. P. 23.  As a result, "the sole plaintiff before it" was Conti, and the sole state statute at issue was R.I. Gen. Laws § 19-9-2(a).

finding the Rhode Island statute preempted, the district court determined only that the statute imposed "limits" on federal-banking power; it did not conduct "a practical assessment of the . . . degree of the interference." See Cantero, 602 U.S. at 219-20. Second, it did not compare the interference produced by the Rhode Island statute against the interference arising from the Supreme Court's seminal banking-preemption precedents identified in Barnett Bank. See id. at 220-21.

As support for its decision, the district court relied principally on our holding in SPGGC, LLC v. Ayotte, 488 F.3d 525 (1st Cir. 2007), which Citizens also relies on to argue for affirmance. In SPGGC, which predates Dodd-Frank and Cantero, this Court found National Bank Act preemption of a New Hampshire law prohibiting the issuance of certain types of gift cards because the law restricted a national bank's incidental power to issue such cards. 488 F.3d at 532-33. But SPGGC neither conducted a practical assessment of the degree of interference posed by the New Hampshire law nor included a "nuanced comparative analysis" of the relevant Barnett Bank precedents. Cantero, 602 U.S. at 219-20. The decision in SPGCC, like the district court's decision, turned on the fact that the New Hampshire law "regulate[d] the terms and conditions" of a banking product. 488 F.3d at 533. SPGGC's methodology deviates from the analysis mandated by Cantero, and we therefore are not bound by it. See Educadores Puertorriqueños en

Acción v. Hernández, 367 F.3d 61, 67 (1st Cir. 2004) (stating that "[t]o the extent that preexisting circuit precedent contradicts [a more recent Supreme Court] holding, we regard that precedent as abrogated by" the superseding holding).

**B.**

Having concluded that the district court's approach differed from that subsequently required by Cantero, we turn to the core legal question disputed by the parties: Has Citizens nevertheless established that the Rhode Island statute is preempted under Cantero?

Citizens contends that the Rhode Island statute is preempted by the National Bank Act because the statute significantly interferes with the exercise of its federal-banking power. Specifically, Citizens argues that the Rhode Island statute significantly interferes with its express power to engage in mortgage lending pursuant to 12 U.S.C. section 371(a), and its incidental power to offer mortgage-escrow accounts pursuant to 12 U.S.C. section 24, Seventh. Conti does not meaningfully dispute the existence and applicability of the relevant federal-banking powers identified by Citizens. With agreement on the relevant national-banking powers at issue, the remaining question is whether the Rhode Island statute significantly interferes with Citizens' exercise of these powers.

**1.**

As explained above, to determine whether a state law significantly interferes with federal power, we must conduct a "nuanced comparative analysis" of Barnett Bank and the six Supreme Court precedents on which Barnett Bank relied.  See Cantero, 602 U.S. at 215-16, 220.  We start by describing the three cases where the Supreme Court found the state law preempted -- Barnett Bank, Fidelity, and Franklin.  We then address two cases where the Court found the state law not preempted -- McClellan and Commonwealth.  Finally, we consider Anderson and First National Bank of San Jose, two decisions involving seemingly similar state banking laws where the Court reached opposite preemption conclusions.

**i.**

In Barnett Bank, the Supreme Court considered whether a Florida statute prohibiting certain banks from selling most kinds of insurance in small towns substantially interfered with federal-banking power under the National Bank Act.  517 U.S. at 27.  Examining the statutory text, the Court concluded that federal law expressly permitted national banks to sell insurance and thus "authorize[d] national banks to engage in activities that the State Statute expressly forb[ade]."  Id. at 31.  Considering the obvious conflict, the Court deemed the Florida law preempted.  Id. at 37.

In Fidelity, the Supreme Court addressed whether a California law barring due-on-sale clauses in mortgage contracts

except when "the lender's security [wa]s impaired," 458 U.S. at 148-49, 155-56, was preempted by a federal regulation that permitted federal savings-and-loan associations to include such clauses "at [their] option," id. at 154 (quoting 12 C.F.R. § 545.8-3(f) (1982)).[6]    Unlike in Barnett Bank, where the state law precluded bank activity that federal law allowed, the California law in Fidelity did not bar savings and loan associations from including due-on-sale clauses entirely.    It simply "limit[ed] [their] availability."    Id. at 156.    The Court nevertheless determined that the California law "deprived the [associations] of . . . 'flexibility'" that the federal regulation "plainly provide[d]."    Id. at 154-55.    In so doing, the Court concluded that the California law "created 'an obstacle to the accomplishment and execution of the full purposes and objectives' of the due-on-sale regulation."    Id. at 156 (quoting Hines v. Davidowitz, 312 U.S. 52, 67 (1941)).

Finally, in Franklin, which Cantero described as "[t]he paradigmatic example of significant interference," 602 U.S. at 216, the Supreme Court considered "whether federal statutes which authorize[d] national banks to receive savings deposits conflict[ed] with New York legislation which prohibit[ed] them

---

[6]    Due-on-sale clauses "permit[] the lender to declare the entire balance of a loan immediately due and payable if the property securing the loan is sold or otherwise transferred." Id. at 145.

from using the word 'saving' or 'savings' in their advertising or business." Franklin, 347 U.S. at 374. As in Fidelity, the New York law did not entirely "object to national banks taking savings deposits or even to their advertising," id. at 378; it only prohibited the "use of the word 'savings,' or its variants" in bank advertising, id. at 374.

The Supreme Court held that the New York law was "incompatible" with federal law. Franklin, 347 U.S. at 374. It concluded that New York's law significantly interfered with federal banks' ability to "accept and pay interest on time deposits of people's savings," and specifically the incidental power "to advertise that fact." Id. 378. Citing the National Bank Act and Federal Reserve Act, the Court found that "Congress ha[d] given a particular label to this type of account" i.e., savings account, and national banks must "have the right to advertise . . . the commonly understood description which Congress has specifically selected." Id. at 375-76, 378. In preventing national banks from using this "particular label," the Court concluded that New York's law posed a "clear conflict" with federal-banking powers. Id. at 378.

Franklin also examined the practical impairment that national banks would suffer from a state-law ban on using the term "savings" in their advertising or business. 347 U.S. at 377-78. The Court stressed that (1) the word savings "aptly describes . . .

the type of business carried on by these national banks," id. at 378, and (2) advertising is "one of the most usual and useful of weapons" in "[m]odern competition for business," id. at 377.  In view of these factors, the Court concluded that "[i]t would require some affirmative indication [from Congress] to justify an interpretation that would permit a national bank to engage in a business but g[i]ve no right to let the public know about it." Id. at 377-78.

**ii.**

In addition to these three cases, Cantero also identifies precedents where the Court found that a state law was not preempted.

In Commonwealth, the Supreme Court considered a Kentucky law that taxed shareholders of bank stock by collecting directly from banks.  76 U.S. at 360-61.  Having determined that "it [wa]s the share which [wa]s intended to be taxed, and not the cash or other actual capital of the bank," the Court addressed the more general argument as to whether banks may be subject to such state legislation.  Id.  The Court held that so long as "[s]tate law [did not] incapacitate[] the banks from discharging their duties," banks were presumed to be "subject to the laws of the State."  Id. at 362.  Applying this principle, the Court reasoned that the shareholder tax produced "no greater interference with the functions of the bank than any other legal proceeding to which its

business operations may subject it." Id. at 362–63.  On these grounds, the Court held the Kentucky law not preempted.  Id.

In McClellan, the Court considered a Massachusetts contract law that prohibited certain real estate transfers by insolvent transferors.  164 U.S. at 358.  The bank argued that the state law interfered with a core banking function to take real estate as collateral for prior debts.  Id.  As in Commonwealth, the Court clarified that national banks were presumed subject to state law where Congress had not expressly preempted state laws and where "state interference [did not] frustrate[] the lawful purpose of [C]ongress, or impair[] the efficiency of the banks to discharge the duties imposed upon them."  Id. at 359.  It noted that the Massachusetts law in question imposed "the same conditions and restrictions to which all the other citizens of the state are subjected." Id. at 358.  The Court thus concluded that banks could satisfy their federal obligations while still subjecting themselves to "the general and undiscriminating law of the state." Id. at 360–61.

### iii.

Finally, we address First National Bank of San Jose and Anderson.  Separated by roughly twenty years, each case involved a state escheat law that compelled banks to confer to the state any deposits from inactive bank accounts.  See First Nat'l Bank of San Jose, 262 U.S. at 366–67; Anderson, 321 U.S. at 236.  In both

cases, the Court addressed whether the respective state law infringed on a national bank's power to accept deposits. See First Nat'l Bank of San Jose, 262 U.S. at 367, 369; Anderson, 321 U.S. at 239-40. Despite the laws' facial similarities, the Court found only the law in First National Bank of San Jose to be preempted, see 262 U.S. at 370.

The California law at issue in First National Bank of San Jose required deposits unclaimed for over twenty years to escheat to the state. 262 U.S. at 366. The Court found the law "unusual" in that it did not require proof of abandonment by the depositor before "attempt[ing] to qualify . . . agreements between national banks and their customers." Id. at 370. The Court concluded the law would "directly impair" national banks' efficiency in collecting deposits. Id. at 369-70. It was specifically concerned that depositors "might well hesitate to subject their funds to possible confiscation," which could then impact a national bank's "ability to obtain loans from depositors." Id. at 370. Accordingly, the Court found the law preempted. Id.

Conversely, Anderson held that a similar Kentucky statute did not "unlawful[ly] encroach[] on the rights and privileges of national banks." 321 U.S. at 252. The Court determined that, unlike the law at issue in First National Bank of San Jose, the law challenged in Anderson required proof of depositor abandonment before Kentucky could seize a bank account.

- 19 -

Id.  Whereas the statute in First National Bank of San Jose allowed a "confiscation" -- "so unusual and so harsh" that it would serve as an "an effective deterrent to depositors" -- the law in Anderson was "nothing more than performance of a duty by the bank" that is "as old as the common law itself."  Id. at 250-52.  The Court further noted that no "word in the national banking laws . . . expressly or by implication conflict[ed] with the provisions of the Kentucky statutes."  Id. at 247-48.

For these reasons, the Supreme Court did not anticipate that the Kentucky law would deter borrowers any more than "tax laws, the attachment laws, or the laws for the administration of estates of decedents."  321 U.S. at 252.  It similarly concluded that the law would "not infringe or interfere with any authorized function of the bank."  Id. at 249.  As the Court explained, the power to collect deposits has always come with the responsibility to pay deposits; this law merely allowed the state "the right to demand payment of the accounts in the place of the depositors."  Id. at 248, 251-52.

**2.**

Having now described the relevant universe of cases identified by Cantero, we consider the significance of the Rhode Island statute's interference against these precedents.  See Cantero, 602 U.S. at 220-21 (requiring courts to perform a "nuanced

comparative analysis" of the preemption cases relied on in <u>Barnett Bank</u>).

<b>i.</b>

Four of the cases -- <u>McClellan</u>, <u>Commonwealth</u>, <u>Barnett Bank</u>, and <u>Fidelity</u> -- are inapposite.  We start with <u>McClellan</u> and <u>Commonwealth</u>.  In both cases, the Court held that national banks could be subject to generally applicable state laws despite some inevitable encroachment on federal-banking power.  See <u>McClellan</u>, 164 U.S. at 359 (explaining that "the purpose and object of [C]ongress in enacting the national bank law was to leave such banks, as to their contracts in general, under the operation of the state law, and thereby invest them as federal agencies with local strength"); <u>Commonwealth</u>, 76 U.S. at 362-63 ("[National banks] are subject to the laws of the State, and are governed in their daily course of business far more by the laws of the State than of the nation."); <u>see also</u> <u>Cuomo</u>, 557 U.S. at 534 (noting that states "have always enforced their general laws against national banks").  By contrast, the Rhode Island statute at issue is not a generally applicable law.  Rather, it is squarely banking-specific.  It "directly and specifically regulates" a bank transaction or account by dictating the amount of interest a bank must pay on escrow.  12 U.S.C. § 25b(a)(2).  <u>McClellan</u> and <u>Commonwealth</u> are thus of limited use in determining whether the Rhode Island statute is preempted.

Barnett Bank and Fidelity are also generally inapposite. In these cases, the Court's preemption inquiry turned on an express conflict between federal and state law. See Barnett Bank, 517 U.S. at 31 (stating that "the Federal Statute authorize[d] national banks to engage in activities that the State Statute expressly forb[ade]"); Fidelity, 458 U.S. at 156 (finding preemption because a federal regulation expressly granted banks unrestricted discretionary power which a California law then limited). Here, Citizens has defined the relevant federal law as the express banking power to make real estate loans, see 12 U.S.C. § 371(a), and the incidental power to establish mortgage-escrow accounts, see id. § 24, Seventh. Unlike Barnett Bank, nothing in the National Bank Act expressly prohibits state interest-on-escrow laws, and unlike Fidelity, nothing in the Act expressly reserves for national banks the option to decide whether to pay interest on escrow accounts. In fact, Citizens has not identified any provision in the National Bank Act that suggests Congress sought to preempt interest-on-escrow laws. Nor has Citizens identified any other source of federal authority that might be relevant.[7]

---

[7]    Cantero references two federal laws in addition to the National Bank Act that "address[] national banks' operation of mortgage-escrow accounts." 602 U.S. at 211 & n.1. Neither is applicable here.

The Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 et seq., enacted in 1974, "extensively regulates

Citizens claims, however, that Congress's silence reflects a "deliberate choice" to exempt national banks from having to comply with state interest-on-escrow laws. Specifically, Citizens contends that Congress made a conscious decision not to legislate on interest-on-escrow and thus left national banks with

---

national banks' operation of escrow accounts." Cantero, 602 U.S. at 211. Even so, the Act "does not mandate that national banks pay interest to borrowers" on such accounts. Id. Moreover, RESPA does not preclude the enforcement of state laws that grant additional protection to consumers beyond what RESPA provides. See 12 C.F.R. § 1024.5(c)(2)(i) (2025) ("The Bureau [of Consumer Financial Protection] may not determine that a [s]tate law or regulation is inconsistent with any provision of RESPA or this part, if the Bureau determines that such law or regulation gives greater protection to the consumer."). Citizens argues that the absence of a requirement in RESPA for national banks to pay interest on mortgage-escrow accounts was actually a deliberate decision by Congress to leave such discretion to national banks. As we discuss above, this argument is unpersuasive. Apart from this, Citizens points to no other evidence in RESPA's statutory text to support its contention that Congress sought to preempt state interest-on-escrow laws.

Cantero also references the Truth in Lending Act ("TILA"). Congress amended the TILA as part of Dodd Frank to require banks to comply with state and federal interest-on-escrow laws for four select categories of mortgages. See 15 U.S.C. § 1639d(a), (b), (g)(3). For those covered mortgages, banks "shall pay" borrowers interest on the amount held in escrow "in the manner as prescribed by th[e] applicable [s]tate or [f]ederal law." Id. § 1639d(g)(3). It is undisputed, however, that the mortgage at issue here is not covered by section 1639d, see id. § 1639d(b), and Citizens, the party carrying the burden to establish that the Rhode Island statute is preempted, states unambiguously that section 1639d is "utterly irrelevant to this case." Thus, applying the usual rules of party presentation, we do not further consider section 1639d's relevance to the preemption question presented here. See Manganella v. Evanston Ins. Co., 702 F.3d 68, 69 n.1 (1st Cir. 2012) ("We consider the issues as the parties have presented them.").

- 23 -

the option "to pay interest as they see fit, within the confines of the federal regulatory framework." We are unpersuaded.[8]

First, we cannot reconcile this congressional intent-by-silence argument with section 25b, which sets out the legal standard for banking preemption. See 12 U.S.C. § 25b(b)(1). Section 25b articulates a limited preemption regime. It proceeds from a default premise that state-consumer-financial laws may lawfully regulate the conduct of national banks unless such laws discriminate against national banks, or prevent or significantly

---

[8]   As part of this argument, Citizens contends that not only has Congress deliberately left national banks free to decide to pay interest on escrow accounts, but so too has the OCC. Citizens derives this argument from title 12, section 371(a), which grants the OCC regulatory oversight of national banks' mortgage lending. See 12 U.S.C. § 371(a). Citizens contends that, pursuant to this authority, the OCC promulgated standards for real estate loans, see 12 C.F.R. pt. 34 (2025), but made "a deliberate choice not to require national banks to pay interest on mortgage escrow accounts." Citizens in fact goes further. It asserts that, under 12 U.S.C. § 371(a), the OCC is the only entity that can regulate escrow accounts of national banks.

While section 371(a) does grant the OCC regulatory oversight, it does not grant the OCC exclusive oversight. Were the OCC to have exclusive regulatory authority, states would be entirely divested of concurrent regulatory power. Congress did not intend this. See Lusnak v. Bank of Am., N.A., 883 F.3d 1185, 1196 (9th Cir. 2018) ("[T]he OCC does not enjoy field preemption over the regulation of national banks."); Cantero, 602 U.S. at 213 ("[N]ot all state laws regulating national banks are preempted.").

We also reject Citizens' argument that we should infer preemption from the OCC's inaction. Dodd-Frank set out specific criteria that the OCC must follow to preempt a state law. See 12 U.S.C. § 25b(b)(1)(B), (b)(3), (b)(5)(A), (d). To circumvent such procedures by inferring preemption from the OCC's dormancy would upend Dodd-Frank's carefully reticulated scheme. See id.

interfere with a national bank exercising federal-banking powers.
Id.  To find preemption from Congress's silence would invert the
section 25b standard and create a presumption of preemption.  Under
such a standard, a state banking law that does not discriminate
against national banks, or prevent or significantly interfere with
a national bank's exercise of federal-banking power, would
nonetheless be preempted absent positive textual evidence of an
intention to permit the state law's enforcement.  Such a
construction would violate the plain text of section 25b.[9]

Citizens' intent-by-silence argument also does not
follow from the case law.  None of the cases identified by Cantero
held a state law preempted based on congressional silence.  Cf.
Fidelity, 458 U.S. at 154-56 (preempting local restrictions on the
discretionary exercise of federal power because the regulation
explicitly required as much).  To the contrary, the Supreme Court

---

[9]    There may be circumstances where Congress's explicit
decision to regulate a defined set of circumstances, but not
another of like-kind, might be a factor in determining whether a
state law significantly interferes with the federal-banking
scheme.  Cf. Marx v. Gen. Revenue Corp., 568 U.S. 371, 381 (2013)
(explaining that the "negative implication" that Congress's
explicit allowance of certain items in an associated group or list
excludes related, unmentioned circumstances "depends on the
context" and "does not apply 'unless it is fair to suppose that
Congress considered the unnamed possibility and meant to say no to
it'" (quoting Barnhart v. Peabody Coal Co., 537 U.S. 149, 168
(2003))).  But as noted above, Citizens makes no attempt to tie
its intent-by-silence argument to any specific statutory language
from which it can reasonably be inferred that Congress considered
the impact of interest-on-escrow laws on national banks and
specifically sought to preempt their application.

has found that "national banking [is] subject to local restrictions" when Congress has expressly indicated as much, as well as "in the absence of such express language." Franklin, 347 U.S. at 378 & n.7 (emphasis added); see also Anderson, 321 U.S. at 247-48 (permitting Kentucky's escheat law despite "find[ing] [no] word in the national banking laws which expressly or by implication conflict[ed] with [its] provisions").[10]

In sum, because Citizens has pointed to no express conflict, Barnett Bank and Fidelity are not useful in determining whether the Rhode Island statute is preempted.

---

[10]    During oral argument, Citizens asserted that the Rhode Island statute should be preempted not because Congress was silent on the specific issue of state interest-on-escrow laws, but because there is a "presumption of preemption" that attaches to all federal-banking powers. As Citizens puts it, federal-banking powers, including incidental powers, are presumed "unqualified," or intentionally free from state restrictions. For the reasons discussed, such a presumption conflicts with the case law and Dodd-Frank's text. We also note that such a presumption would have a profound effect on state-consumer-financial laws that implicate incidental powers. Under such a presumption, the only way for states to enforce their consumer-financial laws against national banks would be for Congress to have "qualified" the relevant federal power by expressly permitting the enforcement of certain state laws. But incidental federal-banking powers are not enumerated; rather they arise organically based on bank needs. To "qualify" such incidental powers would require Congress to do the impossible, i.e., to affirmatively permit state regulation of a federal power that has never been written down. In practice, Citizens' argument that national-banking laws are presumed "unqualified" would lead to the preemption of almost all state banking laws that involve federal incidental banking powers. This, again, would equate to a field preemption regime, which Congress expressly disavowed. See 12 U.S.C. § 25b(b)(4).

**ii.**

Having determined that McClellan, Commonwealth, Barnett Bank, and Fidelity have limited relevance to the problem presented here, we turn to the final three cases identified by Cantero: First National Bank of San Jose, Anderson, and Franklin.  Unlike the cases previously discussed, each of these decisions involved state laws that were banking-specific and that did not expressly conflict with federal law.

In First National Bank of San Jose, the Court found a California escheat law that seized bank account assets without requiring proof of abandonment to be preempted.  See 262 U.S. at 369-70.  The Court determined the California escheat law was "unusual" insofar as it did not require proof of a depositor's abandonment before allowing the state to seize the assets.  Id. at 370.  The Court went on to stress the law's anticipated effect, theorizing that the failure to require proof of a depositor's abandonment before a state could seize a bank account would lead depositors to "hesitate to subject their funds to possible confiscation," with negative downstream implications for national banks.  Id.

Anderson reached the opposite conclusion about a Kentucky state escheat law that differed from the California law in that it did require proof of abandonment.  See 321 U.S. at 252.  Like First National Bank of San Jose, the Court again looked at

the construct of the law as well as its likely practical effects. Id. at 248-49, 251-52. The Court determined that the law was entirely consistent with what was expected of national banks operating under the federal statutory scheme. Id. at 248-49. As the Court put it, the Kentucky law was "as old as the common law itself" and so constitutive of traditional banking duties as to be "an inseparable incident of a national bank's" power. Id. at 248, 251.

The Anderson Court similarly determined that the Kentucky law was not likely to deter borrowers any more than "tax laws, the attachment laws, or the laws for the administration of estates of decedents," 321 U.S. at 252, and would "not infringe or interfere with any authorized function of the bank," id. at 249. To the contrary, the Court explained, because the Kentucky law mandating the payment of deposits was "nothing more than performance of a duty by the bank imposed by the federal banking laws," id. at 252, a bank's inability "to comply with [Kentucky's law]" would be a basis "for closing the doors of the bank and winding up its affairs," id. at 249.

Finally, in Franklin, the Court found a New York law that prohibited the use of the term "savings" to be "incompatible" with federal law. 347 U.S. at 374. Citing both the Federal Reserve Act and National Banking Act, the Court stressed that the term "savings" was a "particular label" that Congress had

"specifically selected." Id. at 378, 375-376.  As in Barnett Bank
and Fidelity, this textual hook served as a basis for finding
federal-banking power to be in clear conflict with the New York
law.  See id. at 378 ("[National banks] do accept and pay interest
on time deposits of people's savings, and they must be deemed to
have the right to advertise that fact by using the commonly
understood description which Congress has specifically
selected.").  As we note above, no equivalent textual hook exists
here.

But Franklin did not rest on that textual hook alone.
It also inferred that the New York law was inconsistent with the
overall federal scheme established by Congress.  The Court first
recognized an incidental power to advertise savings accounts from
the express power of national banks to receive savings deposits.
347 U.S. at 376-78.  The Court stressed that, were it to sanction
New York's law, it would be "permit[ting] a national bank to engage
in a business but [giving it] no right to let the public know about
it." Id. at 377-78.  Such an anomalous "interpretation," the Court
continued, would "require some affirmative indication" from
Congress.  Id.  The Court also emphasized the material impact the
New York law would likely have on banking operations, noting that
advertising was "one of the most usual and useful of weapons" in
"[m]odern competition for business," id. at 377, and the word
"savings," independent of the "peculiar meaning the word may have

in New York, . . . is a word which aptly describes, in a national sense, the type of business carried on by these national banks," id. at 378. Taken together, the Court discerned "a clear conflict between the law of New York and the law of the Federal Government." Id.

In each of these cases, to determine whether the state banking law at issue significantly interfered with the exercise of federal power such that preemption was warranted, the Court considered whether the state law was generally consistent with the federal-banking scheme that Congress intended and the likely practical effect of the state law's enforcement on a national bank's exercise of federal-banking power as informed by generally understood economic principles, or what Cantero calls "common sense." 602 U.S. at 220 n.3; see also First Nat'l Bank of San Jose, 262 U.S. at 369 (explaining that a state law is preempted "whenever it . . . frustrates the purposes of the national legislation, or impairs the efficiency of the bank to discharge the duties for which it was created"); Anderson, 321 U.S. at 247-48 (noting state law may "conflict[] with" national banking laws "by implication" or may "impose an undue burden on the performance of the banks' functions").

Here, Citizens has failed to show that the Rhode Island statute conflicts with the overall scheme of federal-banking law. While Citizens notes that the Rhode Island statute is not so

commonplace and constitutive of traditional banking duties as to be "an inseparable incident of a national bank's" power, <u>Anderson</u>, 321 U.S. at 248, Citizens has not established that Rhode Island's statute is out of step with the federal statutory scheme in the mold of <u>First National Bank of San Jose</u> and <u>Franklin</u>.

To the contrary, as Citizens acknowledges, interest-on-escrow laws have been enacted by at least twelve states. Furthermore, Congress has mandated compliance with state interest-on-escrow laws as to a select set of mortgages under section 1639d of the TILA. <u>See</u> <u>supra</u> note 7. While Citizens does not argue that section 1639d bears directly on whether Congress sought to broadly permit or preempt state interest-on-escrow laws, <u>see</u> <u>id.</u>, Congress's decision to mandate compliance with state interest-on-escrow laws as to certain mortgages provides some evidence that such laws are not inconsistent with the federal-banking scheme, as was the case in <u>Franklin</u> and <u>First National Bank of San Jose.</u> <u>See</u> <u>Franklin</u>, 347 U.S. at 377-78 (explaining that finding no preemption "would require some affirmative indication [by Congress] to justify an interpretation that would permit a national bank to engage in a business but gave no right to let the public know about it"); <u>First Nat'l Bank of San Jose</u>, 262 U.S. at 369-70 (noting that the state statute conflicts "with the letter or general object and purposes of the legislation by Congress" by "attempt[ing] to qualify in an unusual

way agreements between national banks and their customers long understood to arise when the former receive deposits under their plainly granted powers"); cf. Commonwealth, 76 U.S. at 363 (describing the routine nature of a state law as evident by the fact that it was "one which Congress itself has adopted . . . [and] which experience has justified in the New England [s]tates as the most convenient and proper").

Apart from that, the Court's preemption determinations in First National Bank of San Jose, Anderson, and Franklin turned in large measure on the likely practical effects that a state law would have on the ability of national banks to exercise their powers. Here, by contrast, Citizens has not developed any substantial argument about the practical effects that arise from the enforcement of the Rhode Island statute on the exercise of federal-banking power. Instead, Citizens proposes a different preemption test, one that eschews any consideration of the degree of interference arising from the state law. Specifically, Citizens argues that preemption applies whenever a state law dictates the terms of a banking product in a manner that impairs a bank's "flexibility" or "efficiency." We reject Citizens' proposal for three reasons.

First, Citizens' proposed test does not allow for the kind of commonsense analysis that the Supreme Court performed in First National Bank of San Jose, Anderson, and Franklin. As

Citizens acknowledges, virtually every banking-specific state law imposes some burden on the regulated bank and thus can be said to affect a bank's flexibility or efficiency. But if this were sufficient grounds for preemption, Citizens' proposed test would obviate the need for an inquiry into whether a state law's interference with federal-banking powers was significant. See Cantero, 602 U.S. at 219-20 (requiring a "practical assessment of the nature and degree of the interference").

Second, Citizens' proposal is at odds with section 25b. See 12 U.S.C. § 25b. Whereas Citizens' test would preempt virtually all state-consumer-financial laws, section 25b's regulatory scheme presumes that at least some state laws regulating bank products will survive a preemption analysis. Congress specifically established a carefully designed scheme to permit the enforcement of state-consumer-financial laws unless those laws discriminate against national banks or prevent or significantly interfere with a national bank's exercise of its federal-banking powers. See id. § 25b(b)(1) ("State consumer financial laws are preempted, only if . . . ."). Moreover, section 25b(a)(2) defines state-consumer-financial laws as those that "directly and specifically regulate[] the manner, content, or terms and conditions" of a banking product and requires preemption of only a subset of those laws. Id. § 25b(a)(2). Had Congress wanted to preempt every state law that dictates a term of a banking product,

as Citizens now argues, it simply could have preempted all state-consumer-financial laws as defined under section 25b(a)(2). But Congress did no such thing.

Third, Citizens' test does not follow from the relevant precedents identified in <u>Cantero</u>. As support for its contention, Citizens looks to <u>Fidelity</u>, <u>First National Bank of San Jose</u>, and <u>Franklin</u>. It argues that, in these cases, the Supreme Court held a state law preempted where the law attempted to dictate the terms of a banking product or service in a manner that impeded a bank's flexibility or efficiency. Citizens misreads these precedents.

For starters, <u>Fidelity</u> did not preempt California law because it restrained a bank's flexibility per se. It preempted California law because federal law expressly granted banks unfettered discretion over the exercise of the power there at issue, which California purported to limit. <u>See</u> 458 U.S. at 154-56. As discussed above, here federal law does not expressly grant national banks discretion to decide whether to pay interest on mortgage-escrow accounts.

As for <u>First National Bank of San Jose</u> and <u>Franklin</u>, Citizens confuses correlation with causation. Yes, both cases involved state laws that imposed terms on a banking product, but the Supreme Court did not rest its respective preemption determinations on that fact. As we have explained, the Court emphasized instead the unusual nature of the state laws and the

significant interference that the laws would impose on national banks' exercise of federal-banking powers.[11]

If there is a point of reference for Citizens' argument that preemption applies to any state law that dictates a term or condition of a banking product, it may be found in the Second Circuit's decision in Cantero, which held preempted "any state law that 'purport[ed] to exercise control over a federally granted banking power.'"  602 U.S. at 213 (quoting Cantero, 49 F.4th at 131).  But the Supreme Court rejected that analysis, making clear that Dodd-Frank declined to adopt "a categorical test that would preempt virtually all state laws that regulate national banks." Id. at 220-21.  Accordingly, we likewise reject Citizens' argument that National Bank Act preemption applies whenever a state law dictates the terms of banking product in a manner that limits a national bank's flexibility and efficiency.

### iii.

Before concluding, we consider Citizens' final argument for preempting the Rhode Island statute.  Citizens contends that Rhode Island's law significantly interferes with federal-banking power because it forces Citizens to comply with a patchwork of varying and conflicting state regulations concerning the payment

---

[11]    Citizens also relies on SPGGC, 488 F.3d 525, for its "flexibility and efficiency" argument.  As already explained, the preemption analysis employed there is inconsistent with Cantero.

of interest on mortgage-escrow accounts.  Citizens derives this
argument from Watters v. Wachovia Bank, N.A., 550 U.S. 1 (2007),
and First National Bank of San Jose.

In Watters, the Supreme Court addressed whether mortgage
lending by national-bank subsidiaries can be subject to state
supervision.  See 550 U.S. at 7.  The opinion noted that the
National Bank Act "has in view the erection of a system . . .
independent, so far as powers conferred are concerned, of state
legislation which, if permitted to be applicable, might impose
limitations and restrictions as various and as numerous as the
States."  Id. at 14 (quoting Easton v. Iowa, 188 U.S. 220, 229
(1903)).  A similar statement appears in First National Bank of
San Jose.  See 262 U.S. at 370 ("If California may thus interfere
other states may do likewise, and, instead of 20 years, varying
limitations may be prescribed . . . . [Such results] seem
incompatible with the purpose to establish a system of governmental
agencies specifically empowered and expected freely to accept
deposits from customers irrespective of domicile. . . .").
Drawing on this authority, Citizens contends that state
interest-on-escrow laws impose "limitations and restrictions as
various and as numerous as the states," and thus significantly
interfere with Citizens' right to engage in real estate lending.
Like its prior proposal, this test fails for similar reasons.

First, to the extent that the patchwork theory can be said to have any relevance here, it must be considered in light of the later enacted section 25b.  See 12 U.S.C. § 25b.  That Dodd-Frank permits the application of at least some state-consumer-financial laws to national banks, see id. § 25b(b)(1) ("State consumer financial laws are preempted, only if . . . ."), indicates that Congress anticipated exposing national banks to some patchwork of state laws.  In addition, if avoiding a patchwork of state laws were an animating concern of the National Bank Act after Dodd-Frank, it would justify preempting not only state-consumer-financial laws but all state laws, as even generally applicable state laws impose varying and conflicting requirements on banks.  However, all parties agree that generally applicable state laws are in the main permissible.  See Cantero, 602 U.S. at 219 (noting that national banks "remain subject to state law governing 'their daily course of business' such as generally applicable state" laws (quoting Commonwealth, 76 U.S. at 362)).  Furthermore, to the extent that the patchwork theory would seemingly justify preempting all state laws, Congress has expressly declined to adopt such a regime.  See Cantero, 602 U.S. at 221; see also 12 U.S.C. § 25b(b)(4) (stating that the National Bank Act "does not occupy the field in any area of [s]tate law").

Thus, Citizens' patchwork argument, sounding in field preemption, is not convincing.  Watters and First National Bank of

San Jose do identify the profusion of varying state restrictions as an animating concern of the National Bank Act. See Watters, 550 U.S. at 14; First Nat'l Bank of San Jose, 262 U.S. at 369-70. That view, which has appeared only occasionally over the past century, arises from Easton, 188 U.S. at 229, where the Court notably embraced a field preemption regime, see, e.g., id. at 230 ("Such being the nature of these national institutions, it must be obvious that their operations cannot be limited or controlled by state legislation."); id. at 231-32 ("[W]e are unable to perceive that Congress intended to leave the field open for the states to attempt to promote the welfare and stability of national banks by direct legislation.").

Since Easton, the Supreme Court and Congress have squarely rejected the notion that the National Bank Act "occup[ies] the field in any area of [s]tate law." 12 U.S.C. § 25b(b)(4); see also Barnett Bank, 517 U.S. at 33 (explaining that states are not deprived "of the power to regulate national banks" so long as they "do[] not prevent or significantly interfere with the national bank's exercise of its powers"); Cuomo, 557 U.S. at 534 ("States, on the other hand, have always enforced their general laws against national banks -- and have enforced their banking-related laws against national banks for at least 85 years. . . ."); Cantero, 602 U.S. at 217 ("Of course, not all state laws regulating national banks are preempted.").

- 38 -

Over this same period, the Supreme Court rarely relied on the patchwork theory as a basis for National Bank Act preemption. Aside from Watters, Citizens' patchwork argument does not appear in recent Supreme Court authority. Cantero did not include Watters among the relevant precedents.[12] And while Cantero did cite First National Bank of San Jose, see 602 U.S. at 218, it made no mention of the patchwork argument, instead describing the holding as an attempt to "'qualify in an unusual way agreements between national banks and their customers,'" which could then "cause customers to 'hesitate' before depositing funds at the bank," id. (quoting First Nat'l Bank of San Jose, 262 U.S. at 370). The same is true of Anderson, which in differentiating First National Bank of San Jose, similarly did not mention the patchwork argument. See Anderson, 321 U.S. at 250-52. The case law's scattered consideration of the patchwork argument, as well as the patchwork argument's uneasy fit with Congress's and the Court's rejection of a field preemption regime, persuades us that the

---

[12] We note also that Watters did not involve substantive state consumer financial regulations but rather state licensing, reporting, and visitorial regimes. Watters, 550 U.S. at 8, 14-15. This does not mean that Watters -- which was decided after Barnett Bank -- has no possible relevance. We do not think, however, that Watters can govern the preemption analysis for a state consumer financial regulation after the enactment of section 25b.

argument is an insufficient basis for concluding that the Rhode Island statute is preempted.[13]

**3.**

Applying the standard adopted by the Supreme Court in Cantero, we conclude that Citizens has failed to satisfy its burden of showing the Rhode Island statute should be preempted as a matter of law. Unlike the state laws at issue in McClellan and Commonwealth, the Rhode Island statute is a banking-specific law. And unlike in Barnett Bank and Fidelity, there is no express conflict between the Rhode Island statute and the National Bank Act. Citizens has likewise failed to demonstrate, unlike in First National Bank of San Jose and Franklin, that the Rhode Island statute conflicts with the overall federal-banking scheme. Nor has Citizens established, as did the Court in First National Bank of San Jose, Anderson, and Franklin, that the Rhode Island statute's practical implications will significantly interfere with

---

[13]    At various points in its brief, Citizens refers to a preemption rule promulgated by the OCC in 2004, and subsequently amended in 2011, that sought to preempt fourteen categories of state laws including those concerning "escrow accounts." See Bank Activities and Operations; Real Estate Lending and Appraisals, 69 Fed. Reg. 1904, 1917 (Jan. 13, 2004); Office of Thrift Supervision Integration; Dodd-Frank Act Implementation, 76 Fed. Reg. 43459, 43557 (July 21, 2011) (codified at 12 C.F.R. § 34.4(a)). Citizens does not meaningfully rely on the rule as grounds for its claim that the Rhode Island statute is preempted. We therefore do not address its significance. See Cantero, 602 U.S. at 221 n.4 (instructing that Courts of Appeals "may address as appropriate on remand . . . the significance here (if any) of the preemption rules of the [OCC]").

Citizens' exercise of its federal-banking powers. Instead, Citizens has proposed other sweeping theories of preemption that would essentially, albeit in different ways, impose field preemption regimes. Citizens' proposals cannot be reconciled with section 25b or Supreme Court precedent. Citizens has therefore failed to satisfy its burden of showing that as a matter of law, the Rhode Island statute is preempted by the National Bank Act. See Me. Forest, 51 F.4th at 6 (stating that "the burden of proving preemption lies with the parties asserting it"). Accordingly, Conti's complaint should be allowed to proceed.[14]

**IV.**

For the reasons described, we **vacate** the judgment and **remand** for further proceedings consistent with this opinion.

**So ordered**.

---

[14] Conti brought two claims against Citizens: a breach of contract claim and, in the alternative, an unjust enrichment claim. Apart from the preemption question, Citizens requests that we dismiss the unjust enrichment claim. The district court did not reach this question. As we are remanding for further proceedings, we leave this question for the district court in the first instance.